*In the Matter of the 2022 Legislative Districting of the State*
Misc. Nos. 21, 24, 25, 26, and 27, September Term 2021


**Constitutional Law – Redistricting of General Assembly – Role of the Court.** The Maryland Constitution assigns the task of districting the General Assembly to the political branches of State government – the Governor and the General Assembly. Once a districting plan is adopted pursuant to the constitutional process and an objection is made that the plan fails to comply with the State and federal constitutional criteria, the Court's role is to determine whether the adopted plan complies, not whether a better plan could be designed.

**Constitutional Law – Redistricting of General Assembly – Burden of Proof.** A districting plan enjoys a presumption of validity. One who challenges a plan has the burden of presenting compelling evidence of a violation of the constitutional criteria. If a challenger presents evidence satisfying that standard, the State must produce sufficient evidence of compliance with the constitutional criteria.

**Constitutional Law – Redistricting of General Assembly – Compactness.** The preeminent criterion for districting of State legislative districts in Article III, §4 of the Maryland Constitution is that each district have "substantially equal population." The other criteria for districting in the State Constitution – compactness, contiguity, and due regard for natural and political subdivision boundaries – yield to that command and to the proscription against racial or ethnic discrimination in the federal Voting Rights Act and, in practice, can be in tension with one another. Thus, the fact that a district is oddly-shaped, as the State and many of its subdivisions are, does not by itself establish a violation of the compactness requirement. A comparison of the shape of a district in Maryland to districts in other states is not particularly enlightening, especially when no comparison is made to the districts in past Maryland plans found to be compliant.

**Constitutional Law – Redistricting of General Assembly – Contiguity and Due Regard for Natural Boundaries and Boundaries of Political Subdivisions.** The fact that a river bisected one of the subdistricts of a district in southern Maryland did not establish that the district violated the contiguity and due regard provisions of Article III, §4 of the Maryland Constitution.

**Constitutional Law – Redistricting of General Assembly – Legislative Privilege.** The absolute legislative privilege derived from the Maryland Constitution that protects legislators and their staff from being compelled to explain their legislative conduct or events that occurred in a legislative session may be invoked in litigation challenging legislation that accomplishes State legislative redistricting. That privilege could be invoked in response to discovery requests concerning communications with staff about challenged districts and criteria entered into a computer program.

**Constitutional Law – Redistricting of General Assembly – Mix of Single-Member and Multi-Member Subdistricts.** Article III, §3 of the Maryland Constitution authorizes the use of a mix of multi-member and single-member districts in a State legislative districting plan. Unless such districts are used in a particular instance to invidiously cancel or minimize the voting potential of racial or ethnic minorities, a districting plan may include them.

**Constitutional Law – Redistricting of General Assembly – Allocation of Incarcerated Individuals to Domicile Prior to Incarceration.** A State statute that provides for the re-allocation of incarcerated individuals to their domiciles for population counts used in districting is constitutional, even if the reduction in the population count for a jurisdiction where one or more prisons is located means that a districting plan must cross a county line in order to comply with the "substantially equal population" criterion for legislative districts.

Argued: April 13, 2022

# IN THE COURT OF APPEALS
# OF MARYLAND

Misc. Nos. 21, 24, 25, 26, and 27

September Term, 2021

---

IN THE MATTER OF
THE 2022 LEGISLATIVE DISTRICTING
OF THE STATE

---

\*Getty, C.J.,
Watts
Hotten
Booth
Biran
Gould
McDonald, Robert N.
 (Senior Judge,
  Specially Assigned),

JJ.

---

Opinion by McDonald, J.
Getty, C.J., Biran, and Gould, JJ., dissent.

---

Filed: August 31, 2022

\*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, §3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Maryland Constitution requires that the boundaries of the State's legislative districts be adjusted after each decennial national census. Those adjustments are necessary to ensure that each district remains reasonably equal in population following any population shifts that have occurred in the State since the previous census. Any changes to the legislative districts to account for population shifts must be made with an eye on other State and federal Constitutional requirements concerning districting.

The Maryland Constitution assigns the decisions on how to re-draw district lines to the political branches of State government – the Governor and the General Assembly. Inevitably, there are disputes about the best way to re-draw the district maps and – more importantly for our purposes – about whether the new districts comply with the constitutional criteria. And so, every 10 years, one or more challenges are asserted to the latest legislative districting plan. It falls to this Court, as directed by the State Constitution, to consider those challenges, to decide whether burdens have been satisfied and challenges have merit and, if the challenges are found to have merit, to determine the appropriate relief.

*The Bottom Line*

This case concerns the most recent districting plan adopted by the General Assembly. On the tightest timeline in the modern history of redistricting, the General Assembly adopted a new plan for State legislative districts earlier this year. The validity of that plan was promptly challenged by four separate petitions. Consistent with past practice, the Court enlisted the assistance of a special magistrate to conduct a hearing and provide findings of fact and conclusions of law concerning the issues raised by the

challengers. At the conclusion of that process, the special magistrate recommended that the challenges be rejected.

The challengers filed exceptions to the special magistrate's recommendation. On April 13, 2022, the Court heard oral arguments on those exceptions and, later that day, denied the petitions by order with an opinion to follow. This is that opinion.

*The Roadmap*

This Court's opinions analyzing prior challenges to Maryland redistricting plans occupy 358 pages of the Maryland Reports. We are about to add to that number. To aid the reader in navigating this opinion, we offer this roadmap (For those readers who rely on GPS devices for navigation and do not know what a roadmap is, these are the turn-by-turn directions).

Part I of this opinion (pp. 3-23) describes the constitutional provisions governing redistricting and in particular the criteria for redistricting plans as construed in this Court's prior decisions. Part II of this opinion (pp. 23-42) provides an overview of the redistricting process in the current cycle, beginning with the release of 2020 census data, the actions taken by the Governor and General Assembly in the adoption of a redistricting plan, the petitions challenging that plan, and the proceedings in this Court to resolve those challenges. Part III of this opinion (pp. 42-46) outlines the role of the Court in assessing challenges to a redistricting plan and the burdens of proof that apply. Part IV of this opinion (pp. 47-100) discusses in detail the proceedings and evidence relating to the petition filed in Miscellaneous No. 25, the primary challenge to the redistricting plan. Part V (pp. 100-106) and Part VI (pp. 106-111) of this opinion do the same for the petitions filed in

Miscellaneous No. 26 and Miscellaneous No. 27, respectively. Part VII of this opinion (pp. 111-112) briefly summarizes the disposition of the petitions challenging the redistricting plan. Appendices attached to this opinion include the Court's April 13, 2022 order and maps displaying State legislative districts under the redistricting plan and under the previous redistricting plan approved 10 years ago.

Dissenting opinions have been filed by former Chief Judge Getty and Judge Gould (both joined by Judge Biran). For ease of reference, we will refer to Chief Judge Getty's opinion, the primary dissent, as "Dissent" and Judge Gould's opinion, which focuses on specific issues, as "Dissent (Gould, J.)."

# I

## Districting the General Assembly

### A. *Historical and Constitutional Context*

A brief history of State legislative redistricting in Maryland establishes the historical and constitutional context for this case.

#### 1. Historical Context

As of the early 1960s, the Maryland Constitution assigned specific numbers of legislators to each county and Baltimore City, but did not set forth any general criteria for the design of legislative districts.[1] In 1964, the Supreme Court held that the existing

---

[1] At that time, the State Constitution provided for one senator from each county and divided Baltimore City into six legislative districts, each with one senator. Maryland Constitution, Article III, §2 (1963 Repl. Vol.). The Constitution also listed specific numbers of delegates for each county and for the six legislative districts of Baltimore City. *Id.*, Article III, §5. As the only legislative districts not coincident with county boundaries were the six districts in Baltimore City, the Constitution provided guidance only on the

3

apportionment of the Maryland Senate violated the one-person, one-vote principle derived from the Equal Protection Clause of the Fourteenth Amendment. *Maryland Committee for Fair Representation v. Tawes*, 377 U.S. 656 (1964).

During 1967 and 1968, a State constitutional convention was held to devise a new Maryland Constitution. Among other things, the new constitution proposed by that convention would have remedied the constitutional defect in the apportionment of the General Assembly. The proposed constitution was ultimately rejected by the voters, but several elements of it were adopted in 1970 and 1972 as amendments to the existing 1867 Maryland Constitution. *See* Dan Friedman, The Maryland State Constitution: A Reference Guide (2006) at 9-10. Among those amendments were provisions, specific to State legislative redistricting, responsive to the Supreme Court decision in *Tawes*. *See* Chapter 785, Laws of Maryland 1969, *ratified* November 3, 1970; Chapter 363, Laws of Maryland 1972, *ratified* November 7, 1972. Those provisions currently appear in Article III, §2 through §5 of the Maryland Constitution.

---

design of those districts – in particular, that those six districts were to be "near as may be of equal population and of contiguous territory." *Id*., Article III, §2. The Constitution also authorized redistricting of the City districts "from time to time" to ensure compliance with those criteria. *Id*., Article III, §4.

2.　　　State Constitutional Standards and Process

*The Legislative Department*

Article III of the Maryland Constitution pertains to the Legislative Branch – or, as the article is entitled, the "Legislative Department" – of State government.[2] The first seven sections of that Article concern the make-up of the General Assembly. Section 1 specifies that the General Assembly is a bicameral legislature, consisting of a Senate and a House of Delegates. Section 2 provides that the Senate shall have 47 members and the House of Delegates shall have 141 members. Under §3, there are to be 47 legislative districts, each containing one senator and three delegates, with the proviso that, instead of representing the district at large, the three delegates may be apportioned among three single-member subdistricts or two districts (one with one delegate; the other with two delegates).[3]

*Districting Criteria*

Most pertinent to this case, §4 sets forth the criteria for determining the districts that the State senators and delegates represent:

> Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions.

Maryland Constitution, Article III, §4.

---

[2] Our discussion of "legislative redistricting" in this case pertains only to the districting of the General Assembly under Article III. This case does not involve the separate process of drawing districts for seats in the United States Congress.

[3] "Nothing herein shall prohibit the subdivision of any one or more of the legislative districts for the purpose of electing members of the House of Delegates into three (3) single-member delegate districts or one (1) single-member delegate district and one (1) multi-member delegate district." Maryland Constitution, Article III, §3.

5

*The Process*

Finally, §5 sets forth a process for creating legislative districts after each decennial census and provides for judicial review if there are challenges to the plan that result from that process.

Section 5 provides that the Governor is to take the first step by holding public hearings and preparing a plan that sets forth the boundaries of the legislative districts in conformity with the other provisions of Article III described above. The Governor is to submit that plan to the General Assembly by the beginning of the legislative session in the second year following the census and may call a special session to present the plan.

The General Assembly may, by joint resolution, adopt its own plan setting the boundaries of State legislative districts, again in conformity with the other provisions of Article III.[4] If a plan is adopted by joint resolution of the General Assembly by the 45th day of the regular session – whether the Governor's plan or the General Assembly's own plan – that plan becomes law. If the General Assembly does not adopt a plan by that deadline, the Governor's plan becomes law by default.

*Challenges to a Plan*

Section 5 further provides that any registered voter may file a petition with the Court of Appeals challenging the constitutionality of whichever plan has become law. That section also confers original jurisdiction on the Court of Appeals to consider any such

---

[4] Because the Constitution provides for the General Assembly's plan to become law through the Legislature's adoption of a joint resolution rather than passage of a bill, it is not subject to veto by the Governor. *See generally Prince George's County v. Thurston*, ___ Md. ___, ___ (filed July 13, 2022), 2022 WL 2709752 at \*14-16.

6

petition, and to "grant appropriate relief" if the Court finds the plan to be constitutionally deficient. Section 5 does not further specify the procedures to be followed by the Court in conducting such judicial review.

### 3.    Judicial Review of Past Plans by the Court of Appeals

The plan challenged and under review in this case is the sixth plan to be adopted pursuant to the State constitutional amendments of the early 1970s. In each previous cycle, petitions were filed challenging the relevant plan. In each instance, this Court reviewed the plan and issued an opinion explaining the standard of review that the Court applied to those challenges and the Court's conclusions:

*1973 Districting*. Following the 1970 census, the Court held that the Governor's plan was invalid for procedural reasons and, after remedying the procedural defect, promulgated a Court plan largely based on the Governor's plan. *See In re Legislative Districting*, 271 Md. 320 (1974) ("*1973 Districting*"); *see also State Administrative Board of Election Laws v. Calvert*, 272 Md. 659, 664 (1974) ("*Calvert*") (rejecting a challenge to plan promulgated by the Court largely based on Governor's plan).[5]

*1982 Districting*. Following the 1980 census, the Court upheld the Governor's plan. *In re Legislative Districting*, 299 Md. 658 (1984) ("*1982 Districting*").

---

[5] In the first redistricting process under the constitutional amendments of the early 1970s, the General Assembly did not adopt its own plan and accordingly the Governor's plan became the operative plan. However, the Governor had failed to hold public hearings as required by Article III, §5. After remedying the procedural defect by providing for a hearing on the plan, the Court promulgated a plan essentially identical to the original plan "[r]ather than go off on a project of our own." *Calvert*, 272 Md. at 664.

7

*1992 Districting.*  Following the 1990 census, the Court upheld the Governor's plan. *Legislative Redistricting Cases*, 331 Md. 574 (1993) ("*1992 Districting*").

*2002 Districting.*  Following the 2000 census, the Court held that the Governor's entire plan violated the State constitutional requirement of due regard for the boundaries of political subdivisions and adopted its own plan based on a plan proposed by one of the challengers.  *In re Legislative Districting of the State*, 369 Md. 601 (2002) ("*2002 Court Redistricting Plan*").  The Court elaborated its holding in a subsequent opinion.  *In re Legislative Districting of State*, 370 Md. 312, 374 (2002) ("*2002 Districting*").

*2012 Districting.*  Following the 2010 census, the Court upheld the Governor's plan. *In re 2012 Legislative Districting*, 436 Md. 121 (2013) ("*2012 Districting*").

In each of those cases, the challenges alleged violations of federal and State standards for designing State legislative districts.  In each case, the challenges were based entirely on the specifications of district boundaries in the respective plans and on statements made during public hearings on those plans – *i.e.*, their legislative histories. *See, e.g., 2012 Districting*, 436 Md. at 175 & n.33 (referring to the lack of evidence of "discriminat[ion] on the basis of population density, region, partisanship and race").

**B.      *Standards for Drawing Districts***

1.      Requirements Under Federal Law

Under both the Supremacy Clause of the federal Constitution and Article 2 of Maryland's Declaration of Rights, federal law takes precedence over an inconsistent Maryland law.  *Maryland Committee for Fair Representation v. Tawes*, 228 Md. 412, 416-

18 (1962), *rev'd on other grounds*, 377 U.S. 656 (1964). That means that a redistricting map must conform to federal constitutional and statutory provisions as well as State law.

*Substantially Equal Population*

The Fourteenth Amendment to the United States Constitution embodies the one-person, one-vote principle. As applied to districting, that means that each of the districts must contain a nearly equal number of residents, and that any single-member or two-member delegate subdistrict must contain a number of residents nearly equal to the number of residents in other subdistricts of the same type. *See 2012 Districting*, 436 Md. at 130-31. That standard is deemed to have been met if the population variation between any two districts, or type of subdistrict, does not exceed 10 percent. *See Brown v. Thomson*, 462 U.S. 835, 842 (1983); *1992 Districting*; 331 Md. at 592-94.

*Prohibition against Racial or Ethnic Discrimination*

"[I]ntentional and invidious ethnic discrimination in legislative apportionment is repugnant to the United States Constitution under both the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment." *2012 Districting*, 436 Md. at 131, citing *Shaw v. Reno*, 509 U.S. 630 (1993). In addition, the federal Voting Rights Act prohibits "[l]egislative apportionment plans that effectively disenfranchise or abridge the right to vote of any citizen on account of 'race or color.'" *2012 Districting*, 436 Md at 132, referring to 52 U.S.C. §10301. A district violates Section 2 of that Act when it "dilute[s] the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to

9

minimize their influence in the districts next door." *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994); *see also Baltimore County Branch of NAACP v. Baltimore County*, No. 21-CV-03232-LKG, 2022 WL 657562, at \*4 (D. Md. Feb. 22, 2022), *modified,* No. 21-CV-03232-LKG, 2022 WL 888419 (D. Md. Mar. 25, 2022) (addressing a Voting Rights Act claim concerning Baltimore County's redistricting map).  A relevant consideration in assessing the opportunity of members of a racial or ethnic group to participate in the political process and to elect representatives of their choice is "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area."  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 (2006).

*Effect of "Political Gerrymandering"*

The one-person, one-vote principle "does not mean that each party must be influential in proportion to its number of supporters."  *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019).  With regard to claims of partisan gerrymandering, the Supreme Court has "'clearly foreclose[d] any claim that the Constitution requires proportional representation [by a political party] or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will  be.'"  *Id*. at 2499, quoting *Davis v. Bandemer*, 478 U.S. 109, 130 (1986).  Thus, "[i]t hardly follows from the principle that each person must have an equal say in the election of representatives that a person is entitled to have his political party achieve representation in some way commensurate to its share of statewide support."  *Id.* at 2501.  The *Rucho* Court observed that, "while it is illegal for a

10

jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting, 'a jurisdiction may engage in constitutional political gerrymandering.'" *Id.* at 249, quoting *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999).

2. Maryland Constitutional Criteria

As noted above, Article III, §4 of the State Constitution specifies the criteria to be considered for State legislative districts: (1) substantially equal population; (2) adjoining territory, sometimes referred to as contiguity; (3) compactness; and (4) "due regard" for natural boundaries and for boundaries of political subdivisions.

The Court has recognized the "necessary flexibility in how the constitutional criteria are applied – the districts need not be exactly equal in population or perfectly compact and they are not absolutely prohibited from crossing natural or political subdivision boundaries, since they must do so if necessary for population parity." *2002 Districting*, 370 Md. at 322 (2002); *see also, e.g., 1982 Districting*, 299 Md. at 680 ("[T]he compactness requirement must be applied in light of, and in harmony with, the other legitimate constraints which interact with and operate upon the constitutional mandate that districts be compact in form.").

*Substantially Equal Population*

The Maryland Constitution "does not impose a stricter standard for population equality than the 10% rule imposed by the Fourteenth Amendment." *1992 Districting*, 331 Md. at 600-01. We therefore apply that 10 percent rule. It is the "predominant constitutional requirement" in Article III, §4 and the "preeminent constraint on the

11

compactness provision" and the other criteria in Article III, §4.  *1982 Districting*, 299 Md. at 680 n.14, 688.

Population counts come in whole numbers and are therefore readily susceptible to quantitative comparisons.  If one divides the total State population by the number of districts, one can calculate the population of an "ideal" district and, with some simple division, the "ideal" subdistrict of a particular type.  The figure for an ideal district can be compared to the population count of a proposed district to determine whether the proposed district would violate the 10 percent rule.  Past plans reviewed by this Court have complied with that "preeminent constraint," challenges have focused on other criteria, and there is relatively little analysis of the "substantially equal population" requirement in the Maryland redistricting case law.

The practical impact of the "substantially equal population" requirement is that unequal changes in population across the State will affect the geographic boundaries of multiple districts.  For example, a district that has experienced slower growth or a loss of population compared to the rest of the State will have to pull population from adjoining districts – that is, expand geographically into areas previously part of the adjoining districts – to maintain parity with the "ideal" district.  Conversely, a district that has experienced a disproportionate growth in population will need to shed population to adjoining districts – that is, shrink geographically and cede area to other districts – to maintain parity with the "ideal" district.  In both cases, there can be a domino effect as the boundaries of the adjoining districts are adjusted to add or shed population to stay within the 10 percent rule. As adjustments to boundaries are made to comply with this "predominant constitutional

12

requirement," attention must also be paid to the geographic criteria of Article III, §4 – contiguity, compactness, and due regard to natural and political subdivision boundaries.

*Contiguity*

This Court has interpreted the contiguity criterion to require that "there be no division between one part of a district's territory and the rest of the district; in other words, contiguous territory is territory touching, adjoining and connected, as distinguished from territory separated by other territory." *1982 Districting*, 299 Md. at 675-76.  The Court has acknowledged that it was the intent of the original drafters of the "adjoining territory" provision that a State legislative district may not cross the Chesapeake Bay but may cross other bodies of water, such as rivers and estuaries. *2002 Districting*, 370 Md. at 344 (noting that the Committee of the Whole of the 1968 Constitutional Convention had stated its intention: "that under the interpretation of the words adjoining and compact ... a redistricting commission or the General Assembly could not form a district, either a Senate district or a Delegate district by crossing the Chesapeake Bay").  The separation of land areas in a district by rivers does not render those areas non-contiguous. *See Calvert*, 272 Md. at 666.[6]  Since the 1970s, challenges to redistricting plans have generally not focused

---

[6] In that case, the Court noted that:

> Although Talbot and Caroline Counties adjoin and are in the same legislative district, there are but three points of connection, fixed bridges at Hillsboro and New Bridge across the Tuckahoe, and a drawbridge across the Choptank at Dover Bridge; and although Talbot and Dorchester Counties adjoin, their only connection is the mile-long drawbridge across the Choptank at Cambridge opened in the late 1930s.  Prior to that there was no connection.  Dorchester and Wicomico Counties border each other from the Chesapeake Bay to the Delaware line, being divided by Holland Strait, Tangier Sound,

on the requirement of contiguity, and that criterion has not received much discussion in the resulting opinions.

*Compactness*

The Court discussed the compactness criterion at some length in dealing with challenges to several districts as non-compact in the 1980s. *1982 Districting*, 299 Md. at 676-81, 686-92. This criterion has not been a major factor in the challenges made during the three subsequent cycles. It is the primary criterion at issue this year.

In applying the compactness requirement in Maryland, the Court has viewed it "as a requirement for a close union of territory (conducive to constituent-representative communication), rather than as a requirement which is dependent upon a district being of any particular shape or size." *1982 Districting*, 299 Md. at 688. In light of the fact that the State's geography – its "bizarre geographic configuration" – "inhibits the geometric fashioning of districts of symmetrical compactness," the Court concluded that "it was hardly the purpose of the compactness requirement to promote aesthetically pleasing district configuration forms." *Id*. at 687. Thus, an oddly shaped district does not in itself establish a violation of Article III, §4. *Id*. Instead, "an affirmative showing is ordinarily required to demonstrate that such districts were intentionally so drawn to produce an unfair political result, that is, to dilute or enhance the voting strength of discrete groups for

---

and the Nanticoke River, with the only road connections being drawbridges at Vienna and Sharptown across the Nanticoke.

*Calvert*, 272 Md. at 666. Without further analysis, the Court upheld the inclusion of that district in the plan.

partisan political advantage or other impermissible purposes." *Id.* In other words, there must be a showing of "flagrant partisan abuse of the redistricting process" before the Court will invalidate a plan for failing to satisfy compactness.[7] *See 1992 Districting*, 331 Md. at 611.

Although this Court has noted that, in theory, an ideal district might be in the shape of a circle, with its entire boundary equidistant from its center, the Court has found "it obvious that a mathematical formulation for determining whether a particular district is unconstitutionally noncompact was not within the contemplation of the constitutional framers when proposing adoption of §4 of Article III of the Maryland Constitution." *1982 Districting*, 299 Md. at 687. Thus, as this Court has previously explained, the "compactness" methods that theoreticians have devised as measures of compactness that may be applicable to certain other states do not yield much information when applied to districts in Maryland. *Id.*

*Due Regard for Natural and Political Subdivision Boundaries*

The two "due regard" criteria are often considered together, perhaps because political and natural boundaries often coincide.[8] In Article III, §4, "political subdivisions"

---

[7] In surveying decisions of courts in other states with a compactness requirement for legislative districting, this Court noted that many of those courts held that a compactness requirement is "intended to prevent political gerrymandering." *1982 Districting*, 299 Md. at 675. The Court further noted that those cases recognize that the compactness requirement is "subservient" to the "dominant federal constitutional requirement of substantial equality of population." *Id.* at 680.

[8] For example, Howard County is separated from Montgomery County by the Patuxent River and from Baltimore County by the Patapsco River; the Susquehanna River separates Cecil County from Harford County.

refs to counties and municipalities, which have clearly defined boundaries. *See 1982 Districting*, 299 Md. at 681 n.15.

The Court has referred to four purposes served by the "due regard" criteria:

- to preserve those fixed and known features which enable voters to maintain an orientation to their own territorial areas

- to recognize the importance of counties in Maryland's governmental structure

- to enable the residents of a political subdivision that does not have home rule, but rather depends on the General Assembly for many of its laws, to effectively work with a legislator with knowledge of the subdivision

- to avoid the danger that representatives "may face conflicting allegiances as to legislative initiatives which benefit one of their constituencies at the expense of the other"

*See 2002 Districting,* 370 Md. at 357-63; *1992 Districting*, 331 Md. at 611-15. At the same time, the Court has questioned the proposition that a delegate whose district spans three counties would be concerned only with the interests of the one county in which that delegate resided. That proposition, the Court remarked, "pay[s] little heed to the realities of political life. Since [the delegate] is elected by all of the voters in the district, it seems safe to say that one who sees fit to ignore a substantial portion of his constituency undoubtedly will be rebuked when he is next obliged to face the electorate." *Calvert*, 272 Md. at 673.

The Court has characterized the two "due regard" criteria as the "most fluid" of the districting factors in that they may defer to other constitutional criteria. *1982 Districting* 299 Md. at 681; *1992 Districting*, 331 Md. at 615. However, the "due regard" criterion

16

relating to political subdivision boundaries has been the major focus of challenges made during the past three redistricting cycles. *See 2012 Districting*, 436 Md. at 144-59; *2002 Districting*, 370 Md. at 353-75; *1992 Districting*, 331 Md. at 611-16.

The Court has said that the "due regard" criteria do not "encompass protection for a concept as nebulous and unworkable as 'communities of interest.'" *1982 Districting*, 299 Md. at 692. When the Court found that a plan promoted non-constitutional factors, such as the preservation of existing districts, over the requirement that "due regard" be given to subdivision boundaries, the Court held that the plan was invalid. *2002 Districting*, 370 Md. at 374. In that case, there was no question of fact as to whether the mapmakers had promoted non-constitutional factors over the due regard criteria, because the State had taken the position that the due regard criteria were "secondary requirements" that "'[could] be subordinated to the achievement of legitimate rational goals.'" *Id*. at 366 (quoting the State's argument). After finding that the mapmakers had applied the law incorrectly and that the political branches would not be able to draw a new map in time for the primary election, the Court drew its own plan. The Court's plan had "many fewer shared senatorial districts and many fewer subdivision crossings" than the plan adopted by the Legislature. *Id*. at 374. The Court's plan reduced the county crossings in one district from four to three, reduced the 22 shared Senatorial districts to 14, and placed some districts entirely within one county. *Id*. at 374-75.

*How the Several Criteria Interact*

There is science and art in the drawing of districts. The "substantially equal population" requirement is objectively quantifiable, readily susceptible to measurement in

17

whole numbers, and strictly constrained by where people actually reside. It can be determined through simple math. The four geographical criteria are less susceptible to a simple quantitative measurement and may in fact conflict with one another – for example, a political subdivision or natural boundary may define a shape that is far from compact. Thus, the art of districting requires that the geographical provisions be applied flexibly, each in the context of the others and of the very specific quantitative constraint imposed by the substantially equal population mandate. *See 2012 Districting*, 436 Md. at 133-34, quoting *2002 Districting*, 370 Md. at 321-22 (referring to the "necessary flexibility in how the constitutional criteria are applied").

Four readily apparent circumstances complicate the process. First, as is apparent to anyone who looks at a map of Maryland, the State is oddly shaped and is not easily divided into regular geometric shapes. In particular, as the Court previously put it, the "westernmost counties are almost severed from the rest of the State by the protruding northeast boundary of West Virginia; the easternmost counties are severed by the waters of the Chesapeake Bay; and the southwest border is warped by the winding waters of the Potomac River." *1982 Districting*, 299 Md. at 687. Within the State, its land area "is further fragmented by numerous other rivers, water bodies and topographic irregularities." *Id*. In some instances, the shortest route from one part of the State to another involves

18

cutting through another jurisdiction, such as the District of Columbia, Delaware, Virginia, or West Virginia.[9]

Second, many of Maryland's counties are also oddly shaped – for example, two counties wrap around Washington D.C.; Baltimore County almost entirely envelopes Baltimore City, which then reaches into Anne Arundel County; Calvert County is long and thin while Carroll County is almost rectangular; Charles County has an appendage that separates two other counties.

Third, the frequency of the other political subdivisions – *i.e.,* municipalities – within a county varies widely across the State, ranging from none in Baltimore County and Howard County to 27 in Prince George's County and 19 in Montgomery County. And the boundaries of some of those municipalities are irregular.[10]

Fourth, and most notably, the changes in population, and in population density, from one census to another occur unevenly around the State, and even within counties and municipalities.

In sum, while the individual requirements of Article III, §4 are each intended to "work in combination with one another to ensure the fairness of legislative representation," they also "tend to conflict in their practical application." *1982 Districting*, 299 Md. at 681. Thus, "irregularity of shape or size of a district is not a litmus test proving violation of the

---

[9] For example, the shortest routes from certain parts of Prince George's County to certain parts of neighboring Montgomery County go through the District of Columbia and Virginia.

[10] Laurel exemplifies a municipality with irregular lines. *See* https://perma.cc/6YA2 -RHYW.

compactness requirement." *Id.* at 687. For that reason alone, the Constitution's four geographic provisions are not a checklist of separate criteria with which each district, viewed in a vacuum, must strictly comply. In addition, in many instances, particularly in central Maryland, the boundary of a district necessarily depends on the circumstances not only of that district but of the ones surrounding it.

*The Designation of Subdistricts for Electing Members of the House of Delegates*

Under Article III, §3 of the Maryland Constitution, each legislative district elects one senator. The three delegates assigned to that district may also be elected at-large by all of the voters of the district. Alternatively, as noted above, that section also permits a legislative district to be divided into subdistricts for the purposes of electing the three delegates. This can be done in two ways. One way is to divide the district into three subdistricts, each of which has one-third of the district's overall population and elects one delegate. A second way is to divide the district into two subdistricts: one subdistrict contains two-thirds of the district's population and elects two delegates; the other subdistrict contains the remaining third of the district's overall population and elects one delegate. The Constitution contemplates that the apportionment of delegates in these ways can vary from one legislative district to another.

As noted above, to comply with the one-person, one-vote requirement of the federal Constitution, a one-member or two-member delegate subdistrict must have a population proportionate to an "ideal" three-member delegate district and in parity with other subdistricts of the same type. Past redistricting cases have not addressed whether or how the other criteria of Article III, §4 apply to subdistricts, although subdistricts have often

20

been defined to coincide with boundaries of political subdivisions – *i.e.*, counties and municipalities.

Multi-member legislative districts do not violate the Equal Protection Clause of the United States Constitution *per se*, but may do so as applied, if they are drawn "invidiously to minimize or cancel the voting potential of racial or ethnic minorities." *1982 Districting*, 299 Md. at 673 (citations omitted).

*Other Permissible Factors*

The political branches – the Governor and the General Assembly – are not confined to "only the stated constitutional factors." *2012 Districting*, 436 Md. at 133, quoting *2002 Districting*, 370 Md. at 321 (internal quotation marks omitted). At a minimum, a districting plan must address the constitutional factors and may not subordinate them to others. Subject to that constraint, the political branches may permissibly "consider countless other factors, including broad political and narrow partisan ones, and they may pursue a wide range of objectives." *Id.* The fact that an otherwise compliant plan "may have been formulated in an attempt to preserve communities of interest, to promote regionalism, to help or injure incumbents or political parties, or to achieve other social or political objectives, will not affect its validity." *2012 Districting*, 436 Md. at 133, quoting *2002 Districting*, 370 Md. at 322. "[A]n intentional effort to draw district lines so as to create a balance between two primary partisan political parties does not violate the fourteenth amendment." *1982 Districting*, 299 Md. at 674.

Thus, "general principles of legislative apportionment will usually cast doubt upon claims that a redistricting plan produces unfair political results." *1992 Districting*, 331 Md.

at 609. For example, a "claim that the Governor's plan constructs districts with a view toward protecting incumbents states no redressable wrong." *Id*. at 610.

Accordingly, under this Court's precedent, a petitioner who challenges a plan on the grounds that it improperly serves political objectives must establish by compelling evidence that the constitutional factors were subordinated to those objectives and were not met. *1982 Districting*, 299 Md. at 688; *see also 1992 Districting*, 331 Md. at 614 (explaining that the presumption of validity that attaches to a plan that was created in the political branch "may be overcome when compelling evidence demonstrates that the plan has subordinated mandatory constitutional requirements to substantial improper alternative considerations").

*Summary*

Any districting plan is a set of compromises among the geographical criteria to ensure that the plan meets the strictly numerical criterion of a substantially equal population in every district. It is thus endemic to the process of *re*districting that districting decisions that were constitutionally valid during one cycle may no longer be so during a later cycle. *See 2012 Districting*, 436 Md. at 153. The population grows and declines at different rates in different places. That inevitably means that districts that previously had populations within the constitutional tolerance for deviation from the "ideal district" no longer do. And the compromises made among the geographical criteria, such as compactness and the "due regard" factors, that supported a constitutionally valid plan in the past may need to be replaced by a different set of compromises in the present. Past compromises that supported a valid plan are not thereby immunized from future challenge. Conversely, new

22

compromises among the geographical criteria made in support of the "substantially equal population" criterion in a new plan are still entitled to the presumption of validity.

In this case, the Petitioners did not allege that the redistricting plan violates the "substantially equal population" requirement or the prohibition against racial and ethnic discrimination.  Rather, the challenges focused on the geographical requirements of Article III, §4 – primarily compactness – and on whether delegate subdistricts should or should not be used in certain circumstances.

**II**

**The 2022 Redistricting Process**

*A.    Timeline*

Compared to prior redistricting cycles, the timeline for accomplishing redistricting in the current cycle was uniquely challenging, featuring both a delayed beginning and an early deadline.

First, the beginning of the process – accessing the changes in population determined by the decennial census – was delayed by the Census Bureau's late release of census data. By statute, the federal government is to provide the states with the decennial census data by April 1 of the year before the year of the next Congressional election.[11]  This time, however, the Census Bureau did not release the census data until August 12, 2021. Pursuant to State law, the State then adjusted that data to reassign Maryland residents in State and federal correctional institutions for redistricting purposes to the jurisdiction of

---

[11] 13 U.S.C. §141(a), (c).

23

their last known addresses.[12]   The adjusted data was made available by the Maryland Department of Planning in September 2021.

Second, in some redistricting cycles, there is a shorter deadline for accomplishing State legislative redistricting in time for the next election of the General Assembly.  That is because (1) the census is done every 10 years, (2) there are four-year intervals between elections for the General Assembly, and (3) dividing 10 by 4 does not yield a whole number. Thus, the redistricting process does not always face the same deadline for establishing General Assembly districts.[13]   Half of the time, there will be a General Assembly election within two years of the census; the other half of the time, within four years of the census.[14]

This cycle (the 2020 census followed by a 2022 General Assembly election) was one of the occasions when there was a shorter deadline for State legislative redistricting. The next cycle (the 2030 census followed by 2034 General Assembly election) will enjoy

---

[12] No Representation Without Population Act, Chapters 66, 67, Laws of Maryland 2010, *codified in pertinent part at* Maryland Code, State Government Article, §2-2A-01 and Election Law Article, §8-701.  In the case of a Maryland resident inmate incarcerated in a jurisdiction other than the inmate's Maryland domicile, the inmate is reassigned to the jurisdiction of domicile for redistricting purposes.  In the case of inmates from other states, the total population count is reduced.  In the current cycle, the State population count was reduced by 1,821 persons in compliance with that statute.

[13] Because members of the House of Representatives are elected every two years, Congressional redistricting does not involve different intervals.

[14] Because the census typically takes at least a year to complete, because a general election is preceded by a primary election, and because districts must be established well in advance of the primary election, the timeline in any particular cycle will always be considerably shorter than two or four years.

a longer lead time, as did the previous cycle (2010 census followed by 2014 General Assembly election).

In addition, in this cycle, the State had an earlier primary date than in previous cycles with the shorter interval between census and election year. During the previous short interval cycle (2000 Census – 2002 General Assembly election), the primary election was held in September. However, since that time, Congress passed the federal Military and Overseas Voter Empowerment ("MOVE") Act,[15] which requires election boards to deliver ballots to those voters not later than 45 days before the election. *See* 52 U.S.C. §20302(a)(8). In order to comply with the MOVE Act, the State moved the date of the General Assembly primary election from September to June. Chapter 169, Laws of Maryland 2011, *codified at* Maryland Code, Election Law Article, §8-201(a)(2)(i).

This is the first year that election officials and those involved in redistricting have experienced the perfect storm of delayed census data, a short-interval cycle for redistricting, and the earlier primary election date. This year, there were less than 10 months between the release of the adjusted census data and the scheduled date of the next primary election for the General Assembly. By contrast, during the last round of redistricting in 2012, there were more than three years between the release of the census data and the scheduled date of the next primary election for the General Assembly.

---

[15] Pub.L. 111-84, 123 Stat. 2190 (2009).

## B.     The 2020 Census Results

The United States Census Bureau provided the data for the 2020 census on August 12, 2021. The data showed that the State's population had increased seven percent over the previous decade.[16] More pertinent to the continued legal sufficiency of the existing districting map was whether the increase had occurred evenly across the State. On that question, the census results showed that the increase had occurred only in some places; other places had lost population since 2010. The rate of change also differed markedly from county to county.

*Population Swings by Region*

The Maryland Department of Planning presented the census data by dividing the State into six regions. The raw census data showed that the population changed at different rates and in different directions from one region to another, and even within regions:

- *Western Maryland*. Two of the three counties (Garrett and Allegany) lost population while Washington County's population increased by 4.9%.

- *Baltimore Region*. The five counties in the Baltimore region (Anne Arundel, Baltimore, Carroll, Harford, and Howard) all experienced increases in population ranging from 3.4% to 15.8%. Baltimore City's population declined by 5.7%.

- *Suburban Washington*. All three counties (Frederick, Montgomery, and Prince George's) gained population, ranging from 9.3% to 16.4%.

- *Southern Maryland*. All three counties (Calvert, Charles, and St. Mary's) gained population, ranging from 4.6% to 13.7%.

---

[16] The State's population had increased by 403,672 to 6,177,224 people.

26

- *Upper Eastern Shore*. The five counties (Caroline, Cecil, Kent, Queen Anne's, and Talbot) experienced either small gains or small declines in population ranging from a gain of 4.3% to a loss of 4.9%.

- *Lower Eastern Shore*. Half of the four counties (Dorchester, Somerset, Wicomico, and Worcester) gained population while the other half lost population, with the changes ranging from a gain of 4.9% to a loss of 7%.

Below is a map created by Department of Planning that illustrates these changes graphically:



For purposes of redistricting, the Department of Planning adjusted 2020 census data in accordance with State law and released those results in September 2021. That data was used to calculate a target or "ideal" population for districts and the two types of subdistricts for purposes of satisfying the "substantially equal population" criterion.

*Distribution of Number of "Ideal" Districts by County*

Ideally, each legislative district would contain the same population; as noted earlier, the federal and State constitutions tolerate only a slight variation. As of 2020, Maryland's total population, as adjusted under State law for redistricting purposes, was 6,175,403. Under an ideal plan – at least ideal in the sense of having districts with precisely equal populations – each Senate district (and three-member delegate district) would have 131,391 people, each two-member delegate subdistrict (*i.e.*, two-thirds of a Senate district) would have 87,594 people, and each single-member delegate subdistrict (*i.e.*, one-third of a Senate district) would have 43,797 people.

Of course, the State's population does not organize itself neatly within county or municipal boundaries, within geographic markers, or in the form of geometric shapes that equate precisely to those numbers. From the adjusted census data, the Department of Planning computed the number of "ideal" Senate Districts that each county could support, based on the county's 2020 population. The following chart summarizes the population information and ideal Senate district calculations.[17]

---

[17] All figures and percentages in this chart were calculated using census data adjusted by the Department of Planning in compliance with the No Representation Without Population Act. *See* footnote 12 above. The 2020 adjusted census data is available at: https://perma.cc/C3HY-MCSZ. (Note that the data for St. Mary's County and Somerset County were flipped in the Department's chart.). This data thus differs slightly from the unadjusted census data released in August 2021, which is available at: https://perma.cc/WZ26-DSYU. The 2010 adjusted census data is available at: https://perma.cc/4JCW-E3AZ.

| County | % Population Change 2010-2020 | 2020 Adjusted Census Population | # of Ideal Senate Districts |
|---|---|---|---|
| Kent | ↓ -5.1% | 19,239 | 0.15 |
| Somerset | ↓ -8.2% | 21,807 | 0.17 |
| Garrett | ↓ -4.2% | 28,846 | 0.22 |
| Dorchester | ↓ -0.2% | 32,720 | 0.25 |
| Caroline | ↑ 0.7% | 33,414 | 0.25 |
| Talbot | ↓ -0.8% | 37,598 | 0.29 |
| Queen Anne's | ↑ 4.0% | 49,834 | 0.38 |
| Worcester | ↑ 2.1% | 52,607 | 0.40 |
| Allegany | ↓ -9.2% | 65,852 | 0.50 |
| Calvert | ↑ 4.5% | 92,925 | 0.71 |
| Cecil | ↑ 2.6% | 103,963 | 0.79 |
| Wicomico | ↑ 5.1% | 104,227 | 0.79 |
| St. Mary's | ↑ 8.2% | 113,958 | 0.87 |
| Washington | ↑ 5.6% | 150,517 | 1.15 |
| Charles | ↑ 13.7% | 166,836 | 1.27 |
| Carroll | ↑ 3.4% | 172,640 | 1.31 |
| Harford | ↑ 6.5% | 261,465 | 1.99 |

| | | | |
|---|---|---|---|
| Frederick | ↑ 16.4% | 271,985 | 2.07 |
| Howard | ↑ 15.7% | 331,804 | 2.53 |
| Anne Arundel | ↑ 9.6% | 585,432 | 4.46 |
| Baltimore City | ↓ -5.9% | 589,579 | 4.49 |
| Baltimore | ↑ 6.1% | 856,673 | 6.52 |
| Prince George's | ↑ 12.0% | 968,772 | 7.37 |
| Montgomery | ↑ 9.3% | 1,062,710 | 8.09 |

Clearly, the population swings among the various counties meant that the district lines would have to be re-drawn. Just as clearly, some counties would gain districts or parts of districts; some would lose districts or parts of districts; every county would likely have to share a district with at least one other county; and, necessarily, changes in one district's boundaries would ripple across at least one neighboring district.

## C. *The Adoption of the 2022 Legislative Redistricting Plan*

The Governor and the General Assembly each appointed commissions to develop a redistricting plan for consideration at the 2022 regular session of the General Assembly. Both commissions held public meetings across the State in the course of preparing their respective plans. Both plans were presented to the General Assembly in January 2022. In accordance with Article III, §5 of the State Constitution, the General Assembly passed a joint resolution adopting the plan recommended by its own commission.

1.	The Governor's Plan

In January 2021, Governor Hogan issued an Executive Order creating a commission that he named the "Maryland Citizens Redistricting Commission" ("Governor's commission").  COMAR 01.01.2021.02.  That commission consisted of nine members appointed by the Governor.  It was comprised of three Republicans, three Democrats, and three members who were not registered with either party.  Some members were appointed directly by the Governor and others were appointed by him through a "public application process."  COMAR 01.01.2021.02B(1)(d).  The Executive Order provided that none of the members was to be (1) a member of or candidate for the General Assembly or House of Representatives, (2) an employee or officer of a political party or committee, (3) a member of the staff of the Governor, General Assembly, or Congress, or (4) a current registered lobbyist.  COMAR 01.01.2021.02B(3).  This was the first time in the modern history of the State's redistricting that the Governor appointed an advisory body on redistricting that did not include any legislators.[18]  The Executive Order authorized the commission to consult with "outside experts" and "units of State government" and ordered the units that were subject to the Governor's direction to assist the commission.  COMAR 01.01.2021.02D(5), G, I.

The Executive Order also provided certain directions to the Governor's commission for devising its plan.  It directed that the commission should take no account of how

---

[18] *See 2012 Districting*, 436 Md. at 128 n.5 (listing members of redistricting advisory body appointed by Governor); *2002 Districting*, 370 Md. at 327 n.9 (same); *1992 Districting*, 331 Md. at 579 n.1 (same); *1982 Districting*, 299 Md. at 667 n.3 (same).

individuals were registered to vote in the past, how they voted in the past, or what political party they belonged to. COMAR 01.01.2021.02C(1)(b)(i). The order also directed the commission to take no account of where incumbent officeholders or potential candidates resided or were domiciled. COMAR 01.01.2021.02C(1)(b)(ii). Additionally, the order required that districts be subdivided into single-member delegate districts "[t]o the extent possible and consistent with the Commission's other duties." COMAR 01.01.2021.02C(1)(d)(ii). The Governor's commission was to present the plan to the Governor's Office with a report explaining the bases for the decisions embodied in the plans.[19] COMAR 01.01.2021.02D(7)(d).

According to the report of the Governor's commission, it held 16 virtual public hearings during 2021, half of which occurred before the census data was released, and additional public working sessions. On November 5, 2021, the Governor's commission presented its plan to the Governor, who made the plan and report available to the public.

2.  The General Assembly's Plan

In July 2021, the President of the Senate and the Speaker of the House of Delegates created a joint Legislative Redistricting Advisory Commission (the "LRAC"), which was charged with preparing a new State legislative districting plan.[20] The LRAC consisted of the Senate President, the Speaker of the House of Delegates, two other Senators (one

---

[19] The Governor's commission was also tasked with developing a plan for Congressional redistricting, which was to be presented to the Governor at the same time.

[20] Like the Governor's commission, the LRAC was also charged with preparing a Congressional redistricting plan.

Democrat and one Republican), and two other Delegates (one Democrat and one Republican) – in total, four Democrats and two Republicans. It was staffed by the Department of Legislative Services ("DLS").[21] Karl S. Aro, a former executive director of DLS, served as LRAC's Chair; he had previously participated in the legislative redistricting process in 2012 and 2002.[22] The LRAC also held 16 public hearings, all subsequent to the release of the census data by the Census Bureau (but at least one before its adjustment by the Department of Planning), beginning in August 2021.

The LRAC held its hearings – a mix of in-person and remote hearings (all live streamed and recorded) – for each region of the State. Those meetings opened with explanations by the LRAC's chair and DLS staff of the redistricting process and the population shifts in the region that necessitated changes in district lines. Then, at each hearing, the LRAC heard testimony from members of the public and invited further comment. The LRAC invited and received written comments throughout.[23]

---

[21] DLS is an agency in the Legislative Branch that, according to the General Assembly's website, "provides central nonpartisan staff services to support and assist the General Assembly as a whole, its committees and subcommittees, and individual legislators." *See* https://perma.cc/8Q3L-MSGY; *see also* Maryland Code, State Government Article, §§2-1202, 2-1204, 2-1207. DLS supports the General Assembly by, among other things, conducting research and drafting legislation for members of the General Assembly and its appointed commissions.

[22] In 2002, this Court, when drawing a new map, appointed Mr. Aro and Nathaniel Persily, now a professor at Stanford Law School, as consultants. *2002 Districting*, 370 Md. at 350. Mr. Persily served as a consultant to the Governor's Commission in the current redistricting cycle.

[23] *See* Maryland General Assembly, Committee Meetings, available at https://perma.cc/X2V5-SNN5.

The LRAC released a draft legislative map to the public on December 20, 2021. The LRAC's draft map differed from the one proposed by the Governor's commission. The LRAC held a public hearing on its draft plan on December 22, 2021. At the hearing, members of the public from Owings Mills, an unincorporated area in Baltimore County, questioned whether the proposed map assured adequate representation of the minority population in that area. Comments were also submitted on district lines that separated the municipality of Havre de Grace from Aberdeen, both in Harford County. Further, a member of the public asserted that part of the current District 33 had been moved into District 31 for the purpose of changing the district of an incumbent Republican delegate. At the close of the hearing, the chair stated that the LRAC was still accepting public comments and that the plan was still in draft form.

The LRAC held its final meeting on January 7, 2022 to consider the final draft of its legislative map. The Chair explained the changes that had been made in the interim: an added subdistrict in Owings Mills, changes to lines in Harford County, and "minor" changes in Anne Arundel County. He thanked DLS staff, some by name, for their work making the maps. At that meeting, on a party-line vote, the LRAC approved a plan to be submitted to the Legislature.

3.    Introduction of the Two Plans at the 2022 Legislative Session

On January 12, 2022, the two State legislative redistricting plans were filed in the General Assembly. *See* Senate Joint Resolution No. 3 and House Joint Resolution No. 1 (Governor's commission's plan); Senate Joint Resolution No. 2 and House Joint Resolution No. 2 (LRAC plan).

34

The General Assembly promptly held hearings. First, the Senate Reapportionment and Redistricting Committee held a joint hearing with the House Rules and Executive Nominations Committee on January 18, 2022 to hear testimony and receive comments on both plans. One week later, on January 25, 2022, the House Rules and Executive Nominations Committee held a separate hearing on the Senate version of the joint resolution adopting the LRAC plan and voted to give a favorable recommendation to that bill.

At the January 18 hearing, Mr. Aro and Michelle Davis, a DLS staffer, testified. Two members of the LRAC, Senator Griffith and Delegate Luedtke, were also available to answer questions. Senator King, Chair of the Senate Reapportionment and Redistricting Committee, invited committee members to ask questions of Senator Griffith and Delegate Luedtke, who, she stated, were "here today to answer any questions from Legislators too."

Mr. Aro testified on the use of subdistricts. He stated that the LRAC plan kept districts "pretty much where they were" but, so as to give due regard to county boundaries, "if we had to cross a line, and if at all possible," a subdistrict was created to ensure that the people in that area would not be "overwhelmed" in an at-large district.

Ms. Davis gave an overview of the population changes that had occurred and the changes made in districts in the various regions and counties to account for those population changes. After reviewing the map for the committee, Ms. Davis and Senator King both solicited questions from the committee members about the redistricting map. No questions were asked about any particular district.

Delegate Kathryn Szeliga, a member of the House Rules and Executive Nominations Committee,[24] asked Mr. Aro and Ms. Davis who had drawn the maps and whether public money was spent on outside consultants. Ms. Davis testified that making the plan involved a number of aspects so that the staff varied with the particular task, that DLS and LRAC members' staffs worked on it, that some DLS staff worked on the bill-drafting aspects and others on the map-drawing, and that outside consultants had not been hired.[25] Mr. Aro stated that DLS's budget takes the map-making process into account and that consultants were not hired. The Senate committee gave the bill concerning the LRAC plan a favorable report.

Next, the House Rules and Executive Nominations Committee met separately on January 25, 2022 solely to take testimony from the sponsor and vote on the plan. Mr. Aro, speaking on behalf of the LRAC, stated that the map had not changed since the January 18 meeting in which that House committee had participated. He added that the committee adjusted the existing plan to address population changes, that the plan addressed the constitutional requirements, and that the plan sought to preserve existing districts as much as possible, as many of those districts had been in place for decades and had become

---

[24] Delegate Szeliga is one of the petitioners in Miscellaneous No. 25, one of the consolidated petitions in this case. Delegate Nicholaus R. Kipke, also a member of the House Rules and Executive Nominations Committee and also a petitioner in Miscellaneous No. 25, did not ask any questions. Both delegates were present and voted against the LRAC plan at the January 25 committee meeting.

[25] The Dissent complains that the LRAC plan might have been "created … by an outside consultant" and that there was a lack of transparency on that point. Dissent at 21-22, 30. In fact, Petitioner Szeliga asked that question during the legislative process, and Ms. Davis answered it.

communities of interest. His presentation lasted about two minutes. The committee chair invited questions. Delegates Szeliga and Kipke did not ask any questions, and neither offered amendments. That committee, too, gave the plan a favorable report.

On January 27, 2022, the resolutions embodying the LRAC plan were the subject of a floor debate in the House of Delegates. In the floor debate in the House, Delegate Luedtke, a member of the LRAC, addressed the use of multi-member districts in response to questions from legislators who expressed a preference for single-member districts. He stated that the "Constitutional default" was for three-member House districts and that the plan used single-member districts variously to mitigate subdivision crossings and ensure minority voters' opportunity to vote for a candidate of their choice. Asked who was involved in drawing the maps, he responded that DLS and the members' staff had been involved. None of the five delegates who are petitioners in these cases asked questions during the debate on the LRAC plan before the House of Delegates voted.[26] All five voted against the plan.

4.      Adoption of the General Assembly's Plan

The Generally Assembly adopted the LRAC plan when the Senate version of the joint resolution passed both houses on January 27, 2022. As that occurred well before the 45th day of the legislative session, the LRAC plan became law pursuant to Article III, §5 of the State Constitution. We shall refer to it in this opinion as the "adopted plan."

---

[26] Delegate Szeliga and Delegate Fisher did speak in favor of a proposal to amend the resolution to substitute the plan of the Governor's commission for the LRAC plan.

### D. *Proceedings in this Court*

#### 1. Order Creating Procedures and Schedule

On January 28, 2022, the day after passage of the redistricting plan, the Attorney General of Maryland, who anticipated that the plan adopted by the General Assembly would be challenged (as redistricting plans had been challenged during the five previous cycles), filed in this Court a Motion to Promulgate Procedures. That motion asked the Court to adopt and publish procedures applicable to any petitions challenging the adopted plan that might be filed in this Court under Article III, §5 of the State Constitution. That same day, the Court granted that motion and issued an order, later amended on February 3, setting forth procedures and deadlines for the filing of petitions and alternative plans and for the filing of responses to any such petitions and alternative plans.

The Court's order required that "any registered voter of the State who contends that the 2022 legislative districting plan, or any part thereof, is invalid" file with the Court a petition on or before Thursday, February 10, 2022 at 4:30 p.m. The Order further directed that any such petitions set forth "the particular part or parts of the plan claimed to be unconstitutional under the Constitution of the United States of America, Constitution of Maryland, or federal law; the factual and legal basis for such claims; and the particular relief requested, including any alternative district configuration suggested or requested by the petitioner(s)."

The Order appointed Alan M. Wilner, a Senior Judge of this Court, as a Special Magistrate to hold hearings on petitions and responses and to prepare and file with the

38

Court a report of his findings and recommendations. Judge Wilner had served in a similar role with respect to the challenges to the 2012 redistricting plan.

The motion and order were designated as Miscellaneous No. 21 (September Term 2021).

2. Filing of Petitions

Within the time allowed by the Court's Order, four petitions were filed, and each was designated by a separate case number:

• Miscellaneous No. 24, filed by David Whitney, a registered voter, on February 9, 2022. This Petition asserted that a district improperly crossed the Chesapeake Bay. The description of the district in question made clear that it referred to the boundaries of a Congressional district rather than a State legislative district. That Petition was ultimately denied and its allegations are no longer before us.[27]

• Miscellaneous No. 25, filed by Delegates Mark N. Fisher, Nicholaus R. Kipke, and Kathryn Szeliga on February 10. This Petition objected to the design of 13 districts as

---

[27] The State filed a motion to dismiss, pointing out that the petition did not address *State* legislative redistricting. Mr. Whitney then amended his petition to explicitly challenge several State legislative districts, none of which crossed the Chesapeake Bay. The Special Magistrate deemed that amendment to be an abandonment of Mr. Whitney's timely filed petition; noted that, in any event, that petition lacked merit; and recommended the denial of both the original and amended petition.

Mr. Whitney did not except to that recommendation. We agreed with the Special Magistrate that Mr. Whitney's only timely-filed petition had been abandoned, and, in any event, was insufficient to challenge the adopted State legislative redistricting plan. Accordingly, as part of the April 13, 2022 order resolving the consolidated cases, we denied the petitions in Miscellaneous No. 24.

variously non-compact or violative of the "due regard" provisions. Eight of those districts remain at issue before this Court.

- Miscellaneous No. 26, filed by Delegates Brenda O. Thiam and Wayne A. Hartman, and a registered voter, Patricia Shoemaker, also on February 10. This Petition challenged the fact that the plan created subdistricts in some districts and not in others, and incorporated by reference the allegations made in Miscellaneous No. 25.

- Miscellaneous No. 27 filed by Seth E. Wilson, a registered voter, also on February 10.[28] This Petition challenged subdistrict 2A in Western Maryland on several grounds.

On February 11, 2022, the Court consolidated the cases opened for the four petitions with Miscellaneous No. 21 for referral to the Special Magistrate in accordance with procedures set forth in the order in Miscellaneous No. 21. The February 11 order also postponed some of the filing deadlines related to the 2022 primary election, then scheduled for June 28, to accommodate the process for resolving the challenges made by the petitions.

On February 15, 2022, the Attorney General, on behalf of the State, filed timely and detailed motions to dismiss each of the petitions.

3.     Proceedings before the Special Magistrate

*Discovery and Assertion of Legislative Privilege*

The Special Magistrate set deadlines for the parties to exchange discovery and to notify him of any discovery dispute. A discovery dispute did arise with respect to certain requests made by the Petitioners in Miscellaneous No. 25 to which the State asserted

---

[28] Mr. Wilson filed an amended petition on February 15, apparently to correct a typographical error in a date.

40

legislative privilege. After receiving expedited emailed legal memoranda from the parties and holding a virtual hearing on the matter, the Special Magistrate sustained the State's assertion of legislative privilege and resolved that dispute in favor of the State. That ruling is described in greater detail in Part IV.B of this opinion.

*Hearing on the Merits*

In light of the time needed for the Special Magistrate to conduct an evidentiary hearing and promptly produce a report on an expedited basis, the Court issued an order on March 15, 2022 postponing the primary election from June 28 to July 19 and adjusting election-related deadlines that necessarily had to precede the date of the primary election.

Meanwhile, apart from the one discovery dispute, the parties cooperated in expediting the consolidated case to meet the challenging schedule. They submitted comprehensive Stipulations of Fact to the Special Magistrate.

On March 23 and 24, 2022, the Special Magistrate presided over a hearing on the four consolidated cases. The Petitioners' various allegations, requests for relief, and evidence, and the State's responses and evidence are set forth below in the discussion of each of the remaining three petitions.

4.    The Special Magistrate's Report, the Petitioners' Exceptions, and Oral Argument and Decision in the Court of Appeals

The Special Magistrate submitted his Report to this Court on April 4, 2022.[29]  In that report, he recommended that this Court deny all of the petitions. The conclusions of

---

[29] The report of the Special Magistrate, and the extensive exhibits to that report, may be found on the Court of Appeals website under "Highlighted Cases" at this link:

the Special Magistrate are discussed in greater detail in Parts IV, V, and VI of this opinion below. The Petitioners in Miscellaneous Nos. 25, 26, and 27 filed exceptions to the recommendations relating to their respective petitions, with supporting memoranda. The State responded with its own memoranda supporting the Special Magistrate's recommendations.

This Court heard oral argument concerning the exceptions on April 13, 2022. Following the hearing, the Court denied the petitions in an order, indicating that its opinion would follow. That order appears in Appendix A to this opinion.

## III

## Judicial Review of the Adopted Plan

### A. *Role of the Court*

In this context, the Court exercises original jurisdiction under Article III, §5, not appellate review. It is a unique type of judicial review of actions taken by the Governor or the Legislature. That jurisdiction has been triggered under the Maryland Constitution by challenges to a legislatively-adopted districting plan for the General Assembly.

In addressing challenges to a redistricting plan, this Court's role "is limited to determining whether the legislative apportionment plan complies with the applicable constitutional principles." *2012 Districting*, 436 Md. at 159. Absent proof of a violation, "it is not the Court's role to determine how a legislative apportionment plan best may embody the ideals supporting those principles." *Id*. That is because the Maryland

---

https://mdcourts.gov/sites/default/files/import/coappeals/highlightedcases/2022districting/20220404reportofthespecialmagistrate.pdf .

42

Constitution assigns responsibility for the drawing of a State legislative map to the Executive and Legislative Branches of Maryland government. The "political branches are the primary actors" in redistricting and "because of this constitutional commitment, as a matter of the separation of powers, [they] may legally pursue a wide variety of political aims" in that process. *Id*. at 150.

Thus, unless the Court finds that an adopted plan violates the applicable laws, the drawing of a districting map is not a core judicial power such that this Court may substitute its preferred district boundaries for the ones that the Legislature has adopted. *See 2012 Districting*, 436 Md. at 159 (noting that choices made in the district boundaries are "political one[s], well within the authority of the political branches to make"); *see also Murphy v. Liberty Mutual Company*, 478 Md. 333, 372-82 (2022) (explaining the constraints that the Separation of Powers clause in Maryland's Declaration of Rights places on the exercise by one branch of government of core powers belonging to another); *Getty v. Carroll County Board of Elections*, 399 Md. 710, 741 (2007) ("[T]he power of judicial review does not equate to the power to exercise functions that are explicitly vested in the other organs of the government."). This Court has recognized, for example, that "it is not for the judiciary to determine whether a more compact district could have been drawn than that under challenge; the court's province is solely to determine whether the principles underlying the requirement of compactness of territory have been considered and properly applied considering all relevant circumstances." *1982 Districting*, 299 Md. at 680-81.

In sum, the Court's role is to assess the plan that has been adopted according to the constitutional process and to consider any contention that the adopted plan fails to comply

with the Constitution. It is not to determine whether there is another plan, either proposed or that the Court itself can conjure, that would be better.

## B. Burdens of Proof

As with any complaint filed in a circuit court, conclusory statements of law are not sufficient by themselves to state a claim.[30] And, as in past redistricting cases, this Court's initial order in Miscellaneous No. 21 established procedures for any challenge to the 2022 redistricting plan that set forth basic pleading requirements – that a petition state the petitioner's "objection to the plan"; identify the "particular part or parts of the plan" claimed to violate the law; state "the factual and legal basis for such claims"; and specify "the particular relief requested, including any alternative district configuration suggested or requested by the petitioner(s)." The sufficiency of a petition to state a claim poses a legal question that the Court may address before referring the petition for an evidentiary hearing before a special magistrate.

In this instance, the State filed motions to dismiss each of the four petitions shortly after they were filed. Given the exigency of time, we referred all of them to the Special Magistrate for a hearing without first resolving the motions to dismiss. We later accepted the Special Magistrate's recommendation to deny one of the petitions because, although timely filed, it clearly failed to plead a violation of Article III, §4 as to a State legislative district. *See* footnote 27 above. The State pointed to certain deficiencies in the other

---

[30] *See, e.g.*, *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 644 (2010) ("The well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice.").

44

petitions as well. However, as we have an evidentiary record and recommendation from the Special Magistrate as to the merits of the other three petitions, we will address the merits and not resolve these cases on those procedural grounds.

As to the merits, this Court's case law on State legislative redistricting establishes the following principles regarding the burdens of proof:

- *Presumption of Validity*. Every opinion of the Court that has reviewed the substance of a redistricting plan has started from the premise that an adopted plan and the policy choices reflected in it are to be accorded a presumption of validity. *See 2012 Districting*, 436 Md. at 165; *2002 Districting*, 370 Md. at 361, 363, 373; *1992 Districting*, 331 Md. at 614-16; *1982 Districting*, 299 Md. at 688.

- *Burden on Challengers*. The challengers have the burden of demonstrating that a redistricting plan is not valid. *2012 Districting*, 436 Md. at 137; *1992 Districting*, 331 Md. at 610; *1982 Districting*, 299 Md. at 673, 683.

- *Compelling Evidence of a Violation*. To overcome the presumption of validity and satisfy the burden of proof, a challenger must present "compelling evidence" that a plan violates Article III, §4 in some way. *2012 Districting*, 436 Md. at 137, 159; *2002 Districting*, 370 Md. at 373; *1992 Districting*, 331 Md. at 597, 614.

- *Sufficient Evidence of Compliance*. If a challenger presents the requisite "compelling evidence" of a violation of Article III, §4, the State must produce "sufficient

evidence" to support a finding that the plan complies with Article III, §4. *2012 Districting*, 436 Md. at 137-38.[31]

---

[31] In dissent, Judge Gould expresses a preference for the procedure that the Court followed in the *2002 Districting* case when the Court was dealing with 14 separate and varied challenges to the redistricting plan. Dissent (Gould, J.) at 2-3.

In the 2002 case, in contrast to this case and the *2012 Districting* case, the Court issued an initial scheduling order that provided for a preliminary review of the petitions by the Court before referral of issues to a special master. The 2002 scheduling order, like the order in the current case, set a deadline for filing petitions and required petitioners to specify the parts of the plans challenged, the factual and legal basis for the challenge, and the particular relief sought, including suggested or requested alternative district configurations. Order (March 1, 2002) at ¶1. And, like the scheduling order in the current case, the 2002 order set a deadline for the State's response. From that point, the 2002 order set forth a different procedure.

In its 2002 order, the Court set a deadline for the submission of legal memoranda "addressing the facial validity of the plan" and "issues that should be referred to a Special Master," set a hearing date before the Court for the *Court's* initial determination of those questions, and set a hearing date for proceedings before the special master, with a deadline for the special master's submission of a report on the referred issues. Order (March 1, 2002) at ¶¶3-6. Accordingly, upon the filing of 14 timely petitions and the parties' other submissions in the 2002 case, the Court held a preliminary hearing to determine which issues to refer to the special master, referred certain issues to the special master, and placed the burden on the State to produce sufficient evidence of compliance with Article III, §4 on those issues. The Court left the burden on the challengers to show a violation of federal requirements. *2002 Districting*, 370 Md. at 329, 336-37, 368.

In the *2012 Districting* case, only three challenges were filed to the adopted plan, and the Court did not conduct its own preliminary proceeding to assess the potential merits of those challenges before referring them to the special master. Instead, in an opinion by Chief Judge Bell, the Court stated that the challengers bore the burden of producing "compelling evidence" of violations of Article III, §4 before the burden would shift to the State to produce "sufficient evidence" of compliance with the requirements of that constitutional provision. *2012 Districting*, 436 Md. at 137-38.

This case, which was initiated by a similar number of challenges as in 2012, has proceeded in the same manner as the *2012 Districting* case. There is much to be said for the procedure that the Court followed in 2002; as to some allegations, an early disposition

# IV

## Miscellaneous No. 25

### A.    *The Petition*

Petitioners Fisher, Kipke, and Szeliga, all members of the General Assembly who had voted against the adopted plan, alleged in their Petition that the plan violated Article III, §4, as well as other provisions of the Maryland Constitution.[32]  The Petition identified 13 districts that allegedly failed to satisfy the criteria of Article III, §4.  The primary defect, according to the Petition, was lack of compactness.  The Petition also alleged that the drawing of these districts failed to give due regard to the boundaries of political subdivisions and that, with respect to one district, violated the requirements of contiguity and due regard to natural boundaries.  For relief, the Petitioners asked that the Court direct the General Assembly to enact a new legislative districting plan, with the plan proposed by the Governor's commission as the default if the General Assembly failed to do so.[33]

### B.    *Discovery Dispute and Legislative Privilege*

The Special Magistrate had set a March 11, 2022 deadline for the exchange of discovery in all of the cases.  He instructed the parties to notify him, before that date, of

---

of the State's motions to dismiss might well have narrowed the issues before the Special Magistrate.

[32] Specifically, they cited Articles 7, 24, and 40 of the Maryland Declaration of Rights and Article I, §7 of the Maryland Constitution.  Before us, they are no longer pursuing their arguments under those provisions.

[33] At oral argument before us, they proposed a third option:  that the Court charge a Special Magistrate with drawing up a new plan.

any disputes that they were unable to resolve on their own. In Miscellaneous No. 25, the parties cooperatively exchanged discovery and other information on the tight timetable set by the Special Magistrate. On March 3, they timely advised him of a discovery dispute that they were not able to resolve.

*Discovery Request and Response; Assertion of Legislative Privilege*

The Petitioners in Miscellaneous No. 25 sought the following information, all specific to the districts that they had challenged:

> (1) who was responsible for the actual drawing or construction of the specific legislative districts Petitioners have challenged;
> (2) if a computer program was used, what criteria was the program instructed to use to draw the legislative districts Petitioners have challenged;
> (3) who provided instructions to the actual map drawer(s) regarding what factors or other criteria were to be used in drawing the legislative districts Petitioners have challenged; and
> (4) what specific instructions were given to the map drawer(s) regarding the various legislative districts Petitioners have challenged.

In response, the State provided the name of the computer program that DLS staff had used to draw the maps, but declined to respond to the other questions on the ground that the information was protected by legislative privilege. Counsel jointly notified the Special Magistrate of the impasse and, at his request, emailed legal memoranda on that issue to him on an expedited basis.[34]

---

[34] The Dissent asserts that these discovery requests were "seeking to show that the NCEC's Democratic Performance Index guided the drawing of the districts during 2022 Districting." Dissent at 27. Perhaps that was the Petitioners' purpose in making the requests, but Petitioners did not say that in their filings in the record and the Dissent does not point to any particular source for that assertion.

In arguing that the Special Magistrate should overrule the assertion of legislative privilege, the Petitioners urged the Special Magistrate to apply a five-factor test used by the federal district court in a Congressional redistricting case. *See Benisek v. Lamone,* 241 F. Supp. 3d 566, 575 (D. Md. 2017), *vacated and remanded sub nom. Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). In response, the State argued that the information was protected by two provisions in the Maryland Constitution: Article 10 of the Maryland Declaration of Rights ("That freedom of speech and debate, or proceedings in the Legislature, ought not to be impeached in any Court of Judicature") and Article III, §18 ("No Senator or Delegate shall be liable in any civil action, or criminal prosecution, whatever, for words spoken in debate."). Both parties cited two opinions in which the Court of Special Appeals had discussed legislative privilege. *See Montgomery County v. Schooley*, 97 Md. App. 107, 116 (1993), and *Floyd v. Baltimore City Council*, 241 Md. App. 199, 213 (2010). Additionally, the State cited *Blondes v. State*, 16 Md. App. 165 (1972) and cases in which courts discussed Article III, §18 in the context of a legislator's liability.

*Ruling of the Special Magistrate*

On March 10, 2022, after holding a remote informal conference with the parties on the issue, the Special Magistrate upheld the assertion of legislative privilege.[35] In his memorandum opinion, he observed that the *Benisek* court had not relied on Maryland law when it addressed the scope of Maryland legislators' privilege under Maryland's Speech

---

[35] An amended version of that order contained minor editorial changes.

49

and Debate Clause. He then noted that, in *Schooley*, the Court of Special Appeals had adopted from *Gravel v. United States*, 408 U.S. 606 (1972), the principle that "a legislator, even if not a party to the action and thus not subject to any direct consequence of it, cannot be compelled to explain, other than before the legislative body of which he is a member, either his legislative conduct or 'the events that occurred' in a legislative session." *Schooley*, 99 Md. App. at 117. Further, the Special Magistrate stated, the *Schooley* court had cited *Marylanders for Fair Representation v. Schaefer*, 144 F.R.D. 292 (D. Md. 1992), for the proposition that a legislator, acting within the sphere of legitimate legislative activity, may not be required to testify regarding those actions. *Schooley*, 97 Md. App. at 118.

With regard to what conduct falls within the sphere of legitimate legislative activity, the Special Magistrate cited another federal case, *Bruce v. Riddle*, 631 F.2d 272 (4th Cir. 1980), for the proposition that "for purposes of the privilege, [the legislative process] includes more than just proceedings at regularly scheduled meetings of a legislative body" but includes as well "a meeting with citizens or private interest groups" and, if it includes that, "must also include caucuses and meetings with political officials called to discuss pending or proposed legislation." *Schooley*, 97 Md. App. at 123, citing *Riddle*, 631 F.2d at 279. In summary, the Special Magistrate stated, "the privilege stems from the general proposition that legislators and their staff and consultants cannot be compelled to explain

50

their legislative conduct or events that occurred in a legislative session, other than before the legislative body." He therefore sustained the State's assertion of legislative privilege.[36]

## C. *The Hearing on the Merits Before the Special Magistrate*

At the hearing before the Special Magistrate on March 23 and 24, 2022, the Petitioners and the State stipulated to the basic facts about the 2022 redistricting process and each of the districts in question. Various maps and charts were introduced into evidence.

Both sides relied primarily on expert testimony analyzing that data.[37] The Petitioners offered, and the Special Magistrate accepted, Sean Trende as an expert on "political science, redistricting [matters], and calculating compactness" to present computations on how the challenged districts scored on various quantitative tests that purport to measure compactness. Mr. Trende had been an attorney in private practice through 2010, had earned a master's degree in applied statistics in 2019, was working on a Ph.D in political science, and had experience in redistricting matters. As its only witness, the State offered, and the Special Magistrate accepted, Professor Alan Lichtman of American University as an expert on "voting rights, American political history, historical

---

[36] The Special Magistrate noted in his memorandum order that counsel for the Petitioners in Miscellaneous No. 26 had joined on the discovery issue at the oral argument, presumably because they had incorporated by reference the allegations made in Miscellaneous No. 25. *See* Part V of this opinion. However, there is nothing in the record to indicate that the Petitioners in Miscellaneous No. 26 had themselves made any discovery requests that had been denied on the basis of legislative privilege. Accordingly, we will treat this issue as specific to Miscellaneous No. 25.

[37] We discuss that testimony in greater detail below.

statistical methodology, quantitative methodology, and redistricting." For what it is worth, Professor Lichtman's experience and his academic credentials were considerably more extensive than Mr. Trende's. Both experts were cross-examined about the fact that each had exclusively testified on a partisan basis in the past – Mr. Trende in Republican challenges to redistricting plans created by Democratic-leaning bodies and in defense of plans created by Republican-leaning bodies; Professor Lichtman in Democratic challenges to redistricting plans created by Republican-leaning bodies and in defense of plans created by Democratic-leaning bodies. Both experts were also cross-examined about criticism of their respective analyses by courts in previous cases.

The Petitioners also called as witnesses three Republican members of the House of Delegates, including two of the Petitioners. The hearing concluded with almost two hours of oral argument by the parties.[38]

### D.    *The Recommendation of the Special Magistrate*

The Special Magistrate filed his report with the Court on April 4, 2022. With respect to Miscellaneous No. 25, the Special Magistrate observed that the hearing had focused almost entirely on one criterion in Article III, §4 – compactness. He noted that there was no assertion that the adopted plan violated either the substantially equal population criterion or the Voting Rights Act. He found that "[a] comparison of the current plan with the one it replaces shows that an attempt was made to keep voters in their current districts,

---

[38] At the conclusion of the argument, the Special Magistrate thanked counsel for the cooperative manner in which they had litigated the case. Our review of the video of that proceeding confirms the high standard of professionalism exhibited by counsel on both sides.

with which they are familiar, and to avoid crossing political or natural boundary lines except when required to achieve or maintain population equality." He concluded that there was no compelling evidence of a constitutional violation and recommended that the petition be denied.

### E. Petitioners' Exceptions to the Recommendation of the Special Magistrate

Petitioners excepted to the Special Magistrate's recommendation, arguing that eight of the challenged districts should have been found to violate Article III, §4 – seven as to compactness (Districts 12, 21, 22, 23, 24, 33, and 47) and one as to contiguity and due regard for natural boundaries (District 27). As to those eight districts, Petitioners argued that they had presented compelling evidence of constitutional violations and had therefore shifted the burden of proof to the State to justify the validity of the plan. Accordingly, those are the issues and districts that we shall address here. *See 1992 Districting*, 331 Md. at 584-85 (addressing only the challenges that were the subject of exceptions filed by petitioners to the special master's report). Petitioners also excepted to the Special Magistrate's ruling, based on the doctrine of legislative privilege, that they were not entitled to discover certain information about the creation of the adopted plan. We also address that exception below.

### F. Analysis

As noted above, the Petition that initiated Miscellaneous No. 25 had asserted a wide range of violations of Article III, §4 in 13 of the 47 legislative districts in the adopted

plan.[39] By the time of the hearing before the Special Magistrate, the alleged violations had largely been reduced to the question of compactness of some of those districts. We will address first whether there is compelling evidence of a violation of Article III, §4, related to the issue of compactness, with particular reference to the seven districts identified by Petitioners. We bear in mind as we do so that one district in a districting plan can seldom be viewed without regard to the characteristics of its neighboring districts. Next, we will address whether there is compelling evidence that District 27 violates Article III, §4 for failure to satisfy the contiguity and due regard criteria. Then we will address Petitioners' exception to the Special Magistrate's ruling on legislative privilege. Finally, we will address certain arguments made in the dissenting opinion of Chief Judge Getty that relate to Miscellaneous No. 25.

1.    Compactness

With respect to their allegations that seven districts failed to comply with the compactness criterion of Article III, §4, Petitioners relied on (1) the shapes of those districts – what they called the "eye test"; (2) the testimony of Mr. Trende concerning certain

---

[39] For example, in alleging that various districts did not give due regard to political subdivisions, as required by Article III, §4, Petitioners cited instances in which districts crossed county lines and asserted that those districts also divided 57 specific "towns or localities." *See* Petition at ¶¶28, 32, 36, 41, 45, 52, 58, 62, & 67. However, the adopted plan had the same number of districts with county crossings as their preferred plan (the plan of the Governor's commission), and Petitioners stated at the hearing that only one crossing of a municipality – Glenarden in Prince George's County – was at issue in the districts they had challenged. Although they contended that the districts encompassing that municipality and Hyattsville, another municipality, are not compact, they did not specifically allege that either town was the subject of partisan gerrymandering. In their exceptions, they did not pursue a contention that the crossing of Glenarden violated Article III, §4.

quantitative metrics and comparisons that he made; and (3) the testimony of two legislators providing their own analysis of the consequences of the way in which three of those seven districts were drawn.

*The Eye Test*

As to the visual examination test, it is certainly true that none of the legislative districts in the adopted plan resembles either a circle or a square and that some districts have odd shapes. But the same can also be said of past State redistricting plans approved by this Court, including the one drawn by the Court itself in 2002, and of the plan proposed by the Governor's commission for this cycle. The mapmakers of all of those plans had to contend with what this Court has characterized as the "bizarre" shape of Maryland itself and the irregular shapes of some of the State's counties[40] and municipalities.[41]

One district that has had an odd shape in its several iterations in different plans is District 12. Its shape in each of the three most recent redistricting plans is illustrated below:

*2002 Court-drawn plan*:



---

[40] For example, Charles County, bounded on two sides by the Potomac River, might not score well on any compactness test.

[41] Examples of irregularly-shaped municipalities include Bowie, Glenarden, Hyattsville, LaPlata, and Laurel.

*2012 Court-Approved Plan:*



*2022 Adopted Plan*:



The fact that a particular district had a peculiar shape in the past does not immunize a map from close scrutiny in the present. But the fact that past plans resorted to oddly-shaped districts to satisfy the "predominant criterion" of the substantially equal population and the other federal and State constitutional requirements illustrates that an odd shape alone is not compelling evidence of a violation.

*Mr. Trende's Measures, Maps, and Comparisons*

Mr. Trende's testimony concerning certain quantitative metrics was apparently intended to provide the Court with some context for assessing the degree to which these districts deviated from what one might expect for a compact district in Maryland.

However, the comparisons that Mr. Trende made were not those that would have been helpful in providing the desired context.

Mr. Trende himself did not offer an opinion or conclusion as to whether the challenged districts did or did not satisfy Maryland's compactness criterion. Rather, he offered a comparison of the challenged districts with a data set of other districts from around the country – a comparison that suggested that the challenged districts lagged behind others on a compactness scale.

First, Mr. Trende presented charts showing the scores of the challenged districts on four quantitative tests that are known as the Reock, Polsby-Popper, Inverse Schwartzberg, and Convex Hull tests. Each measures the "compactness" of a district by comparing its area and perimeter in different ways to those of a purportedly ideal reference shape.[42] He

_____

[42] As described by the expert witnesses and the Special Magistrate in his report, those four tests are:

- *Reock test:* The ratio of the area of the legislative district to the area of a circle that encompasses the district, known as the minimum bounding circle. The score is between 0 and 1, with a higher score demonstrating a more compact district. In this measurement, a circle represents a fully compact district.

- *Polsby-Popper test:* The ratio of the area of the legislative district to the area of a circle with the same circumference, or perimeter, as the subject district. The score ranges between 0 and 1, with more compact districts receiving higher scores.

- *Inverse Schwartzberg test:* The Schwartzberg test measures the ratio of the perimeter of the legislative district to the circumference or perimeter of a circle with the same area as the district. The inverse of the score on the Schwartzberg test yields a number between 0 and 1 with a higher number indicating greater compactness.

testified that he used several tests because there is no "magic number" for measuring compactness.

Using the scores of the challenged districts on these metrics, Mr. Trende constructed a summary chart that compared the challenged Maryland districts with 13,473 mapped state legislative districts (both house and senate) nationwide for the years 2002 through 2020. For each challenged Maryland district, that chart showed the number of districts in the data set that scored lower than the challenged district on all four of the tests. In other words, if a district in the data set scored better on *any one* of the four metrics than a challenged Maryland district, the data set district was graded as "better" than the challenged district on the issue of compactness. This, of course, means that a challenged Maryland district could score better than a data set district on three out of the four tests for compactness, but would be classified as "worse" than the data set district because it did not do so on the fourth test.[43] We do not know whether or how frequently that phenomenon occurred in Mr. Trende's analysis. He did not say.

---

- *Convex Hull test:* A similar test to the Reock test, except it uses a polygon instead of a circle to enclose the district.

Mr. Trende noted that scores on these tests were not always consistent with one another as a district shaped like a square or rectangle might not score particularly high on a circle-based metric.

[43] An analogy might be made to a batter in a baseball game who has three hits out of four at bats against a pitcher – resulting in an incredible .750 batting average against that pitcher. Mr. Trende's methodology would find that the pitcher had prevailed in that game and credit the batter with a .000 batting average.

Based on this selective comparison, only 0.71% of the districts in the data set were "worse" than one of the challenged Maryland districts (District 12), and 43.56% of the mapped districts were "worse" than District 27. This led him to conclude that District 12 "is an outlier" – presumably meaning not very compact – and that District 27 is "pretty compact." This was the closest that Mr. Trende came to stating an opinion on compactness.

Mr. Trende plotted the distribution of the data set districts by their scores on each metric on four histograms, resulting in the familiar bell curve for most data distributions.[44] He indicated on each histogram where the scores of each challenged district fell in the distribution. In at least one of the histograms, the challenged districts appear to fall on both sides of the median. However, Mr. Trende did not calculate any reference measure, such as a standard deviation,[45] that a student learns in Statistics 101 for ascribing significance to a data point on a bell curve. Nor did he provide any useful analysis of these histograms, preferring to rest his conclusions on the summary chart mentioned above.

---

[44] When graphed, many large data sets tend to distribute themselves in what is commonly known as the "bell curve," clustering around the average and tapering off on either side. Basic statistics regarding the distribution can identify biases and outliers within the data set. *See* Wolfram Alpha, "Bell Curve" (2022), available at https://perma.cc/KP5Y-4JYR.

[45] The standard deviation is a measure of how spread out a data set is from the average. This statistic is "useful because, given normal chance, an outcome will occur within one standard deviation of the average about two-thirds of the time." *See* Samuel S.-H. Wang, *Three Tests for Practical Evaluation of Partisan Gerrymandering*, 68 Stan. L. Rev. 1263, 1288 (2016). The Supreme Court has noted that as a general rule, "if the difference between the expected value and the observed number is greater than two or three standard deviations," the outcome could indicate manipulation. *See Castaneda v. Partida*, 430 U.S. 482, 496 (1977).

More to the point, it seems odd to compare the shapes of districts in a state like Maryland – which itself resembles a paint splatter that someone half-heartedly started to wipe up – with districts in the many states that are relatively rectangular in shape.[46] For that reason, some scholars have questioned the relevance of compactness comparisons made across state lines, with Maryland being held up as a prime example of why such comparisons are not appropriate. As one study explained:

> [O]ne need only look at Colorado and Maryland side by side to justify [the rule against comparisons of compactness scores across states]. For nearly every measure, the districts of Maryland will be less compact than the districts of Colorado. Maryland, of course, has a jagged, incising coastline which skews the score of most compactness measures. But these are forgone conclusions, as state borders do not change and congressional districts are subject to these boundaries. So, using most traditional compactness measures, comparisons across states are inappropriate.

Carl Corcoran and Karen Saxe, *Redistricting and District Compactness*, in THE MATHEMATICS OF DECISIONS, ELECTIONS, AND GAMES (2014 ed. Karl-Dieter Crisman, et al.).[47]

Mr. Trende provided no basis for his implicit assumption that a comparison of districts in other states would be informative on the compactness of districts drawn under

---

[46] In his written testimony presented to the General Assembly, Professor Persily, the consultant to the Governor's commission, noted that the "strange shape of Maryland and some of its counties" necessarily affected compactness scores.

[47] Along the same lines, Professor Lichtman testified that Maryland ranked near the bottom on a variety of measures of the compactness of states themselves. One of the State's exhibits provided the precise ranking of the states on the compactness scores, but it is not clear from the video record of the hearing that the exhibit itself was received in evidence.

Maryland law. Specifically, he made no apparent effort to exclude the scores of districts in states where the districting requirements differ from those in Article III, §4; made no effort to exclude the numerous states whose shapes make them more conducive to division into neat shapes than that of Maryland; provided no basis for assessing the scores of the challenged Maryland legislative districts – that is, State Senate districts – by reference to a data set that included districts from other states that would be the equivalent of *subdistricts* in Maryland (that is, the data set included both senate *and* house districts from other states); and seemingly did not weight the analysis to account for the varying number of districts in each state.

What is perhaps more informative than what Mr. Trende did is what he did not do. Mr. Trende did not compare the test scores of the challenged districts specifically with those of other maps of Maryland districts,[48] such as the districts approved in prior redistricting cycles, or with those in the plan proposed by the Governor's commission.[49] He said that he made only the comparison that Petitioners had asked him to make.

---

[48] Some of the 13,473 districts in the data set would have been Maryland districts and subdistricts from past redistricting cycles, but Mr. Trende apparently made no effort to run the comparison specifically against those districts.

[49] Although Mr. Trende depended on test scores to conclude that most of the districts were low on a compactness scale, he offered no testimony on how the Petitioners' default alternative – the Governor's commission plan – would fare in the same comparison with data set districts. In written testimony presented to the General Assembly on January 18, 2022, Professor Persily, that commission's consultant, provided tables of compactness scores for districts in that plan, as well as the LRAC plan. While most of the districts in the Governor's commission plan scored higher on most metrics than most of the districts in the LRAC plan, the mean compactness scores of the two plans on most measures were not dramatically different and Professor Persily did not opine that the LRAC plan was

Mr. Trende did not do anything other than compute and compare compactness scores. He provided no opinions or analysis of the other districting factors set forth in Article III, §4. He did not analyze county or border crossings, the effect of population shifts, the existence of Voting Rights Act districts, the shapes of Maryland's subdivisions, or its natural boundaries. He testified that he had not been asked to undertake those analyses. Although he had appeared as an expert in a number of previous cases involving allegations of partisan gerrymandering, he said that he had not analyzed the adopted plan as to whether it advantaged Democrats or disadvantaged Republicans, and he offered no opinion on that subject. Nor did he express an opinion on whether the shapes of the challenged districts or his comparisons demonstrated partisan gerrymandering.[50] Specifically, he did not opine on whether the configuration of any of the challenged districts would impermissibly dilute or enhance the voting strength of any discrete group. *See 1982 Districting*, 299 Md. at 687.

The compactness comparison made by Mr. Trende is not instructive on the issues before the Court. His number crunching had the appearance of rigor, but contributed little

constitutionally deficient. That written testimony did not include any comparison to compactness scores of past Maryland districting plans.

[50] In the State's case, Professor Lichtman testified that a comparison of compactness scores of Maryland districts to the scores of districts in other states was meaningless and that the Governor's plan also contained some districts with low scores and county crossings. Professor Lichtman did offer an analysis of the adopted plan on the issue of partisan gerrymandering which, he said, should be analyzed instead by reference to voter affiliation statistics and past election results. He testified that, by most measures of partisan gerrymandering used in political science literature on the subject, the adopted plan advantaged Democrats "slightly less" than the prior 2012 districting plan.

to meeting the Petitioners' burden. The Special Magistrate apparently accorded little weight to it. Given the superficial quality of his analysis and the lack of any opinion by Mr. Trende whether the adopted plan demonstrated the alleged partisan gerrymandering, we agree that it is entitled to little weight.

*Mr. Trende's Past Election Result Map Overlays*

In addition to the charts and histograms concerning test scores, Mr. Trende produced maps in which the challenged districts were overlaid by a color scheme that indicated the share of the vote received in past elections by certain Republican candidates – Governor Hogan in 2018, former President Trump in 2020, and an unsuccessful Republican candidate for Maryland Attorney General in 2018. The color scheme followed the convention of displaying Democratic-leaning areas in various shades of blue and Republican-leaning areas in various shades of red. Mr. Trende provided no analysis of the significance of those maps on the issues of compactness and partisan gerrymandering. Indeed, he provided no analysis of those maps at all.

*The Four Challenged Districts in Prince George's County*

It is evident from the map overlay exhibits that, for the four challenged districts that lie completely within Prince George's County (Districts 22, 23, 24, and 47), partisan gerrymandering was not a likely source of their odd shapes. On those maps, past election results favoring Democrats are represented by shades of blue. Each of the four Prince George's County districts lies in a sea of dark blue. Even if one of those districts could be squared or rounded off in one direction or several, consistent with the other constitutional

criteria, the map overlays suggest that the partisan make-up of those districts would not change.

In written testimony presented to the General Assembly and introduced by stipulation before the Special Magistrate, the architect of the plan of the Governor's commission noted that districts in Prince George's County would contain majority African-American and Hispanic populations and that the many municipalities in that county have "strange" and "contorted" shapes. Special Magistrate Report Appendix II (Written Testimony of Nathaniel Persily at 22). Consistently with those observations, Ms. Davis of DLS testified before the General Assembly committees that District 23 "no longer has sub-districts because of the changing racial make-up in that area" and "moved further south to respond to the population growth in southern Maryland." She further testified that "minimal changes were made to Districts 24, 25, and 26, including a slight move to the south for Districts 25 and 26 and that was again to respond to the population growth or to capture that population growth in southern Maryland."

With respect to these districts, Petitioners' challenge relied entirely on the "eye test" and Mr. Trende's compactness comparisons.[51] Neither Mr. Trende nor any other witness for the Petitioners provided an opinion on whether their shapes and scores on various

_____

[51] The Dissent suggests that "the Prince George's County districts that … border the District of Columbia arguably provide the best opportunity to create compact districts" because that boundary is a straight line. Dissent at 36. That suggestion does not account for the need to give due regard to the oddly-shaped municipalities in that area, such as Cheverly, Seat Pleasant, and Colmar Manor.

64

metrics were in aid of partisan gerrymandering.[52] The eye test and the use of mathematical measures by themselves seldom amount to "compelling evidence" of a violation of Article III, §4. The Reock and Schwartzberg tests pre-date the addition of the compactness criterion to the Maryland Constitution.[53] The Polsby-Popper test has been available during three redistricting cycles.[54] None has previously figured prominently in this Court's review of a redistricting plan.

As this Court has repeatedly explained, neither the drafters of Article III, §4 nor the voters who ratified that provision could have intended that the constitutionality of Maryland's districts be gauged by the results of quantitative tools devised by political scientists looking at districting nationally. *1982 Districting*, 299 Md. at 687-88. That is

---

[52] Petitioners argued that the Special Magistrate's denial of their discovery requests made it difficult to prove their allegations of extreme partisan gerrymandering. Facts relevant to the dilution of the votes of a discrete partisan group would be proven through evidence of changes that a redistricting made to the partisan makeup of the challenged districts; that is the evidence that, depending on the degree of the change, might establish an impermissible partisan gerrymander. *Cf. Rucho v. Common Cause*, 139 S. Ct. 2484, 2497 (2019) ("The 'central problem' is not determining whether a jurisdiction has engaged in partisan gerrymandering. It is 'determining when political gerrymandering has gone too far.'") (citation omitted). As discussed below, Petitioners introduced a chart of changes in precincts, by party affiliation, for District 33. Presumably, if there was evidence that the partisan make-up of the Prince George's county districts had changed as a result of the adopted plan, they could have generated the same information and presented it to the Special Magistrate. But the record contains no such evidence.

[53] Ernest C. Reock, Jr., *Measuring Compactness as a Requirement of Legislative Apportionment*, 5 Midwest J. Pol. Sci. 70 (1961); Joseph E. Schwartzberg, *Reapportionment, Gerrymanders, and the Notion of "Compactness"*, 50 Minn. L. Rev. 443 (1966).

[54] Daniel D. Polsby & Robert D. Popper, *The Third Criterion: Compactness as a Procedural Safeguard Against Partisan Gerrymandering*, 9 Yale L. & Pol'y Rev. 301 (1991).

so for two reasons. First, as this Court's precedent instructs, anyone familiar with Maryland and the shapes of its subdivisions and waters can easily tell that quantitative measurements based on shapes are not likely to be instructive. *Id.* Second, had the people of the State intended to incorporate into the compactness provisions a test such as the Reock test or to mandate particular shapes, they could easily have done so. And, they can yet do so; for example, the Missouri Constitution was amended in 2020 to specify the shapes that the mapmakers should try to attain in that largely rectangular state.[55] It is not the Court's role to insert such provisions into the Maryland Constitution.[56]

In addressing alleged violations of Article III, §4, this Court has: expressed skepticism about the usefulness of "a mathematical formulation" in assessing compliance with Article III, §4, *see 1982 Districting*, 299 Md. at 688; made clear that an odd shape of one district in a plan, in isolation, does not by itself evidence a violation, *see id.*; explained that so long as a map is not proven to violate the constitutional provisions, the mapmakers may draw lines to favor or disfavor an incumbent, *id.* at 687; and ordinarily required "an

---

[55] The Missouri Constitution, Article III, §3, provides "Subject to the requirements of subdivisions (1) and (2) of this subsection, districts shall be composed of contiguous territory as compact as may be. Areas which meet only at the points of adjoining corners are not contiguous. In general, compact districts are those which are square, rectangular, or hexagonal in shape to the extent permitted by natural or political boundaries." *See* https://perma.cc/Z5EH-ENSK.

[56] The Dissent states that "the [Court] misses an opportunity for this Court to refine a compactness standard that will apply during the current era of high-powered computer analytics and voter microtargeting used in [mapping]." Dissent at 5. The refinement of Article III, §4 is a legislative function in the first instance and then a matter for the voters. Indeed, the Dissent recognizes as much when it quotes the Supreme Court: "Provisions in state statutes and constitutions can provide standards and guidance for courts to apply." Dissent at 32, quoting *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019).

affirmative showing ... to demonstrate that such districts were intentionally so drawn to produce an unfair political result, that is, to dilute or enhance the voting strength of discrete groups for partisan political advantage or other impermissible purposes." *Id*. at 687.

The Petitioners' evidence concerning compactness did not establish that these four districts violated Article III, §4.

*Testimony Concerning the Three Challenged Districts in Anne Arundel County*

Petitioners did provide some additional evidence concerning the other three districts challenged on compactness grounds. All were located fully or partially in Anne Arundel County. One of the Petitioners, Delegate Kipke, testified at the hearing and briefly gave his analysis of the new boundaries of those three districts.[57] As noted earlier, Delegate Kipke was a member of the House Rules and Executive Nominations Committee and was present during the joint hearing that the committee held with the Senate committee on the LRAC plan. He did not ask any questions or make any comments during that hearing. Nor did he ask any questions or make any comments during the floor debate prior to adoption of that plan by the House of Delegates.

*Districts 12 and 21*

At the hearing before the Special Magistrate, Delegate Kipke was asked to compare District 12 under the 2012 districting plan with the updated version of that district in the 2022 adopted plan. He noted that District 12 would now cross from Howard County into

---

[57] Delegate Kipke also testified about the new boundaries of District 31, which was one of the districts challenged in the petition in Miscellaneous No. 25, but is not a subject of the Petitioners' exceptions.

67

Anne Arundel County[58] – that is, it contains one of the 15 county crossings in the adopted plan. He also observed that the district's senator and the delegate representing the smaller Anne Arundel County portion of that district will likely be Howard County residents, and that they would now have votes as members of the Anne Arundel County delegation.

With respect to District 21, Delegate Kipke testified that the version of the district in the adopted plan was similar to its configuration in the 2012 plan and that it crossed from Prince George's County into Anne Arundel County. He stated that the senator and delegates representing the district were all Democrats and residents of Prince George's County and that these legislators would have a vote in the Anne Arundel County delegation. He said that the "practical effect" would be to "dilute" the vote of representatives hailing from Anne Arundel County when the legislators met in the delegation. He did not testify as to any particular partisan effect of the crossing.[59]

The Petition that initiated Miscellaneous No. 25 had alleged that both of these districts demonstrated political gerrymandering – in the case of District 12, to protect an incumbent member of the House of Delegates (Petition, ¶29) and in the case of District 21, to help "flip" District 33 from Republican to Democratic legislators (Petition, ¶33).

---

[58] Under the prior 2012 districting plan, District 12 crossed from Howard County into Baltimore County.

[59] In testimony presented to the General Assembly with respect to the plan developed by the Governor's commission, which was entered into evidence by stipulation at the hearing before the Special Magistrate, Professor Persily remarked on the difficulty of avoiding county crossings in Anne Arundel County, as that county is "in the center of the state," where "outlying districts converge to get adequate population to comply with one-person, one-vote." The plan developed by the Governor's commission included three districts that crossed into Anne Arundel County from other counties.

However, as to both districts, Delegate Kipke's analysis did not refer to a partisan effect but instead focused on the effect that the new district boundaries might have on the make-up (by residence) of the members of the Anne Arundel County delegation – that is, the "dilution" of the votes of legislators resident in Anne Arundel County in that delegation.

County delegations are not created by the State Constitution or statute. Rather, they are creatures of the respective rules of the Senate and House of Delegates and are denominated as "select committees."[60] In the context of legislative redistricting, this Court has alluded to the role of a county delegation as acting essentially as the local legislative body for a county without home rule. *2002 Districting*, 370 Md. at 359. While the Anne Arundel County delegation no doubt performs important functions, it does not function as the local legislative body. Anne Arundel County is a charter county with home rule.[61] In 2004, this Court held that the Anne Arundel County delegation was not subject to the constitutional one-person, one-vote requirement. *McMillan v. Love*, 379 Md. 551, 570 (2004); *see also* 80 *Opinions of the Attorney General* 53 (1995).

The evidence with respect to Districts 12 and 21 amounted to a critique of their shapes under the eye test and Mr. Trende's questionable compactness comparison, and a concern that a county crossing would dilute votes in the Anne Arundel County delegation.

---

[60] *See* Department of Legislative Services, Maryland Legislator's Handbook Volume 1 (2018) at 22-23. The Maryland Legislator's Handbook is available online at https://dls.maryland.gov/pubs/prod/RecurRpt/Handbook_Volume_1_MD_Legislators_Handbook.pdf .

[61] The same is true of the two other counties involved in the county crossings in these districts – Prince George's County and Howard County.

However, the shapes and scores are not by themselves evidence of a violation of Article III, §4; a single county crossing is unremarkable in light of the population numbers indicating the need for county crossings; the "towns" identified in the Petition are not in fact political subdivisions – *i.e.,* municipalities; and the fact that an otherwise compliant plan "may have been formulated in an attempt to preserve communities of interest, to promote regionalism, to help or injure incumbents or political parties, or to achieve other social or political objectives, will not affect its validity." *2012 Districting*, 436 Md. at 133, quoting *2002 Districting*, 370 Md. at 221-22.

The fact that a redistricting plan changes the makeup of a county delegation does not establish a violation of Article III, §4. The Petitioners did not introduce compelling evidence that Districts 12 and 21 violated the constraints that the Constitution places on the political branches when they draw redistricting maps.[62]

*District 33*

Delegate Kipke also testified about District 33, which lies entirely within Anne Arundel County. He said that the mapmakers changed District 33 in such a way as to give it "jagged" boundaries, that the district is no longer a "generic" central Anne Arundel

---

[62] During her testimony before the General Assembly committees on January 18, 2022, Ms. Davis, the DLS staffer, stated that population from the Odenton area, previously in District 21, had been moved to District 33, which had been split into three single-member districts, one for "mostly Odenton," one for the Broadneck area, and one for the rural or central portion of Anne Arundel County. She stated that District 33 had added population from Odenton to reduce the population in District 32. Although Ms. Davis solicited questions from the legislators about the map, the committee members did not ask her to elaborate on District 21 or any other district. Nor were any questions about these districts posed to the members of the LRAC who had been invited to the hearing to answer questions.

County district, and that it now has been divided into three single-member delegate subdistricts. He did not otherwise analyze the effect of the change in its boundaries.

Delegate Rachel Muñoz, an incumbent Republican delegate from that district, also testified at the hearing. She had been appointed to fill a vacant House seat in District 33 in November 2021. She testified that the new boundaries of District 33 in the adopted plan no longer included her in that district and now placed her neighborhood in adjacent District 31. Petitioners introduced a map showing the line and argued that the line was "surgical[ly]" drawn that way to remove a sitting Republican delegate from District 33. Petitioners did not except to the Special Magistrate's recommendation concerning District 31.

With regard to Petitioners' allegation that District 33 was designed to dilute the votes of Republicans, an exhibit that the Petitioners introduced into evidence after the State's case, without explanation by any witness, purports to show, by precinct, and without totals, the movement of Republican and Democratic voters in and out of the District. Also, the parties stipulated to voter registration data by district before and after the LRAC plan. Petitioners represent that these exhibits show that the percentage of registered Democrats in the District has increased by 3%, from approximately 38% to approximately 41%, and registered Republicans have declined, from 38% to 35%. An exhibit prepared by Mr. Trende, but that he was not asked to analyze, shows that the district, as configured now, is comprised of voters who voted heavily for Governor Hogan, a Republican, in 2018. The evidence of intended dilution of Republicans' opportunity to elect candidates of their own party therefore is not compelling. In any event, "an intentional effort to district so as to

71

create a balance between two primary partisan political parties does not violate" the federal constitution.[63]  *1982 Districting*, 299 Md. at 673-74.

The assertion that the District 33 line was "surgically" drawn in order to remove Delegate Muñoz from the district seemingly poses a closer question:  the map itself permits an inference that the mapmakers bumped the line out to remove only a small area from the district.  The record, however, does not compel that inference.[64]  In any event, the issue is once again resolved by the fact that Maryland's Constitution assigns the drawing of maps to the political branches and not to this Court.  Accordingly, the fact that a plan "may have been formulated in an attempt to ... help or injure incumbents or political parties, or to achieve other social or political objectives, will not affect its validity."  *2002 Districting*, 370 Md. at 322; *see also 2012 Districting*, 436 Md. at 134 (stating that, within the constraints of State and federal law, "[t]he political branches may pursue a wide variety of

---

[63] With regard to District 33, the Dissent states that "[i]t is time for this Court to adopt a standard to apply for extreme partisan gerrymandering …."  Dissent at 55.  The Petitioners did not introduce any evidence to suggest that a 3% swing, in a district that now comprises a large number of voters who voted Republican in the last gubernatorial election, is "extreme."  Even so, it is not the Court's role to legislate districting standards.  *See* footnote 56.

[64] The map also permits an inference that the line that allegedly targeted the area that includes Delegate Muñoz's neighborhood gave due regard to a natural boundary. The jagged line follows a river immediately below that area and follows Ritchie Highway to its immediate east.  More to the point is that the adopted plan puts the Delegate's residence in District 31, which contains a higher percentage of registered Republicans than District 33.

Given the conflicting inferences, and Ms. Davis' testimony that population from Odenton was added to District 33 to reduce the population in District 32, the evidence as to District 33 is not compelling.

objectives, including ... aiding political allies or injuring political rivals"). The facts to which Delegate Muñoz testified thus did not state a claim of a constitutional violation.

In sum, the Petitioners did not present compelling evidence that Districts 12, 21, or 33 violated Article III, §4.

### 2. Contiguity and Due Regard to Natural Boundaries

The Petitioners faulted just one district with respect to the criteria of contiguity and due regard for natural boundaries – District 27. Under the adopted plan, District 27 encompasses parts of Calvert, Prince George's, and Charles counties and is divided into three single-member subdistricts. Subdistrict 27A is split between Charles and Prince George's counties; subdistrict 27B is split between Calvert and Prince George's counties; and subdistrict 27C lies completely in Calvert County. Under the prior 2012 districting plan, District 27 had encompassed parts of the same three counties and had also been divided into three subdistricts, although the boundaries had shifted under the adopted plan due to population changes. As noted above,[65] the populations of all three counties had increased, but the increases in Charles and Prince George's counties were significantly greater, both in percentage terms and absolute numbers, than the increase in Calvert County.[66]

---

[65] *See* Part II.B of this opinion.

[66] The parties stipulated to a "malapportionment report" that showed, for each existing district and subdistrict, its deviation under the 2020 census figures from the "ideal" population for the particular type of district. As of the 2020 census, the existing subdistrict 27A deviated from the ideal for a single-member subdistrict by 15.48%; subdistrict 27B by 3.98%; and subdistrict 27C by 4%.

At the joint committee hearing on the LRAC plan in the General Assembly, Ms. Davis of DLS testified that District 27 "continues to be in three counties ... and is right where the three counties converge." She stated that subdistrict 27A "picks up more of Charles County to accommodate for the growth in that county." She further testified that the three single-member subdistricts were intended to "make sure that each county has the possibility to elect their own representation." She stated that the boundaries of District 29, which lies along the Patuxent River, and of District 28, a small portion of which reaches that river, were "changed minimally for population balancing purposes."

At the hearing before the Special Magistrate, Delegate Mark Fisher, the lead Petitioner in Miscellaneous No. 25 and the delegate who represents subdistrict 27C, testified as to his concerns about District 27. He testified that, while his own subdistrict is located entirely in Calvert County, the portions of subdistrict 27B in Prince George's County and Calvert County are divided by the Patuxent River. He further testified that there is no bridge across that river within that subdistrict so that a person driving from one side of the subdistrict to the other would have to leave the subdistrict to get to the other side. He said that, currently, the senator representing District 27 is from Prince George's County. He opined that, under the adopted plan, only one delegate is likely to be from Calvert County, which has also been the case under the prior 2012 districting plan. He stated his view that subdistrict 27B was drawn without regard to natural boundaries and that Calvert County, as a commissioner county dependent on its State delegation to introduce local legislation in the General Assembly, ought to have two subdistricts of its

74

own.[67] Delegate Fisher neither identified the parties to which the current legislators from District 27 belonged nor provided any analysis that would suggest partisan gerrymandering of the district.

In recommending that the Court deny the Petition in Miscellaneous No. 25, the Special Magistrate found that the State had explained the need to cross county lines in order to account for population shifts. He did not specifically address whether the absence of a bridge over the Patuxent River within subdistrict 27B violated either the contiguity or the due regard criteria of Article III, §4.

The Petitioners excepted to the Special Magistrate's recommendation on the ground that the district violated the contiguity and due regard criteria of Article III, §4,[68] because it is divided among three counties and because there is no bridge within subdistrict 27B providing direct access between the two portions of that subdistrict.

In our view, the Petitioners did not present compelling evidence that the contiguity and due regard criteria were violated in the re-design of District 27 generally or of subdistrict 27B in particular. As for the county crossings, which were also part of the prior

---

[67] Delegate Fisher stated that the population of Calvert County is over 90,000. As noted earlier, that population is less than what would be needed to create a legislative district, but is slightly more than the population of an "ideal" two-member district. *See* Part II.B of this opinion.

[68] The Petition had originally alleged that District 27 also failed to give due regard to the boundaries of political subdivisions because it divided six "towns" as well as encompassing parts of three counties. However, the "towns" identified in the Petition are not actual political subdivisions – *i.e.*, municipalities – and Petitioners did not press that contention before us. The Petition did not allege a lack of compactness as to District 27; in fact, Mr. Trende conceded that it is "reasonably compact."

75

approved plan and one of which also appeared in the plan of the Governor's commission, the Court has indicated that "[i]n the absence of evidence of invidious, impermissible discrimination, the choice of where [a county] crossing would be located and what form that crossing would take was a political one, well within the authority of the political branches to make." *2012 Districting*, 436 Md. at 159.

As for the contiguity requirement, the Court has previously noted that the drafters of the constitutional provision intended that no district cross the Chesapeake Bay, but that, otherwise, "separation of two areas by water does not render the areas non-contiguous." *2002 Districting*, 370 Md. at 344. The bisection of subdistrict 27B by the Patuxent River may pose a closer question on whether due regard was given to natural boundaries. However, it is apparent that the prior 2012 plan similarly split the subdistrict and that one driving from one side of the subdistrict to the other would have used the same bridges (then in a different subdistrict of District 27) as now. The only difference is that population shifts and the need to work in from the outside geographically in designing districts had shifted district boundaries slightly so that the same bridges were in a different district rather than in a different subdistrict. The configuration of districts in Southern Maryland was driven by the above average increases in population, both in absolute numbers and percentage-wise, in both St. Mary's County (+8.2%) and Charles County (+13.7%). Both counties occupy the southern edge of the State, and the mapmakers worked from the edges inwards. That southernmost district had to borrow population from Calvert, which in turn had to borrow population from neighboring counties.

In sum, the record does not contain compelling evidence that District 27 generally, or subdistrict 27B in particular, violates the contiguity or due regard provisions of Article III, §4.

### 3.     Legislative Privilege

The Petitioners excepted to the Special Magistrate's ruling sustaining the State's assertion of legislative privilege in response to certain discovery requests. The discovery requests concerned the identity of the persons responsible for the design of the challenged districts, who instructed those persons on the criteria to be used in doing so, any specific instructions given concerning the challenged districts, and any criteria used with the computer program that was used in the drawing of the districts.[69]

*Legislative Privilege under Maryland Law*

The legislative privilege applicable to State legislators and their staffs in Maryland derives from the Maryland Constitution as well as from the common law. Article 10 of the Maryland Declaration of Rights provides "[t]hat freedom of speech and debate, or proceedings in the Legislature, ought not to be impeached in any Court of Judicature." A related provision of the Maryland Constitution provides legislators with immunity from civil actions or criminal prosecution for actions or speech related to legislative activity. Maryland Constitution, Article III, §18.[70] Another underpinning of legislative privilege is

---

[69] With respect to the computer program itself, the State did not assert legislative privilege and identified for Petitioners the computer program that was used.

[70] Article III, §18 provides that "[n]o Senator or Delegate shall be liable in any civil action, or criminal prosecution, whatever, for words spoken in debate."

77

Article 8 of the Declaration of Rights, which provides for the separation of powers of the Legislative, Executive, and Judicial branches of State government.[71] *See Murphy v. Liberty Mutual Insurance Co.*, 478 Md. 333, 370-82 (2022); *see also Hamilton v. Verdow*, 287 Md. 544, 553-54 n.3, 556 (1980).

With respect to the common law, this Court has recognized that the doctrine of legislative immunity, like the doctrine of judicial immunity, is also historically rooted in the English common law, which was adopted for Maryland in the Maryland Declaration of Rights. *See* Maryland Declaration of Rights, Article 5; *Gill v. Ripley*, 352 Md. 754, 763 (1999) ("An absolute immunity for legislators, with respect to conduct and statements made in the course of legislative proceedings, is as venerable as judicial immunity, having been traced back to 1399."). As noted by this Court in a civil fraud case involving a Governor's exercise of the legislative function of vetoing a bill, courts have deemed the common law doctrine of legislative immunity to be broader than that conferred constitutionally and have applied it where a particular constitutional provision did not apply to conduct that was legislative in nature. *Mandel v. O'Hara*, 320 Md. 103, 112 (1990). There, the question was not whether Maryland law recognizes legislative immunity under the common law but rather whether the exercise of a veto fell within it. After explaining the policy reasons behind the doctrine as applied to legislators acting within their legislative function, the Court stated: "There is no policy reason why

---

[71] Article 8 provides "[t]hat the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

legislators should enjoy absolute immunity for their legislative acts but that a Governor should have only a qualified immunity for his or her legislative function of vetoing or approving legislation." *Id*. at 134.

The Court of Special Appeals has had occasion to examine the constitutional privilege that applies to State lawmakers on four occasions. In two instances, the intermediate appellate court determined the breadth of an analogous common law legislative privilege possessed by members of local legislative bodies and the extent to which it could be asserted in response to a discovery request. *See Montgomery County v. Schooley*, 97 Md. App. 107 (1993) (common law legislative privilege applicable to discovery requests directed to member of county council); *Floyd v. Baltimore City Council*, 241 Md. App. 199 (2019) (common law legislative privilege applicable to discovery requests directed to members of City Council).[72] Although neither decision is binding on this Court, the two decisions provide background on the origin of the doctrine of legislative privilege and are informative on its application.

*Schooley* was a challenge to the adoption of a redistricting plan for the Montgomery County Council pursuant to the County charter. The challengers sought to take the deposition of a Council member concerning the adoption of amendments to the bill that enacted the plan. The challengers stated that they were not seeking information about the

---

[72] The other two cases concerned the aspect of legislative privilege that confers immunity from prosecution. *State v. Holton*, 193 Md. App. 322, 338-62 (2010) (common law legislative privilege of member of City Council provided immunity from criminal prosecution), *aff'd on other grounds*, 420 Md. 530 (2011); *Blondes v. State*, 16 Md. App. 165 (1972) (constitutional provision and related statute provided for limited exception from legislative immunity), *overruled on other grounds*, 273 Md. 435 (1975).

79

member's "legislative intent," but rather information "about the procedural aspects of the enactment." 97 Md. App. at 111. The County sought a protective order against the deposition, asserting legislative privilege; the council member apparently took no position on the request for a protective order. The challengers insisted that the deposition should go forward with the member asserting the privilege on a question-by-question basis. The circuit court denied the motion for a protective order, and the County appealed.

In a scholarly opinion by then-Chief Judge Wilner, the Court of Special Appeals vacated the circuit court's denial of the protective order and remanded for that court to explore whether there was any area of inquiry that would *not* be subject to the privilege. In sketching the scope of the common law legislative privilege applicable to local legislators, the intermediate appellate court traced the history of the legislative privileges applicable to members of Congress and to State legislators to the common origin of those privileges in the English Bill of Rights. The court noted that legislative privilege has "long been regarded as an important protection of the independence and integrity of the legislature and, in this country, as also reinforcing the core doctrine of separation of powers." *Schooley*, 97 Md. App. at 114 (citations and internal quotation marks omitted). The legislative privilege is to be read broadly to serve that purpose; it applies "not only [to] words spoken in debate but anything generally done in a session of the [legislature] by one of its members in relation to the business before it." *Id.* (citations and internal quotation marks omitted).

The Court of Special Appeals further noted that one aspect of legislative privilege is a testimonial privilege that protects a legislator from questioning other than in the

legislative body itself. 97 Md. App. at 116 (citing *Gravel v. United States*, 408 U.S. 606 (1972)). The intermediate appellate court summarized the testimonial privilege:

> … a legislator, even if not a party to the action and thus not subject to any direct consequence of it, cannot be compelled to explain, other than before the legislative body of which he is a member, either his legislative conduct or the "events that occurred" in a legislative session.

*Id*. at 117.

In *Floyd*, an opponent of a new zoning map adopted by the Baltimore City Council alleged irregularities in its adoption and filed a "Petition for Enforcement of the Open Meetings Act." 241 Md. App. at 206. After denial of the City's motion to dismiss, the plaintiff sought the testimony of two Council members and a staff member. The City asserted legislative privilege and moved to quash the subpoenas to the council members and to limit the staff member's testimony to compliance with the Act. The circuit court granted the motion and, following trial of the case, ruled in favor of the City because the plaintiff had failed to produce sufficient evidence of a willful violation of the Act. *Id.*

On appeal, the plaintiff alluded to the requirement that she had to prove a "willful" violation of the Act and argued that, because the council members were "uniquely positioned and qualified to elucidate the proceedings" in question, the assertion of legislative privilege severely prejudiced her in pursuing her claim. The Court of Special Appeals reprised its analysis and holding in *Schooley* and reached the same conclusion, affirming the circuit court's discovery ruling. It stated that "even if we perceived a tension between the doctrine of legislative privilege and the requirements of the [Open Meetings]

81

Act, a judicial carve-out of an exception to the application of that doctrine in such cases would be inappropriate" and was a matter for the General Assembly. 241 Md. App. at 214.

Consistent with these principles, confidentiality is a core feature of the drafting process before a bill is filed. *See* Department of Legislative Services, Maryland Legislator's Handbook Volume 1 (2018) ("DLS Handbook") at p.71.[73] There is no question that the privilege applies to the information sought by Petitioners, as they seek non-public information concerning the drafting of legislation. The question is whether that confidentiality – the legislative privilege – should be set aside in this instance.

*The Redistricting Process and Privileges*

As explained earlier, under the Maryland Constitution, each of the three branches of State government can be involved in the drafting of a redistricting plan. The Executive Branch – *i.e.*, the Governor – is commanded by the Constitution to draft a plan; the Legislature has discretion to draft its own plan; and the Judicial Branch – this Court – may ultimately (as has happened twice) draft a plan as a back stop when a plan drafted by one of the other branches falls short of the constitutional requirements.

The Constitution requires some transparency in the redistricting process, as Article III, §5 directs the Governor to hold public hearings on the Governor's plan, which might otherwise be drafted completely in private.[74] Transparency is already built into the

---

[73] *See* footnote 60 above.

[74] Indeed, the failure of the Governor to hold public hearings led this Court to invalidate the first redistricting plan in the modern history of Maryland state redistricting. *See 1973 Districting*.

82

legislative process, which involves public committee hearings and votes on proposed legislation and public proceedings on the floor of each house to debate and vote on proposed legislation. *See* Maryland Constitution, Article III, §21 (doors of Legislature to be open); GP §§3-101(f), (j), 3-102 (State Open Meetings Act applicable to legislative, as well as "quasi-legislative," functions of a public body); *see also Avara v. Baltimore News American*, 292 Md. 543, 553 (1982) (State Open Meetings Act applies to legislative conference committee).

The deliberations of each branch are also protected to some extent by an evidentiary privilege – the Governor by executive privilege and, as indicated in the *Mandel* decision described above, also by legislative privilege; and this Court by the judicial privilege that protects its deliberations.[75] As noted above, the legislative privilege applicable to members of the General Assembly and their staffs similarly protects them from questioning about the performance of their legislative duties, other than in the legislative body itself. *See* DLS Handbook at 71.

Our review of the past redistricting decisions of this Court and the reports of the special masters appointed in those cases reveals no instance in which matters covered by

---

If the Governor creates a committee by executive order, it will be subject to the State Open Meetings Act. Maryland Code, General Provisions Article ("GP"), §3-101 *et seq.*

[75] The basis and boundaries of judicial privilege are a bit amorphous, perhaps because of the infrequency with which it needs to be asserted. *See, e.g., In the Matter of Certain Complaints under Investigation by an Investigating Committee of the Judicial Council of the Eleventh Circuit*, 783 F.2d 1488, 1518-20 (11th Cir. 1986); *In re United States*, 463 F.3d 1328, 1332 n.4 (Fed. Cir. 2006); *see generally* Charles W. Sorenson, Jr., *Are Law Clerks Fair Game? Invading Judicial Confidentiality*, 43 Val. U. L. Rev. 1, 47-50 (2008).

the constitutional legislative privilege, executive privilege, or the common law judicial privilege were part of the decision in those cases.[76]  In each instance, the Court and the special master analyzed the plan in question in the same manner that this Court typically analyzes other pieces of legislation – looking to the actual terms of the plan and at the effect of the plan and any alternative plans offered by challengers, without inquiry into the specific motives of any individual drafter.  *See, e.g., 2002 Districting*, 370 Md. at 339-43, 347 (describing special master finding merit in one challenger's objection to the adopted plan and rejecting an alternative plan proposed by another challenger on the basis that the alternative plan "advances partisan interests," but not basing that finding on testimony as to individual motives).  So, too, did the Special Magistrate in this case.

As with other legislation, the issue is not whether a sponsoring legislator's personal motives were noble or nefarious, but what does the legislation actually provide?  The sponsoring legislator's motives or communications with staff are not probed – or even considered relevant; after all, it is the body, not the individual legislator, that ultimately adopts legislation.  *See Baltimore Retail Package Stores Ass'n v. Board of License Commissioners*, 171 Md. 426, 430 (1937); 2A Sutherland, Statutes and Statutory Construction (7th ed.), §§48.12, 48.17.  In the specific context of reviewing legislative resolutions related to redistricting, this Court has functioned no differently.[77]

---

[76] None of those decisions mentions any discovery requests for privileged material or assertions of legislative privilege, and the analyses of the plans in question do not refer to anything that would have been privileged.

[77] In his dissent, Judge Gould cites a case concerning the invocation of the Fifth Amendment privilege against self-incrimination in a civil context and, by analogy,

Thus, this Court typically looks first to the plain language of legislation and frequently to its legislative history – which does not involve breaching legislative privilege. Here the joint resolution describes the plan, which is graphically represented by maps (as to the accuracy of which there appears to be no dispute). Although there is no requirement in the State Constitution that the Legislature hold hearings before introducing a resolution

---

proposes that the Court draw an adverse inference from the State's assertion of legislative privilege. For example, he would infer, from the State's claim of legislative privilege in response to a request for information about instructions given to mapmakers, that any such instructions violated the State and federal constitutions. Dissent (Gould, J.) at 5. However, there are significant distinctions between the two contexts that render the analogy inapt.

One difference between the Fifth Amendment privilege and the legislative privilege is that the Fifth Amendment privilege embodies a notion of potential incrimination and thus goes to the content of the information requested. By contrast, the legislative privilege does not turn on whether the information is potentially incriminating or otherwise adverse to the one who claims it. Thus, it is reasonable to infer – at least in the context of a civil case – that the information protected from disclosure when a witness invokes the Fifth Amendment privilege is adverse to that witness. The same cannot be said about the invocation of legislative privilege. It is not inherent in the nature of the privilege that the information it protects is necessarily adverse to anyone.

Another difference is that, unlike the Fifth Amendment privilege, the purpose of the legislative privilege is not to protect an individual legislator, but rather to advance a public interest. It is rooted not in individual rights, but in separation-of-powers principles applicable to the branches of State government. *See Hamilton v. Verdow*, 287 Md. 544, 554, 556 (1980) (regarding executive privilege, noting that "[a]s it has roots in the constitutional doctrine of separation of powers, a similar privilege extends to the judicial and legislative branches as well."). For that reason, too, the State's assertion of the privilege, by itself, does not imply that members or staff of one of the other branches of government, whether executive or legislative, acted illegally in some way.

That is particularly so in this case, where the Petitioners, equipped with data on the partisan make-up of the various districts and with an expert witness who had opined on partisan gerrymandering claims in other states, nonetheless introduced no evidence or analysis based on that data that the LRAC plan would dilute the votes of any discrete group of voters in the challenged districts. Instead, their evidence focused on the physical configuration of a few districts.

embodying a plan, the LRAC held 16 open meetings following release of the census data. Despite the abbreviated timeline of this cycle, the legislative committees to which the resolutions were referred held two public hearings at which the members had the opportunity to, and were told that they should, ask questions of the chair of LRAC and, at one hearing, the director of LRAC's staff. Two Petitioners in this case were members of the House committee to which the joint resolutions were referred and they attended both hearings; one Petitioner asked questions. There were floor debates in both houses, during which members could – and did at some length – ask questions of the member presenting the resolution that ultimately passed. Some of those questions were similar to the questions posed by Petitioners in their discovery request.

Therefore, if the preparation of the LRAC districting maps falls within the legislative conduct protected by the Speech and Debate Clause, inquiries into that process belong in the Legislative Branch and not in the Judicial Branch. That is particularly so when the parties who seek to inquire into legislative motives are themselves members of the legislative branch; it is not for this Court to assess the adequacy of the opportunity of legislators to seek information during the legislative process, whether in the committee hearings or in floor debate. Put another way, two of the Petitioners in Miscellaneous No. 25 had the opportunity to question the LRAC chair, a staff member, and the sponsor of the legislation in the joint committee hearing on the bill. Every delegate had the opportunity to ask questions during the floor debate in the House. One member did engage in an

extended discussion posing questions to the House majority leader, an LRAC member, about the LRAC's process, staff, and meetings.[78]

The LRAC map was drafted by DLS – an agency of the General Assembly – and was introduced, debated on, and adopted as legislation. The drafting of that legislation fell within the legislative conduct protected by the Speech and Debate Clause. Therefore, under State law, inquiries into DLS's drafting process properly belonged in the General Assembly.

*Legislative Privilege under Federal Common Law*

Petitioners rely primarily on a federal district court opinion on a discovery dispute in a case concerning a federal constitutional challenge to Congressional redistricting. *Benisek v. Lamone,* 241 F. Supp. 3d 566 (D. Md. 2017).[79] The plaintiffs in *Benisek* had challenged the Congressional districts that the Governor had proposed, and the General Assembly had approved, after the 2010 census. As described by the federal district court, their complaint alleged "in essence that the Plan's redrawing of the Sixth District's boundaries constituted unlawful retaliation in violation of their rights under the First Amendment and Article I [of the United States Constitution]." 241 F.Supp.3d at 570. To succeed on their claims, the federal district court concluded, the plaintiffs would have to

---

[78] The Dissent surmises that the Petitioners may have concluded that asking questions in committee would be pointless because they would "not change any votes." Dissent at 26. Whether or not that is so, the Petitioners were uniquely positioned to request the information and chose not to do so.

[79] The Supreme Court later vacated the district court's opinion on the merits. *See Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

prove, among other things, that the map drawers had the "*specific intent* to impose a burden on [them]" because of how they voted or their political affiliation. *Id*. (internal quotation and citation omitted). Accordingly, the plaintiffs sought to subpoena and depose members of the Governor's redistricting advisory committee, including several sitting state legislators. The proposed deponents filed motions to quash on the grounds that legislative privilege shielded the information that the plaintiffs were seeking; the plaintiffs in turn filed motions to compel. *Id*. at 570-72.

In addressing those motions, the federal district court held that the members of the advisory committee, including the non-legislators, enjoyed a qualified legislative privilege under federal common law that could be denied "where important federal interests are at stake." 241 F. Supp. 3d at 574. Applying a five-factor test[80] to balance the competing interests of the litigants, the court concluded that federal legislative privilege did not protect conversations and other communications between and among the legislators and some legislator-staff communications. *Id*. at 575-77.

The Special Magistrate stated that the *Benisek* discovery ruling was inapposite to this case because (1) that case was an action in federal court asserting that the Congressional redistricting process violated federal law and (2) the Supreme Court had

---

[80] The five-factor standard, which was derived from the deliberative process privilege for executive branch actors, requires a court to weigh: (1) the relevance of the evidence sought; (2) the availability of other evidence; (3) the seriousness of the litigation; (4) the role of the State, as opposed to individual legislators, in the litigation; and (5) the extent to which the discovery would impede legislative action. *Benisek*, 241 F. Supp. 3d at 575.

ultimately vacated and remanded the case with instructions to the lower court to dismiss the action. *See Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

We agree that the *Benisek* district court ruling is inapposite to this case, given the context in which it was made and in light of the Supreme Court's later holdings in that case. The issue arose in that case when, in 2017, six years after the adoption of the Congressional map, the *Benisek* plaintiffs asked the federal district court to issue a preliminary injunction against the election official defendants to enjoin them from holding the 2018 Congressional election under that map. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018). The federal district court denied that motion and stayed further proceedings pending the Supreme Court's disposition of another districting case. *Id.* In seeking to establish that they had exercised reasonable diligence, as required of a party seeking a preliminary injunction, the plaintiffs attributed their delay to the State defendants' opposition to their discovery requests. The Supreme Court found that the plaintiffs' delay was instead attributable to the fact that they had waited until 2016 to allege their retaliation claim. *Id.* at 1944. The Court stated: "Plaintiffs' newly presented claims – *unlike the gerrymandering claim presented in the 2013 complaint* – required discovery into the motives of the officials who produced the [map]." *Id.* (emphasis added). It thus appears that a gerrymandering claim, by itself, does not defeat the legislative privilege under the federal common law and entitle a plaintiff to discovery into the motives of those who produced the map. Later, in *Rucho*, the Supreme Court vacated the lower court's decision that the *Benisek* plaintiffs had proven their case on the merits. In doing so, the Court

rejected the use of specific intent as an element of a constitutional challenge to a district. *Rucho*, 139 S. Ct. at 2504.

Thus, it is at best unclear whether the holding concerning the federal common law privilege applicable to State lawmakers in *Benisek* survives the vacatur of that decision by the Supreme Court. It may well be that a *federal* court would apply that five-factor test with respect to privileges asserted by *any* of the State actors involved in redistricting when a plaintiff has alleged a claim, such as invidious racial or ethnic discrimination, that implicates the mapmakers' specific intent. But that is distinct from the question that was before the Special Magistrate and is now before this Court. Petitioners did not allege such claims, and the *Benisek* discovery ruling does not apply here.

We conclude that the Special Magistrate properly sustained the State's assertion of legislative privilege in response to the Petitioners' discovery requests.

### G. *A Word on the Dissenting Opinions*

We have already addressed, in previous sections of this opinion, the two issues discussed in Judge Gould's dissenting opinion[81] and many of the points made by Chief Judge Getty's dissenting opinion.[82] Chief Judge Getty's dissenting opinion almost entirely relates to the districts challenged in Miscellaneous No. 25 and briefly discusses the challenge made in Miscellaneous No. 27; he apparently has no quarrel with our disposition of the petitions filed in Miscellaneous Nos. 24 and 26. In this section, we address certain

---

[81] *See* footnotes 31 and 77 above.

[82] *See* footnotes 25, 34, 51, 56, 63, and 78 above; *see also* footnote 98 below.

issues raised by Chief Judge Getty's dissenting opinion that are salient to Miscellaneous No. 25, to the extent they have not been addressed earlier in this opinion.

1. The Alleged Discrepancy Between the Parties' Stipulation and the Planning Data

The Dissent contends that Joint Exhibit F, part of the Stipulation of Facts that the parties presented to the Special Magistrate, is inaccurate. The Dissent asserts that the stipulation does not correlate with the Department of Planning data categorizing adjusted population figures from the 2020 Census. There are at least three reasons why that assertion lacks merit.

*The Parties Stipulated to Joint Exhibit F*

Joint Exhibit F was provided to the Special Magistrate as part of a stipulation entered into by the parties. It contains extensive data concerning adjusted population figures for the districts and subdistricts in the adopted plan broken down by certain racial and ethnic groups, voting age population, party registration, and other criteria. It was introduced as background information that was not in dispute and was not the subject of any extended discussion during the hearing before the Special Magistrate. The Dissent suggests that the Special Magistrate, instead of focusing on the material facts that the parties contested, should have spent the limited time available to him questioning and recomputing the stipulated evidence.

*No Allegation of "Discrepancies" in the Data was Made by Anyone Until Now*

Not only did no party to this case question the accuracy of the data in Joint Exhibit F, no member of the Court has previously raised any issue about that data. No question

was posed to the parties either before, at, or even after oral argument; the issue appears for the first time in the Dissent. In essence, the Dissent would have the Court base a decision on the Dissent's belated (and, as we shall see, flawed) assertion of "discrepancies" in data to which these ably-represented parties had stipulated without giving them the opportunity to dispel its concerns. It faults the parties and Special Magistrate for failing to answer a question that was never asked.

*The Dissent's Charts and Computations are Inaccurate*

The Dissent includes 14 charts related to the eight districts that are challenged in Miscellaneous No. 25 and asserts that the numbers in those charts, and computations that the Dissent makes based on those numbers, demonstrate that there are "discrepancies" between Joint Exhibit F and the adjusted population data published by the Department of Planning.

But the real discrepancy appears to be in the labels that the Dissent uses in its charts versus the numbers actually included in the charts under those labels and in the computations the Dissent makes following the charts. The Dissent labels the columns of each chart as "Percentage of Total Adjusted Population" for various racial groups, ending with a catch-all column for "Percentage of Total Adjusted Population: Other." Each chart includes a row labeled "Department of Planning" that the Dissent represents to be percentages provided in the Department of Planning's adjusted population data for these various groups, and another row labeled "Exhibit F" under the same columns. The implication is that each column presents an apples-to-apples comparison of the Department of Planning data with that in Joint Exhibit F. However, a closer examination of the actual

Department of Planning data reveals that the Dissent's charts and computations mischaracterize that data and that the Dissent's charts and computations do not provide an apples-to-apples comparison.

As each of the Dissent's charts specifies certain racial categories of the adjusted population and a catch-all "other" category, one would assume that these percentages in the rows attributed to the Department of Planning data should add up to 100% of the total adjusted population. But, as it turns out, none of them do. For example, on p. 96 of the Dissent, there is a chart that, for subdistrict 12A, purports to list the breakdown of the adjusted population of that subdistrict in the Department of Planning data under categories labeled "White," "Black," "Hispanic Origin," "Asian," and "Other." If one adds the percentages for each of those categories in the row labeled "Department of Planning," one obtains a total of 94.17% (46.75% White + 23.84% Black + 8.85% Hispanic Origin + 14.05% Asian + 0.68% Other = 94.17%). The Dissent's summary of the Department of Planning data for subdistrict 12A thus leaves out more than 5% of the subdistrict's adjusted population.

Similarly, directly following the chart for subdistrict 12A, the Dissent lists adjusted population numbers for that district for the same racial categories. Those figures total 81,435 people (40,425 White + 20,615 Black + 7656 Hispanic + 12,147 Asian + 592 Other = 81,435). However, the actual Department of Planning data indicate that the adjusted population for that subdistrict is 86,473.[83] The numbers presented by the Dissent

---

[83] See Maryland Department of Planning, *Maryland 2022 Legislative Districts with 2020 Total Adjusted Population*, available at https://perma.cc/7B95-4Q7E.

93

undercount the subdistrict's adjusted population, as reported by the Department of Planning, by more than 5,000 people.

A similar pattern holds true for all 14 sets of charts and computations in the Dissent.[84] Thus, the Dissent's comparisons in its charts, and the computations that appear below each chart, all involve a consistent undercount by the Dissent in the figures it attributes to the Department of Planning compared to the Department of Planning's actual data.

[84] The following summarizes the undercount in the Dissent's charts and computations, by percentages and numbers of people, compared to the actual Department of Planning ("MDP") data:

**Undercounts in Dissent's Charts and Computations**

| District | Percent of Adjusted pop in Dissent charts compared to MDP data | Undercount of adjusted pop in Dissent computations compared to MDP data |
|---|---|---|
| Subdistrict 12A | 94.17% | -5,038 |
| Subdistrict 12B | 93.86% | -2,787 |
| District 21 | 96.36% | -5,664 |
| District 22 | 96.69% | -4,523 |
| District 23 | 95.46% | -8,989 |
| District 24 | 96.79% | -4,362 |
| Subdistrict 27A | 94.29% | -2,508 |
| Subdistrict 27B | 94.27% | -2,599 |
| Subdistrict 27C | 93.72% | -2,859 |
| Subdistrict 33A | 93.06% | -2,924 |
| Subdistrict 33B | 94.33% | -2,580 |
| Subdistrict 33C | 94.54% | -2,425 |
| Subdistrict 47A | 97.21% | -2,540 |
| Subdistrict 47B | 98.37% | -742 |

*See* Dissent at 96-106 and compare with Maryland Department of Planning, *Maryland 2022 Legislative Districts with 2020 Total Adjusted Population*, available at https://perma.cc/7B95-4Q7E.

Where are the people missing from the Dissent's summaries of the Department of Planning data? They actually *do* appear in the data itself; the Dissent has simply overlooked them. When one takes a closer look at the Department of Planning's data, it becomes evident why the Dissent's summaries of the Department's data do not add up to 100% and thus undercount the adjusted population for various racial and ethnic groups, as well as the total adjusted population. The Department's spreadsheets have separate columns for people who identify themselves as belonging to one racial group ("One Race") and for people who identify themselves as belonging to more than one racial group ("Two or More Races"). People in the latter category – *i.e.*, those who identify with more than one racial category – were excluded from the Dissent's summaries of the Department's adjusted population data.[85]

For example, the percentages that the Dissent has included under the label "Percentage of Total Adjusted Population: Black" in its charts is actually the Department of Planning's number for "Percent of Total Adjusted Population – Black or African American *Alone*" (emphasis added) – *i.e.*, those who identify themselves as being *only* Black or African American. The Dissent makes the same mistake in the figures that it represents to be the Department of Planning's figures for the "White," "Asian," and "Other" categories in its charts and computations. The Dissent's charts and computations

---

[85] Also excluded from the Dissent's charts are the adjusted population data for two specific racial groups that appear in the Department of Planning data – (1) "American Indian and Alaska Native Alone" and (2) "Native Hawaiian and Other Pacific Islanders Alone." Although the Department of Planning numbers for both of these categories are generally small, the Dissent does not include them in its column labeled "Other" – or anywhere else in its charts and computations.

take no account of people who identify as belonging to more than one racial group, even though the Department of Planning – like the Census – actually includes figures for those individuals in its adjusted population data.[86]

The Dissent asserts that the "discrepancies" that it perceives suggest that the adopted plan violates the prohibition against racial and ethnic discrimination. Dissent at 90, 106. We are willing to accept that the Dissent's undercounts of minority population numbers in the rows it labels "Department of Planning" in its charts are attributable to an oversight. How those undercounts by the Dissent would establish a violation of federal districting

---

[86] The numbers in the rows in the Dissent's charts labeled "Exhibit F" were apparently derived from the spreadsheets stipulated to by the parties as Joint Exhibit F. If one adds the percentages in the various categories in those rows, one finds that they total slightly more than 100% in each instance. That may be due to the fact that a person who identified with more than one racial group is included Joint Exhibit F in each group the person identified with.

The Dissent notes that the figures under the column labeled "Hispanic Origin" in its charts are identical in each instance for its rows labeled "Exhibit F" and "Department of Planning." The Dissent is seemingly perplexed that these figures do not exhibit the same "discrepancy" as the other racial categories. Dissent at 94. It seems likely that figures for "Hispanic Origin" are unaffected by the "More than One Race" category because the question on the census questionnaire concerning Hispanic Origin is a completely separate from the question on that questionnaire about how a person identifies by race – where "more than one race" is an option. *See* United States Census Bureau, Decennial Census of Population and Housing Questionnaires and Instructions, available at https://perma.cc/N9AW-RUS3.

In any event, while these seem likely reasons for the differences in the figures in the Dissent's charts that it perceives as "discrepancies," we do not have the benefit of what may be a simple explanation as those who seem to doubt the stipulated figures never asked the question when the parties were before us – or even afterwards – until now. What we do know for sure is that what the Dissent presents as its own summaries of the Department of Planning data do not present a complete and accurate breakdown of the Department's adjusted population numbers and provide no basis for contending that there are "discrepancies" in Joint Exhibit F.

requirements by mapmakers using accurate data is inexplicable. And the Dissent does not even venture an explanation. At any rate, the Dissent's misinterpretation of the Department of Planning data does not support voiding the adopted plan.

2.      Alleged Lack of Transparency in Resolving the Discovery Dispute

The Dissent alleges that the Special Magistrate decided the discovery dispute and the application of legislative privilege "out of public view." Dissent at 28. That characterization is unfair to both the Special Magistrate and the parties.

On February 17, 2022, the Special Magistrate conducted a remote to discuss discovery and other matters. During that live-streamed conference, the State advised that issues involving legislative privilege might arise during discovery. In a promptly-issued scheduling order posted the next day on the Court's website, the Special Magistrate required the parties to advise him of any discovery disputes by March 8. The parties in fact did so on March 3 by joint letter conveyed by email. The Special Magistrate who, like the parties, was operating on an extremely tight deadline, asked the parties to submit memoranda to him by email on the issue. The parties did so immediately and served each other with their respective memoranda. Shortly after receiving the memoranda, the Special Magistrate allowed the parties to make the same points orally in a virtual meeting on March 8. The Special Magistrate promptly ruled on the issue in a March 10 order that recited the arguments of the parties and the reasoning of the Special Magistrate.[87] That order was filed

---

[87] Indeed, the Dissent cites portions of that order that explicitly quote arguments made by Petitioners in the legal memoranda submitted to the Special Magistrate. Dissent at 24, 28. That order was publicly posted when it was issued, shortly after the discovery dispute

and posted on the Court's website that same day. The Special Magistrate retained the parties' memoranda. Presumably by inadvertence, the memoranda were apparently were not filed in MDEC by either the parties or the Special Magistrate.

In filings concerning the Petitioners' exceptions in Miscellaneous No. 25, both parties again briefed the issue in elaborate detail. Those filings have been publicly available on MDEC system and on the Court's website since they were filed.

We agree that it would have been better for the initial memoranda emailed to the Special Magistrate to have been formally filed on MDEC as well. They have been retrieved from the Special Magistrate's files and, although duplicative of filings already in the record, they will be added to the public record. And we agree that, although the virtual meeting concerning the discovery dispute resembled a prehearing court conference in a civil case that might not occur in open court, it ideally would have been held, in this case, in a format that was simultaneously accessible by the public. However, contrary to the characterization by the Dissent, this was not an effort to "shield" the issue or its resolution from the public. The public was notified of the issue, the respective arguments of the parties, and the resolution when the Special Magistrate posted his order less than a week after the issue first arose.[88]

---

arose. There is simply no factual basis for the Dissent's suggestion that either the Special Magistrate or the parties concealed this issue from the public.

[88] The Dissent also asserts that the Special Magistrate – and this Court – considered the issue "without traditional briefing." Dissent at 18 n.12. However, as reflected in the Special Magistrate's order, the parties thoroughly briefed the issue before him and did so again in the exceptions and response to exceptions filed with the Court.

3. The Alleged Evidence Relied Upon by the Dissent

The Dissent states that it "analyse[s] the plan on the record before the Court." Dissent at 7 n.5. The Dissent does not address the adequacy of the testimony actually presented at the hearing before the Special Magistrate, does not mention either the expert witnesses or the Petitioners who testified, and only briefly refers to the testimony of a non-petitioner delegate who appeared as a witness. Specifically, while alluding to "extreme partisan gerrymandering," the Dissent does not cite to any facts in the record that would establish that the design of any of the challenged districts effected such a result.

Instead, the Dissent relies on many "facts" that do not appear in the record before Special Magistrate, were not brought up by the Court or counsel at the oral argument in this case, were not raised in the Petitioners' exceptions, and accordingly were never subject to cross-examination, rebuttal, or explanation. It further appears that a significant portion of the Dissent is devoted to relitigating failed challenges to past redistricting plans, the facts of which are not part of the record of this case. And the Dissent devotes considerable space to recounting past challenges alleging racial gerrymandering when no such claims were made by the Petitioners in this case.

The Dissent emphasizes that we have original jurisdiction of this matter. That is true. But to say that we have original jurisdiction to review a plan does not mean that we originate objections to the plan. It does not mean that we are a free-roaming fixer of any ill we perceive. The framers of the State Constitution, like those of the federal Constitution, created a government of separate branches and defined powers that, ultimately, means a limited government. Our original jurisdiction in this case under Article III, §5, is triggered

99

by the filing of a petition, not by our own desire to redo redistricting. A petition contains allegations, as those that resulted in this case did, and our original jurisdiction means that we are the trial court charged with deciding the merits of the petition based on the evidence presented in support of, and in rebuttal of, the petition in light of the governing law. In this case, there were petitions containing specific allegations. The parties introduced evidence for and against those allegations and ably tried the case. It is our job to decide that case based on those allegations and that evidence. It is not to devise claims not made and refer to evidence not introduced to reach a result that we prefer.

The Dissent's discomfort with the redistricting process created by the Maryland Constitution – which assigns line-drawing to the political branches and provides a limited role for the Court – is understandable. However, this Court's role is not to relitigate the case on facts not raised by the parties; instead, it is to address the challenges that have been presented under the law and precedents that govern redistricting in this State.

**V**

**Miscellaneous No. 26**

*The Petition*

In Miscellaneous No. 26, Petitioners alleged that the adopted plan's use of single-member delegate districts in some places and multi-member delegate districts in others violated their rights under various provisions of the Maryland and federal constitutions, both facially and as applied. Specifically, the Petition alleged that "[a]llowing multimember districts to exist and be apportioned for the Maryland House of Delegates violates the 'one person, one vote' principle, both as a logical *prima facie* violation and as

100

a violation as applied in the Plan." Further, the Petition alleged that "multimember districts are employed exclusively under the Plan so as to allow for consolidation of partisan political power and advantage to the majority party," and that the "failure of the Plan to have uniformly sized single member House districts" violates both constitutions.[89]

As relief, the Petitioners proposed that the Court order the General Assembly to adopt a plan that "specifically incorporates uniform single member House of Delegates districts" and, if the General Assembly did not do so, that the Court order that a new plan be prepared by "a special magistrate, Court-ordered expert, or in any other method or manner deemed appropriate by this Court."[90]

*The Hearing before the Special Magistrate*

The Petitioners did not introduce live testimony at the hearing before the Special Magistrate. Instead, their counsel introduced an affidavit of Patricia Shoemaker, one of the Petitioners.[91] In that affidavit, she states that her residence in Hampstead had previously been in a district entirely located in Carroll County and that, in that district, she

---

[89] The Petitioners in Miscellaneous No. 26 also adopted by reference "the averments and objections" to the adopted plan and the "legal and factual bases" for those objections made by the petition in Miscellaneous No. 25. They offered no further elaboration or additional evidence with respect to those claims and, accordingly, there is no need to repeat our analysis of those claims in this section of this opinion.

[90] According to the allegations of the Petition, Delegates Brenda Thiam and Wayne Hartman, the two legislator petitioners in Miscellaneous No. 26, would each represent single-member districts under the adopted plan. Patricia Shoemaker, a registered voter who is a petitioner in Miscellaneous No. 26, would reside and vote in a single-member delegate district under the adopted plan.

[91] Otherwise, these Petitioners simply reiterated that they were adopting the evidence introduced by the Miscellaneous No. 25 petitioners.

101

had the opportunity to vote for one State senator and three delegates. As a result of the adopted plan, her residence will be in a subdistrict of a legislative district that crosses the county line into Baltimore County and thus she will have the opportunity to vote for a State senator, but only one delegate.

Referring to the Shoemaker affidavit, Petitioners' counsel noted that some Carroll County residents will now vote in District 42C for one delegate, while other Carroll County residents in Westminster will vote for three at-large delegates. He asserted that the State had not articulated reasons for the distinction. At the hearing, counsel stated that the Petitioners were not contesting the constitutionality of Article III, §3 of the Maryland Constitution (which specifically authorizes the use of multi-member delegate districts) – thereby apparently withdrawing the facial constitutional challenge alleged in the petition – but maintained that the use of multi-member districts in the adopted plan violated other constitutional provisions – thereby maintaining the "as applied" constitutional challenge to the adopted plan.

In response, the State introduced the testimony of its expert, Professor Lichtman, who observed that the Petitioners had not come forward with any facts to support their allegation that the plan used a mixture of single-member and multi-member districts for partisan advantage. He testified that he had conducted his own analysis as to whether the plan would confer an advantage on Democrats and concluded that, given the percentage of Democrats in Maryland, the plan would result in their under-performance when compared with nine other states with multi-member legislative districts.

*Recommendation of the Special Magistrate*

As indicated above, following the hearing, the Special Magistrate submitted a report to the Court in which he recommended that the Petition in Miscellaneous No. 26 be denied. He noted that the Supreme Court has held that multi-member legislative districts are not *per se* unconstitutional, even when used in combination with single-member districts. *See White v. Regester*, 412 U.S. 755, 765 (1973). He also noted that allowing a mix of multi-member and single-member districts "can serve a useful purpose of giving minority groups a better opportunity to elect one of their own." But he suggested that the issue of disparate voting power between a voter in a three-member district and a voter in a one-member district was a "fair one" for consideration whether the part of Article III, §3 of the Maryland Constitution authorizing the mixture of single-member and multi-member districts should be amended or repealed.

*Petitioners' Exceptions to Recommendation of the Special Magistrate*

In their exceptions to the Special Magistrate's recommendation that the Court deny the Petition, Petitioners again disclaimed any challenge to the facial constitutionality of Article III, §3. Instead, they stated, they were arguing that §3 was unconstitutional as applied in this plan.[92] Further, they stated that they were not asking the Court to order the

---

[92] Petitioners relied on a North Carolina case that held that a provision of the North Carolina constitution that appeared to implicitly recognize the use of multi-member state legislative districts did not "authorize use of both single-member and multi-member districts in a manner violative of the fundamental right of each North Carolinian to substantially equal voting power" under another provision of that state's constitution. *Stephenson v. Bartlett*, 562 S.E.2d 377, 394 (2002). As best we can tell from that decision, there was no provision of the North Carolina constitution analogous to Article III, §3, that explicitly authorized the use of single-member and multi-member districts.

adoption of a map composed entirely of single-member districts, but instead had alternatively asked that the Court order the preparation of a plan "in any other manner," which, they stated, could include the multi-member districts when justified by a compelling state interest.

*Analysis*

Multi-member legislative districts are expressly permitted by Article III, §3. They do not violate equal protection principles *per se*, but they may do so as applied, as when drawn "invidiously to minimize or cancel the voting potential of racial or ethnic minorities." *See 1982 Districting*, 299 Md. at 673-74 (citations omitted) (referring to the Fourteenth Amendment); *see also 1992 Districting*, 331 Md. at 606 (discussing multi-member districts in the context of the Voting Rights Act). Petitioners bear the burden of establishing such a claim. *2012 Districting*, 436 Md. at 143-44. Petitioners made no such claim and introduced no evidence in support of such a claim. In the absence of such a claim supported by sufficient evidence, the Maryland Constitution expressly permits a mix of single-member and multi-member districts.

Likewise, the use of single-member districts in some places and multi-member districts in others does not on its face violate either the Maryland Constitution (which expressly permits that use) or the federal Constitution. To the contrary, single-member districts are sometimes created to ensure compliance with the Voting Rights Act. *See 1992 Districting*, 331 Md. at 608. At other times, as Mr. Aro testified before the General Assembly, subdistricts are sometimes used to preserve representation for a locality when population shifts require a district to cross subdivision boundaries. In those cases, a

104

subdistrict ensures that the people in the crossed-over area "would not be overwhelmed by an [] at-large district." In any event, the Supreme Court has observed, with regard to bicameral legislatures, that "[o]ne body could be composed of single-member districts while the other could have at least some multimember districts." *Reynolds v. Sims*, 377 U.S. 533, 577 (1964). The Supreme Court further noted that "[s]ingle-member districts may be the rule in one State, while another State might desire to achieve some flexibility by creating multimember or floterial districts." *Id*. at 579. In 2002, this Court created and adopted a plan that used a mix of single-member and multi-member districts. *See 2002 Court Redistricting Plan*, 369 Md. at 601-49 (order specifying Court plan).

In short, the Maryland Constitution permits mapmakers to use a mix of single- and multi-member districts, and it does not condition the practice on the determination of a compelling state interest. While the Governor's Executive Order directed his appointed commission to use single-member districts to the extent possible,[93] and other states' constitutions might contain such a requirement, adding such a requirement to the Maryland Constitution lies beyond the role of this Court.

With regard to the Petitioners' argument that Article III, §3 was unconstitutional as applied in the plan, they introduced no evidence to support their allegation of a systematic use of single-member and multi-member districts to achieve an unfair partisan advantage.

---

[93] COMAR 01.01.2021.02C(1)(d)(ii). Notably, the Governor's commission determined that it was unable to reach a consensus on the universal use of single-member subdistricts in its plan. It ultimately reached a compromise that included a mix of three-member and single-member delegate districts. *See* Report of the Special Magistrate, Appendix II (Final Report of the Maryland Citizens Redistricting Commission at pp. 8-9).

If, by incorporating all of the evidence presented in Miscellaneous No. 25 into their case, they intended to rely on any of that evidence to support that claim, they did not identify it. Even without the testimony of the State's expert to the effect that the delegate subdistrict lines did not confer a partisan advantage, Petitioners' conclusory allegation that those lines constituted an impermissible "gerrymander" was speculative at best.

*Summary*

The Petition and evidence in Miscellaneous No. 26 did not establish by compelling evidence that the plan adopted by the General Assembly violated either the Maryland Constitution or the federal Constitution.

## VI

## Miscellaneous No. 27

*The Petition*

Petitioner Seth E. Wilson filed a *pro se* petition challenging the adopted plan only as to subdistrict 2A, a two-member delegate district that lies largely in Washington County and crosses into Frederick County.[94]  In his petition, he also protested the adjustment of the population attributed to Washington County for purposes of redistricting pursuant to Maryland Code, State Government Article, §2-2A-01.  That statute was enacted in 2010 as part of the No Representation Without Population Act[95] and provides for the assignment of incarcerated individuals to their actual domiciles for purposes of redistricting.  As a

---

[94] His petition also appears to complain about the 2012 version of that district and expresses a preference for the districting lines drawn in 2002.

[95] Chapters 66, 67, Laws of Maryland 2010.  *See* footnote 12 above.

106

result, prisoners who are incarcerated in Washington County but hail from other jurisdictions or from out of state and who would have been attributed to Washington County under prior law no longer were counted in that manner for purposes of redistricting.

Mr. Wilson contended that the Maryland Constitution does not permit the State to adjust a county's population under the Act when the adjustment would require the drawing of a district across county lines. He also asserted that Article III, §4 of the Maryland Constitution and, by extension, the Fourteenth Amendment to the United States Constitution do not permit the State to make that adjustment when it would result in the drawing of multi-member subdistricts.

For relief, Mr. Wilson asked that the Court order that three single-member House subdistricts be created within Senate District 2, with two of the subdistricts entirely within Washington County. He asked that the Court declare the No Representation Without Population Act of 2010 "null and void" and that the incarcerated individuals excluded from the count for Washington County be added back into the count for purposes of redistricting.

*The Hearing Before the Special Magistrate*

Mr. Wilson did not submit any testimony or other evidence at the hearing before the Special Magistrate. However, he did attend the hearing and present argument.

*Recommendation of the Special Magistrate*

As indicated above, the Special Magistrate recommended in his report that the Petition be denied. The Special Magistrate noted that Washington County had sufficient

107

population to have a Senate district and associated House districts entirely within its borders. However, he also noted that the combined population of Garrett and Allegany counties was significantly less than what was necessary to create an "ideal" Senate district – *i.e.*, one that would that satisfy the constitutional criterion of "substantially equal population" in comparison to other Senate districts. He also noted that those drawing the districting maps had little choice but to start at the State's external boundaries and work toward the interior – in the case of Western Maryland, moving from west to east – to avoid painting themselves into a corner where they could not comply with the constitutional criteria. For that reason also, District 2 crossed into Frederick County.[96]

The Special Magistrate noted that the Supreme Court had approved the use of both single-member and multi-member districts in state legislative districting and that this Court had used such a mix when it created its own plan in 2002. Finally, he cited the

---

[96] From the 2020 census, the Special Magistrate concluded that the combined population of Garrett County and Allegany County was well short of the population of the "ideal" Senate district (131,391), and that the deficit would need to be made up by extending the boundary of District 1, which encompassed those two westernmost counties, into Washington County, the nearest adjoining county to the east, to add the necessary population. That, in turn, resulted in extending the boundary of District 2 from Washington County into Frederick County, in order to pick up the necessary population for District 2. In the General Assembly, Ms. Davis testified at the joint committee hearing on January 18, 2022, that population loss in the westernmost counties required the extension of District 2 across the county line. She stated that subdistrict 2A includes the City of Thurmont, a municipality, and goes to, but not across, the Carroll County line.

Hypothetically, we suppose, a challenger could take issue with the mapmakers' practice of beginning in the west of the State instead of somewhere else, but no Petitioner has questioned that practice. Quite likely, given the barrier posed by the Chesapeake Bay and the heavy concentration of population in the counties on its western shore, the result would be the same: a cluster of districts in those counties, and subdivision crossings, both there and to the west.

authorization in Article III, §3 of the Maryland Constitution.  The Special Magistrate concluded that "[t]here is no legal impediment to including multi-member districts, even when the district or part of it includes residents of another county, at least when that becomes necessary to assure population equality."

Finally, the Special Magistrate noted that a claim similar to the one made by Mr. Wilson concerning the No Population Without Representation Act had been rejected by the Supreme Court.  *Fletcher v. Lamone*, 831 F. Supp. 2d 887, 897 (D. Md. 2011) (three-judge court), *aff'd*, 567 U.S. 930 (2012).

*Petitioner's Exception to the Recommendation of the Special Magistrate*

In his exception to the Special Magistrate's recommendation, Mr. Wilson stated that the Special Magistrate had "fundamentally misstated, misconstrued, or misunderstood" his claims.  He contended that the adopted plan failed to give "due regard" to the boundaries of political subdivisions in creating a two-member district that crossed from Washington County into Frederick County instead of creating three single-member subdistricts, with two of those subdistricts entirely within Washington County.  He reiterated his contention that the statute that redistributes prison population in accordance with domicile for purposes of redistricting violates Article III, §4 when applied in districts that cross county lines.

*Analysis*

Everyone appears to agree that it was necessary for legislative District 2 to cross from Washington County into Frederick County as a result of the declining population in Western Maryland.  It is evident that House subdistrict 2B was drawn to coincide, more or

109

less, with the boundaries of Hagerstown, thereby honoring the prescription of "due regard" for political subdivision boundaries. Hagerstown does not extend into Frederick County, so the crossing would not occur in that subdistrict. Instead, it occurs in the two-member subdistrict 2A.

Mr. Wilson's preference for three single-member districts instead of one single-member district and one two-member district might well be our preference as well if the task of drawing the districts were assigned to this Court. However, the Constitution in Article III, §3 clearly authorizes the political branches to adopt the latter configuration.[97] Mr. Wilson has not provided any compelling evidence that any of the federal or State constitutional criteria were violated by doing so.

With regard to the No Representation Without Population Act, nothing in the text of that Act suspends its application when the adjustment of the census figures to reflect inmates' actual domiciles results in the drawing of a legislative district that crosses county lines. Nor do the State and federal constitutions so require. As the federal district court has explained in reference to this statute, "a State may choose to adjust the census data, so long as those adjustments are thoroughly documented and applied in a nonarbitrary fashion and they otherwise do not violate the Constitution." *Fletcher*, 831 F. Supp. 2d at 894-95, (discussing *Karcher v. Daggett*, 462 U.S. 725, 732 n.4 (1983)). The General Assembly's decision to exclude from the population count inmates currently incarcerated in a jurisdiction where they were never domiciled and were present only against their will is

---

[97] See the discussion of Article III, §3 in Part V of this opinion.

110

hardly unreasonable.  Mr. Wilson has neither alleged nor proved that the State applied the statute to Washington County's population count in an arbitrary manner.[98]

*Summary*

The Petition and evidence in Miscellaneous No. 27 did not establish compelling evidence that the configuration of subdistrict 2A violated either the Maryland Constitution or the federal Constitution.  The constitutional provisions did not require that the plan include three one-member delegate subdistricts in District 2 simply because the district crossed a county line.

# VII

# Conclusion

The Court's well-established case law on challenges to legislative redistricting sets a high bar for the challenger even when the schedule is not as compressed as it was on this occasion.  The constitutional assignment of redistricting to the political branches and the presumption of the validity that we must apply require it to be so.  The Petitioners in these cases did not clear that bar.  Yet it must be acknowledged that some of the allegations in the Petitions raise meaningful questions about the basis for the location of boundaries of several districts and of the appropriate use of subdistricts for the election of members of

---

[98] Chief Judge Getty's dissenting opinion would grant the Petition in Miscellaneous No. 27 based on the Dissent's "question … whether the Democratic Performance index is at play" in the configuration of District 2.  Dissent at 107.  However, the Petition did not allege any specific partisan effect of the configuration of the subdistricts in District 2 and the voter registration data in the record reveals that Republican registration exceeds Democratic registration in both subdistricts by substantial margins.  The Dissent's speculation provides no basis for invalidating the adopted plan as a whole or subdistrict 2A in particular.

111

the House of Delegates.  Clearer expression of the basis for the location of the boundaries of districts would have promoted not only this Court's confidence that it has decided the case correctly on an adequate record, but also the public's trust in its government. Nonetheless, the Petitioners' evidence fell short of the proof needed to establish the unconstitutionality of a redistricting plan.

For the reasons set forth in this opinion, we conclude that:

(1) the Petitioners in Miscellaneous No. 25 did not present compelling evidence that the adopted plan subordinated the requirements of Article III, §4 to partisan gerrymandering and other political concerns, as alleged in the Petition in that case.

(2) the Petitioners in Miscellaneous No. 26 did not present compelling evidence that the use of a mix of multi-member and single-member districts in the adopted plan violated Article III, §4, or other provisions of the Maryland and federal constitutions.

(3) the Petitioner in Miscellaneous No. 27 did not present compelling evidence that the adjustment of population numbers required by statute and the use of adjusted numbers in the designation of subdistricts in District 2 violated Article III, §4 of the Maryland Constitution and did not establish that those subdistricts violated the Fourteenth Amendment to the United States Constitution.

# Appendix A

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Nos. 21, 24, 25, 26 and 27

September Term, 2021

IN THE MATTER OF

2022 LEGISLATIVE

DISTRICTING OF THE STATE

Getty, C.J.
Watts
Hotten
Booth
Biran
Gould
McDonald, Robert N.
  (Senior Judge, Specially Assigned),

JJ.

ORDER

Filed: April 13, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



2022-04-13
17:19-04:00

Suzanne C. Johnson, Clerk

IN THE MATTER OF         \*     IN THE

2022 LEGISLATIVE          \*     COURT OF APPEALS

DISTRICTING OF THE STATE     \*     OF MARYLAND

                                               \*     MISC. NOS.

                                               \*     21, 24, 25, 26, 27

                                               \*     SEPTEMBER TERM, 2021

## O R D E R

**WHEREAS**, pursuant to the provisions of Article III, § 5 of the Constitution of Maryland, on January 27, 2022, the General Assembly of Maryland enacted Senate Joint Resolution 2, which constitutes the Legislative Redistricting Plan of 2022, and

**WHEREAS**, the Attorney General of Maryland having filed a motion to promulgate procedures to govern any petitions brought under Article III, § 5 of the Constitution of Maryland, and

**WHEREAS**, petitions challenging the validity of the Plan having been filed and an evidentiary hearing having been held before a Special Magistrate appointed by this Court, and

**WHEREAS**, on April 4, 2022, the Special Magistrate filed a report recommending that the petitions filed in the cases be denied, and on April 8, 2022, exceptions to the report were filed in this Court, and

**WHEREAS**, a hearing on the petitions and exceptions to the report of the Special Magistrate having been held before this Court on April 13, 2022, and

**WHEREAS**, the Court having determined that the Plan enacted into law on January 27, 2022 is consistent with the requirements of the Constitution of the United States and the Constitution of Maryland,

For reasons to be stated later in an opinion to be filed, it is this 13th day of April, 2022,

**ORDERED**, by the Court of Appeals of Maryland, a majority concurring as to the decision in *In the Matter of Legislative Districting of the State*, Misc. Nos. 25 and 27, September Term, 2021, that the exceptions filed by Petitioners in *In the Matter of Legislative Districting of the State*, Misc. Nos. 25, 26 and 27, September Term, 2021, are overruled in each case and that the relief sought in the petitions is denied; and it is further

**ORDERED**, that the relief sought in the petition filed in *In the Matter of Legislative Districting of the State*, Misc. No. 24, September Term, 2021, with no exceptions having been filed, is denied; and it is further

**ORDERED**, that the Legislative Redistricting Plan of 2022 enacted as Senate Joint Resolution 2 on January 27, 2022 shall be used for all purposes in acting upon or implementing the State of Maryland's legislative redistricting plan; and it is further

**ORDERED**, that

(1) The 2022 Primary for Gubernatorial Elections, shall remain scheduled for July 19, 2022.

(2) The following election deadlines for the 2022 Primary for the Gubernatorial Elections shall remain as set forth in this Court's Order of March 15, 2022:

(a) The deadline for filing certificates of candidacy, established pursuant to Maryland Code, (1957, 2017 Repl. Vol., 2021 Supp.),

Election Law Article ("EL") § 5-303 is Friday, April 15, 2022 at 9:00 p.m.;

(b) The deadline for candidates to withdraw a certificate of candidacy, established pursuant to EL § 5-502(a) is Monday, April 18, 2022;

(c) The deadline to fill a vacancy in candidacy for a primary election, established pursuant to EL § 5-901 is Wednesday, April 20, 2022;

(d) Pursuant to EL § 9-207, the Maryland State Board of Elections is authorized to adjust any deadlines related to certifying, displaying, and printing ballots, including the setting of a new deadline to challenge a candidate's residency; and it is further

**ORDERED**, that, pursuant to Article III, § 9 of the Maryland Constitution, a candidate for senator or delegate must reside in the district that the candidate seeks to represent for at least six months preceding the date of the statewide general election. For the 2022 statewide general election, a candidate must take up residence in a new district by May 8, 2022. The requirement that a candidate be a citizen of the State of Maryland, as set forth in Article III, § 9 of the Maryland Constitution, is unaffected by this Order; and it is further

**ORDERED**, that, in accordance with § 7 of Article XV of the Constitution of Maryland and EL § 8-301(a), a statewide general election will be held on November 8, 2022; and it is further

**ORDERED**, that the mandate is to issue forthwith.

/s/ Joseph M. Getty
Joseph M. Getty
Chief Judge
Court of Appeals of Maryland

Filed: April 13, 2022

/s/ Suzanne C. Johnson
Suzanne C. Johnson
Clerk
Court of Appeals of Maryland

# Appendix B

# MD 2022 State Legislative Districts

*SJ2*



| District | Adj. Population | Deviation | % Deviation |
|---|---|---|---|
| 01A | 43868 | -929 | -2.12% |
| 01B | 44733 | 936 | 2.14% |
| 01C | 44956 | 1159 | 2.7% |
| 02A | 84508 | -3694 | -2.75% |
| 02B | 43891 | 94 | 0.21% |
| 03 | 126161 | -5230 | -3.98% |
| 04 | 42636 | -455 | -2.7% |
| 05 | 132491 | 2100 | 1.6% |
| 06 | 131282 | -109 | -0.08% |
| 07A | 84123 | -2471 | -3.93% |
| 07B | 45473 | 1676 | 3.83% |
| 08 | 128487 | -2904 | -2.12% |
| 09A | 85573 | -2821 | -2.31% |
| 09B | 44760 | 31 | 2.28% |
| 10 | 126173 | -5218 | -3.97% |
| 11A | 42367 | -1430 | -3.27% |
| 11B | 84119 | -3475 | -3.97% |
| 12A | 85473 | -1121 | -1.28% |
| 12B | 43154 | -337 | -3.31% |
| 13 | 132747 | -3444 | -2.62% |
| 14 | 128914 | -977 | -0.74% |
| 15 | 133263 | 1392 | 1.21% |
| 17 | 134714 | 3333 | 2.53% |
| 18 | 127708 | -3623 | -2.76% |
| 19 | 128638 | -2753 | -2.1% |
| 21 | 130259 | -1132 | -0.86% |
| 22 | 133497 | 2106 | 1.6% |
| 23 | 136451 | 5060 | 3.85% |
| 24 | 133583 | 4192 | 3.19% |
| 25 | 135504 | 4113 | 3.13% |
| 27A | 43333 | 4070 | 3.56% |
| 27B | 43971 | -980 | -2.28% |
| 27C | 42638 | 1374 | 3.82% |
| 29A | 45304 | 1507 | 3.44% |
| 29B | 45516 | 1719 | 3.92% |
| 29C | 44543 | 1112 | 3.91% |
| 30A | 43583 | 866 | 1.98% |
| 30B | 45478 | 1682 | 3.84% |
| 31 | 84165 | -3429 | -3.31% |
| 32 | 42375 | -1422 | -3.25% |
| 33A | 130883 | -508 | -0.39% |
| 33B | 37054 | 1673 | 2.6% |
| 33C | 45689 | 1572 | 3.82% |
| 34A | 44220 | -1530 | -1.18% |
| 34B | 84684 | -1574 | 0.97% |
| 35A | 43791 | 1591 | 1.93% |
| 35B | 83235 | 1712 | 3.51% |
| 37A | 43509 | 570 | 2.74% |
| 37B | 44447 | 3383 | 1.5% |
| 38A | 90961 | 3367 | 3.84% |
| 38B | 44543 | 1646 | 3.85% |
| 38C | 44405 | 30 | 0.67% |
| 39 | 133983 | 2592 | 1.97% |
| 40 | 128162 | -5229 | -3.98% |
| 41 | 126149 | -441 | -2.95% |
| 42A | 42580 | -1137 | -2.57% |
| 42B | 89197 | 3603 | 2.27% |
| 42C | 44237 | -1580 | -2.62% |
| 43A | 42593 | 1296 | 2.96% |
| 43B | 87889 | 295 | 0.34% |
| 44A | 134162 | -5229 | -3.96% |
| 44B | 126149 | -5242 | -3.99% |
| 45 | 91843 | 3449 | 3.94% |
| 46 | 45401 | 1676 | 3.83% |

## Baltimore City



# MD 2022 State Legislative Districts

*Central Baltimore Area*



# MD 2022 State Legislative Districts

*Baltimore, Carroll and Harford County Area*



# MD 2022 State Legislative Districts

*Frederick County Area*



# MD 2022 State Legislative Districts

*Montgomery, Howard, Northern Prince George's Area*





# MD 2022 State Legislative Districts

*Prince George's, Anne Arundel Area*



# MD 2022 State Legislative Districts



# MD 2022 State Legislative Districts

## Southern Maryland Area



# MD 2022 State Legislative Districts

*Western Maryland Area*



# Appendix C

# 2012 Legislative Districting Map



Map available at :
http://redistricting.state.md.us/planviewer/ViewPlan.aspx?plan=Governors%202012%20Legislative%20Redistricting%20Plan

Argued: April 13, 2022

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Nos. 21, 24, 25, 26, 27

September Term, 2021

---

IN THE MATTER OF 2022

LEGISLATIVE DISTRICTING

OF THE STATE

---

*Getty, C.J.
Watts,
Hotten,
Booth,
Biran,
Gould,
McDonald, Robert N.
    (Senior Judge, Specially Assigned)

JJ.

---

Dissenting Opinion by Gould, J., which
Getty, C.J. and Biran, J. join

---

Filed: August 31, 2022

*Getty, C.J., now a Senior Judge, participated in
the hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to Md. Const., Art. IV, § 3A, he also
participated in the decision and adoption of this
opinion.

I respectfully dissent. Article III, Section 5 of the Maryland Constitution provides, in part:

> Upon petition of any registered voter, the Court of Appeals shall have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland.

Given the political nature of the legislative map-drawing function, this Court has recognized that our constitutional mandate does not allow us to substitute our policy judgments for that of the Executive and Legislative branches. Rather, our role "is limited to assessing whether the principles underlying the compactness and other constitutional requirements have been fairly considered and applied in view of all relevant considerations." *Matter of Legislative Districting of State*, 299 Md. 658, 688 (1984). This Court cannot, however, determine whether the "constitutional requirements have been fairly considered and applied" unless we know which constitutional requirements *were* considered and applied.

Whether one agrees with his analysis or not, Judge Getty has raised serious, colorable issues with respect to the legislative redistricting plan adopted by the General Assembly. So too, in my view, did the petitioners in petition numbers 25 and 27. That being the case, for the reasons expressed below, I believe that the Majority misallocated the burdens of production and persuasion, and misapplied the legislative privilege. In my view, instead of the order issued on April 13, 2022, this Court should have kept the hearing open, ordered the State to choose between: (i) answering the four questions as to which the State asserted legislative privilege or (ii) suffering the consequence of adverse inferences,

and reconvened the hearing promptly to consider the petitioners' exceptions in light of the State's response or lack thereof to such order. Thus, when this Court voted on April 13, 2022, although I found merit in much of Judge Getty's analysis, the deference this Court owed to the political and policy choices of the General Assembly left me reluctant on April 13, 2022 to disregard the General Assembly's plan without first giving the State another opportunity to provide the information necessary for us to conduct a proper review.

**1**

The Maryland Rules do not include any rules that govern petitions filed under Article III, section 5 of the Maryland Constitution. Chief Judge Bell, however, provided this analytical framework for reviewing such petitions:

> When the plan adopted by the Governor or Legislature is challenged, it becomes our lot to review it for constitutionality. We first look at the plan on its face, in light of the challenges, to see whether, and to what extent, the federal and state legal requirements have been met. When, from the petitions and the answers alone, we perceive deviations that do not appear to be permissible, but for which there may be some explanation that could serve to justify them, we have appointed a special master, thus affording the State and the petitioners the opportunity to present evidence and argument to supply that explanation. Following those proceedings, if we conclude that the deviations are within a permissible range or for a permissible purpose, we have approved the plan. On the other hand, if we are satisfied that, despite the proffered explanation, the deviations are constitutionally impermissible, we have but one choice: declare the plan unconstitutional and void. The former is exemplified by the 1982 and, as held by the majority, 1992 plans. As indicated, we declared the 1972 Plan unconstitutional, albeit for procedural, rather than substantive, default.

*In re Legislative Districting of State*, 370 Md. 312, 322-23 (2002). Since Chief Judge Bell's articulation of the allocation of the burdens of production and persuasion, this Court has not consistently applied it. But neither has this Court expressly overruled it. In my

2

view, Chief Judge Bell had it exactly right—when a prima facie case is alleged in the petition that the plan suffers from one or more constitutional infirmities, the proponent of the map should be called upon to furnish evidence to enable this Court to fulfill its constitutional mandate to review the plan.

That threshold was met with respect to petition numbers 25 and 27, notwithstanding that some of the facts alleged therein were based on "information and belief."[1]  Thus, the burden should have shifted to the State to produce evidence and provide an explanation for the perceived constitutional infirmities.[2]  Instead, the Majority allowed the State to hide behind an unsubstantiated assertion of legislative privilege.  To establish clear guidance for the next redistricting cycle, this Court should exercise its rulemaking authority to codify the allocation of burdens of production and persuasion articulated by Chief Judge Bell twenty years ago.

---

[1] Our initial order in Misc. No. 21 set forth the pleading requirements for such petitions: the petitions were required to state the "objection to the plan[,]" the "particular part or parts of the plan" alleged to be in violation of the law, "the factual and legal basis for such claims[,]" and the relief requested.  Our order did not require a petitioner to present the evidence supporting the alleged factual basis; nor did it preclude allegations made on information and belief.

[2] The allocation of burdens for which I advocate here is analogous to the burdens imposed in confidential relationships.  "When a confidential relationship is established, the burden is then upon the trusted party to show that the challenged transaction was freely, fairly made and that no unfair or unreasonable advantage was taken of the confiding party in the confidential relationship." *Desser v. Woods*, 266 Md. 696, 708-09 (1972) (citations omitted).  Given the enormous trust reposed by Maryland voters in their elected representatives, and the constitutional obligation imposed on this Court, the approach adopted in cases involving confidential relationships is appropriate here.

3

The discovery dispute was limited to the State's assertion of legislative privilege over petitioners' requests for four pieces of information. The petitioners asked for:

> (1) who was responsible for the actual drawing or construction of the specific legislative districts Petitioners [have] challenged;
> (2) if a computer program was used, what criteria was the program instructed to use to draw the legislative districts Petitioners [have] challenged;
> (3) who provided instructions to the actual map drawer(s) regarding what factors or other criteria were to be used in drawing the legislative districts Petitioners [have] challenged; and
> (4) what specific instructions were given to the map drawer(s) regarding the various legislative districts Petitioners [have] challenged.

From my review of the record, it does not appear that the petitioners demanded the answers to these four questions in a particular format. There was, as far as I can tell, no request to take depositions or subpoenas for any legislative files. The answers to these four questions could have been easily ascertained by the State's counsel, conveyed to petitioners in a letter, and embodied in the joint stipulation the parties submitted. No testimony was requested or required. The provision of such information would not have exposed any member (or staff personnel) of the legislative branch to civil or criminal liability or to provide testimony. Thus, it seems rather obvious that the State could have furnished the requested information without compromising the values that animate the legislative privilege.[3]

---

[3] One of the cases discussed by the Majority, *Floyd v. Baltimore City Council*, 241 Md. App. 199 (2019), involved a claim that a comprehensive rezoning plan violated the Open Meetings Act, Md. Code Ann. (2014, 2018 Supp.), General Provisions §§ 3-301, *et seq.* The defendant city moved to quash subpoenas to two Council members based on legislative privilege, and sought to curtail the scope of testimony of a member of the

The separation of powers doctrine enshrined in Article 8 of the Declaration of Rights is, and should be, zealously guarded, and as pointed out by the Majority, the legislative privilege serves a key function in so doing. But that is not the only value at stake here. This Court also has a constitutional obligation to review the legislative redistricting plan when a petition is filed under Article III, section 5.

A proper balance of the competing interests can be struck by taking a page from the civil litigation playbook when the Fifth Amendment right against self-incrimination is invoked. A civil litigant is permitted to assert the Fifth Amendment privilege to justify a refusal to provide discovery, but not without consequence. *Kramer v. Levitt*, 79 Md. App. 575, 587 (1989). One consequence is that the jury will be entitled to draw adverse inferences. *Id*.

In my view, the exercise by this Court of similar discretion would have been appropriate here. If the State wanted to hide behind legislative privilege to avoid disclosing, for example, the "specific instructions [that] were given to the map drawer(s) regarding the various legislative districts Petitioners [have] challenged[,]" then it would

---

Council's staff. Similar to the petitioners here, the plaintiff in *Floyd* argued that the assertion of legislative privilege effectively gut the "force and purpose" of the Open Meetings Act. *Id*. at 213. The Court of Special Appeals, however, was unconvinced because "questions specifically related to compliance with the Act would not be protected by legislative privilege and appellant was able to pursue these questions with [the staff member]." *Id*. at 214. The same reasoning applies here with the narrowly drawn questions over the which the claim of legislative privilege was fought.

have been reasonable for this Court to infer that such instructions were inconsistent with the requirements of the United States Constitution and the Maryland Constitution.

**Conclusion**

For the reasons explained above, on April 13, 2022, I would have provided the State the opportunity to provide, on an expedited basis, the limited information responsive to the four outstanding discovery requests. If the State had provided the information, I would have favored reconvening the hearing to entertain the exceptions in light of the new information. If the State had declined to provide the information, then I would have favored drawing adverse inferences against the State and ruling accordingly.

Chief Judge Getty and Judge Biran have authorized me to represent that they join in this dissent.

6

Argued: April 13, 2022

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Nos. 21, 24, 25, 26, 27

September Term, 2021

---

IN THE MATTER OF 2022

LEGISLATIVE DISTRICTING

OF THE STATE

---

\*Getty, C.J.
Watts,
Hotten,
Booth,
Biran,
Gould,
McDonald, Robert N.
 (Senior Judge, Specially Assigned)

JJ.

---

Dissenting Opinion by Getty, C.J.,
 which Biran and Gould, JJ., join.

---

Filed: August 31, 2022

\*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

"A fairly apportioned legislature lies at the very heart of representative democracy."

> Chief Judge Robert M. Bell
> Court of Appeals of Maryland

*In re Legislative Districting of State*, 370 Md. 312, 319 (2002).

"The partisan gerrymanders in these cases [North Carolina and Maryland] deprived citizens of the most fundamental of their constitutional rights: the rights to participate equally in the political process, to join with others to advance political beliefs, and to choose their political representatives. In so doing, the partisan gerrymanders here debased and dishonored our democracy, turning upside-down the core American idea that all governmental power derives from the people. These gerrymanders enabled politicians to entrench themselves in office as against voters' preferences. They promoted partisanship above respect for the popular will. They encouraged a politics of polarization and dysfunction. If left unchecked, gerrymanders like the ones here may irreparably damage our system of government.

*    *    *

In giving such gerrymanders a pass from judicial review, the majority goes tragically wrong."

> Justice Elena Kagan
> Supreme Court of the United States

*Rucho v. Common Cause*, 139 S. Ct. 2484, 2509 (2019) (Kagan, J., dissenting).

The Constitution of Maryland grants this Court "original jurisdiction to review the legislative districting of the State . . . ." Md. Const. art. III, § 5.[1] It is an awesome responsibility. It is rare for this Court to be granted original jurisdiction. The fact that the people of this State, through the ratification of a constitutional amendment in 1972, assign the entire review of decennial districting to this Court signifies the importance to the people that these districts be fair, devoid of overt partisan gerrymandering, and created with full public transparency. In these cases, the Court has failed to uphold these profound responsibilities. For reasons I shall explain, I respectfully dissent.

The actions of political leaders to redraw legislative districts in a design to benefit their incumbency and the electoral performance of their political party has deep roots in American history. In 1812, Massachusetts Governor Elbridge Gerry drew a noncompact district to give his Democratic-Republican party an undue advantage. The salamander shape of the Gerry district was satirized in a political cartoon that became the origin of the term "gerrymander."

The rallying cry for the proponents of the 2022 legislative districting plan was that "it ensures continuity of representation by keeping the majority of Marylanders in their current district."[2] That phrase sounds altruistic, as if the highest priority of the mapmakers

---

[1] All references to "Constitution" are to the Constitution of Maryland, unless otherwise indicated. All references to "Article III" or "Art. III" are to Article III of the Constitution of Maryland, unless otherwise indicated.

[2] *See* Senate Proceedings No. 6, Floor Debate on Senate Joint Resolution 2, Remarks by Senator Nancy King, Chair of the Senate Reapportionment and Redistricting Committee, at 8:48, https://mgaleg.maryland.gov/mgawebsite/FloorActions/Media/senate-6-, archived at https://perma.cc/RZ5V-RZ6H.

2

was a concern that the citizens of Maryland might be confused if their legislative district lines were changed. But that altruism is a pretext for the actual priority in this plan, which is incumbent protection on a scale of extreme partisan gerrymandering.

What about where district lines are changed in a manner that is unfavorable to an incumbent? The policy of protecting incumbents due to their "community of interest" is not uniformly applied. It is important to note that not every incumbent is protected, but instead, it is only those favored by the current legislative leadership.

To prevent overt partisan gerrymanders in Maryland, the Constitution establishes a rubric in Article III, § 4 that has been the subject of this Court's deliberations once every ten years over the last fifty years. These constitutional requirements are simply stated:

> Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions.

Art. III, § 4.

As we are engaged in our sixth cycle of districting jurisprudence, we review with original jurisdiction the "adopted plan" enacted by the Maryland General Assembly through Senate Joint Resolution 2 following the 2020 decennial census. In this cycle, the petitions filed by registered voters under Article III, § 5 primarily challenge the compactness prong of § 4. Upon the assertion of legislative privilege by the General Assembly over the process upon which the adopted plan was created, the petitions also challenge the lack of transparency and assert the public's right to know the factors upon which the General Assembly determined the district lines in the adopted plan.

3

Democracy—literally, "rule by the people"[3]—is undermined by the lack of compactness in a legislative districting plan: noncompactness leads to the underrepresentation of minorities and ample opportunities for partisan gerrymandering. A historical review of the State's districting demonstrates just that. Neither the Attorney General, who defends the 2022 plan as passed by the General Assembly, nor the Majority, whose decision today approves that plan, can be confident that it conforms to the requirements of Article III, § 4.

As I will describe, the *laissez-faire* standard on compactness as articulated by the Majority is, in reality, no standard at all. The Petitioners in Misc. No. 25 ("Petitioners")[4] have established by compelling evidence that certain districts in the adopted plan are not compact. The Attorney General, hiding behind the legislature's assertion of legislative privilege, offers little to justify the noncompact districts except to assert that, under this Court's prior districting jurisprudence, where district lines are drawn does not matter. Instead, the Attorney General repeatedly reiterates that if districts in the current plan are consistent with shapes previously "blessed" by this Court in prior districting cycles, the compactness inquiry is over. Following this rationale, the Majority skirts past this Court's fundamental responsibility and fails to reassert the firm standard on compactness established in the 1982 Districting. 299 Md. 658. Such a firm standard is necessary to

---

[3] *See Democracy*, Encyclopedia Britannica, https://www.britannica.com/topic/democracy, archived at, https://perma.cc/HKY4-D4JH.

[4] My discussion pertains principally to the challenges levied in Misc. No. 25. Accordingly, I shall refer to "Petitioners" with the understanding that, unless otherwise indicated, I mean only the Petitioners in that case, and not those in Misc. Nos. 24, 26, and 27.

4

protect the public. Thus, the Majority misses an opportunity for this Court to refine a compactness standard that will apply during the current era of high-powered computer analytics and voter microtargeting used in the mapping of Maryland's legislative districts.

Under our original jurisdiction, this Court also has the obligation to ensure that the public is fully informed during the process of redrawing legislative districts and that all elements of that process, whether by the Governor, the General Assembly or even by this Court, are transparent and open to public access. The closest analogy to this principle of disclosure arises from our public information act cases, where we have acknowledged a "legislative intent that citizens of the State of Maryland be accorded wide-ranging access to public information concerning the operation of their government." *Kirwan v. The Diamondback*, 352 Md. 74, 81 (1998) (quoting *The A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 32 (1983)).

For the first time in our districting cases, the General Assembly has asserted legislative privilege over the process used in determining the boundaries for the state legislative districts. The only reasonable explanation for the assertion of this privilege is that the General Assembly engaged in the identical process used for the 2012 Districting. As we know from the federal case of *Benisek v. Lamone*, 138 S. Ct. 1942 (2018), the 2012 state legislative districts were derived from a "Democratic Performance Index" database for voter microtargeting used in the computer mapping for districting software Maptitude. *See Benisek v. Lamone*, 266 F. Supp. 3d 799, 809 (D. Md. 2017), *aff'd*, 138 S. Ct. 1942 (2018).

5

The Majority accedes to the assertion of legislative privilege for staff actions that occurred totally outside of "their legislative conduct [] or events that occurred in a legislative session." *Amended Order of Special Magistrate Regarding Discovery*, at *9 (March 11, 2022). As I explain, *infra,* in the section on transparency, I fundamentally disagree with the Majority's opinion because it condones the use of legislative privilege to evade a discovery request for data, for which there is a limited exception, as opposed to the deliberative process, which is privileged. Further, for an issue so critical to protecting the rights of Maryland voters, the General Assembly should embrace transparency in the districting process instead of asserting privilege to conduct a secret process that shields from the public the actual data and manipulations of district lines that resulted in the adopted plan.

The Court's eschewal of rigorous review is particularly troubling in light of the fact that, in *Rucho v. Common Cause*, the Supreme Court deferred the "political question" of partisan gerrymandering to the states. 139 S. Ct. 2484, 2509 (2019). State courts of last resort are the gatekeepers for the protection of the public's voting rights. Under *Rucho*, the magnitude of our responsibility under the Constitution's original jurisdiction is heightened. It is our duty to ensure that, under Maryland's form of democracy as guided by our Constitution, it is the voters who select the members of the General Assembly—not the Senators and Delegates ensuring incumbency by selecting their own microtargeted voters.

The Majority likewise fails to adhere to our firm standards for compactness by deferring to a nonstandard of "flexibility" to the General Assembly through an overbroad

deference instead of applying the constitutional principles of Article III, § 4 as articulated by this Court as early as 1982.

In dissent, I can see no path that justifies the adopted plan and agree with U.S. Supreme Court Justice Elena Kagan that partisan gerrymandering "deprive[s] citizens of the most fundamental of their constitutional rights: the rights to participate equally in the political process, to join with others to advance political beliefs, and to choose their political representatives." *Rucho*, 139 S. Ct. at 2509 (Kagan, J., dissenting); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 824 (2015) (internal citation omitted) (noting that the districting process provides an opportunity to "restore the core principle of republican government, namely, that voters should choose their representatives, not the other way around").

I would sustain certain of the Misc. No. 25 Petitioners' exceptions and hold that Petitioners produced compelling evidence demonstrating that numerous challenged districts in the adopted plan are violative of Article III, § 4's requirement that districts be compact in form and give due regard to the boundaries of political subdivisions.[5]

---

[5] I join in Judge Gould's well-written dissent. I, too, would have held open the Special Magistrate's evidentiary hearing. *See* Gould, J., Dissent at 1–2. However, given the April 13, 2022 Order, I analyze the plan based on the record before the Court.

**INTRODUCTION**

Redistricting and reapportionment in the General Assembly is a historically contentious process.

*A.      Maryland's History of Apportionment*

Until the Supreme Court of the United States issued its landmark decision in *Baker v. Carr*, 369 U.S. 186 (1962), the legislative districts in Maryland were defined by the boundaries of each county. Historically, every county had one Senator and at least one Delegate. Additional Delegates were apportioned to counties based upon the population of the county. Baltimore City, which contained a large percentage of Maryland's population, was granted additional Senators and Delegates.

For example, in the period just before the reform necessary under the one person, one vote standard, apportionment in the General Assembly was controlled by the Constitutional Amendment of 1956. *See* 1956 Md. Laws, ch. 99, *ratified* November 6, 1956. Under that plan, Baltimore City was divided into six legislative districts, each apportioned one Senator and six Delegates. For the remainder of the state, the county boundaries comprised the legislative districts and each county had one Senator. In counties with multiple Delegates, the Delegates ran at-large in multi-member districts within the county.

The 1956 Amendment provided for the following apportionment of Delegates: Two Delegates per County—Calvert, Caroline, Charles, Howard, Kent, Queen Anne's, and St. Mary's Counties; Three Delegates per County—Cecil, Garrett, Somerset, Talbot and Worcester Counties; Four Delegates per County—Carroll, Dorchester, Harford, and

8

Wicomico Counties; Six Delegates per County—Allegany, Anne Arundel, Baltimore, Frederick, Montgomery, Prince George's, and Washington Counties.

During the first half of the twentieth century, population increases in the State's urban areas did not result in increased legislative representation. As a result, the General Assembly experienced lengthy periods of severe malapportionment. Then-President of the Senate William S. James[6] remarked that "[i]n the areas of fair representation, the General Assembly flunked all tests. . . . The groundwork was laid for intervention by the courts to order fair legislative apportionment[—]a task beyond the capacity of legislators." Maryland Dep't of Leg. Servs., *Under the Dome: The Maryland General Assembly in the 20th Century*, 4–5 (2001).

*Baker v. Carr* forced states to abandon county boundaries as legislative district lines and apportion substantially equal population in each district to comply with the principle of one person, one vote. By constitutional amendment in 1969, and in response to *Baker v. Carr*, the notion that districts be "compact in form" was first added to Article III, § 4. *See* 1969 Md. Laws, ch. 785, *ratified* November 3, 1970. The modern language of the provision, discussed in more detail *infra*, came by constitutional amendment in 1972. *See* 1972 Md. Laws, ch. 363, *ratified* November 7, 1972.

---

[6] *William S. James*, Md. State Archives, https://msa.maryland.gov/megafile/msa/speccol/sc3500/sc3520/001500/001556/html/1556bio.html, archived at https://perma.cc/J8G6-DFQC.

9

## B.    *Modern Districting*

Following the first post-*Baker* reapportionment, this Court began forming its districting jurisprudence.[7]  Despite the use of the term "modern," the districting processes of 1972 and 2022 are vastly different.

In early districting cycles, districts were hand-crafted by spreading out large paper maps on the floor, tallying population totals from census blocks using a handheld calculator, and shading census blocks using colored pencils.  "Old-time efforts, based on little more than guesses, sometimes led to so-called dummymanders—gerrymanders that went spectacularly wrong. Not likely in today's world."  *Rucho*, 139 S. Ct. at 2512–13 (Kagan, J., dissenting).

Make no mistake, districting has immeasurably changed over the last two decades. Today, geographic information system ("GIS") mapping programs, such as Maptitude, generate population totals and other demographic data in milliseconds with the drag of a cursor over a new census block.  As Justice Kagan explained:

> Mapmakers now have access to more granular data about party preference and voting behavior than ever before.  County-level voting data has given way to precinct-level or city-block-level data; and increasingly, mapmakers avail themselves of data sets providing wide-ranging information about even individual voters.  Just as important, advancements in computing technology have enabled mapmakers to put that information to use with unprecedented efficiency and precision.  While bygone mapmakers may have drafted three

---

[7] I adopt citations to previous districting decisions of this Court similar to those used by the Majority: *In re Legislative Districting*, 271 Md. 320 (1974) ("*1973 Districting*"); *In re Legislative Districting*, 299 Md. 658 (1984) ("*1982 Districting*"); *Legislative Redistricting Cases*, 331 Md. 574 (1993) ("*1992 Districting*"); *In re Legislative Districting of State*, 370 Md. 312 (2002) ("*2002 Districting*"); and *In re 2012 Legislative Districting*, 436 Md. 121 (2013) ("*2012 Districting*").

or four alternative districting plans, today's mapmakers can generate thousands of possibilities at the touch of a key—and then choose the one giving their party maximum advantage (usually while still meeting traditional districting requirements).[8]  The effect is to make gerrymanders far more effective and durable than before, insulating politicians against all but the most titanic shifts in the political tides.[9]  These are not your grandfather's—let alone the Framers'—gerrymanders.

*Rucho*, 139 S. Ct. at 2513 (Kagan, J., dissenting).

In recent years, voter records, data, and social media proved to be the new front of elections.  Democratic and Republican entities alike host enormous repositories designed to identify and target voters based on hundreds of sources of information.  Indeed, over three hundred demographic and psychographic attributes are maintained on nearly every household in the United States.  Demographic information, such as political affiliation, residential address, zip code, marital status, number of children, age, gender, religious affiliation, voting history, household income, and social media presence inform the microtargeting of voters and, with advanced statistical analysis and mapping programs,

---

[8]  In *Rucho*, amici cautioned that modern day mapmakers "can use software to generate tens of thousands of possibilities, all precisely engineered based on hyperlocal voting data, allowing partisan actors to select the single map that exhibits the greatest partisan advantage."  Brief for Political Science Professors as Amici Curiae Supporting Appellees, *Rucho*, 139 S. Ct. 2484, 2019 WL 1167919, at *24.  "These tools enable mapmakers to reduce the risk that they have drawn anything less than a maximally-partisan map, which in turn enable them to create more durable and aggressive partisan gerrymander." *Id.* at *24–25.

[9]  The exceedingly effective and durable gerrymanders Justice Kagan describes are technologically designed to survive swings in the popular vote.  Voters drawn into these districts cannot save themselves; their "elected representatives" chose them, and there exists no effective recourse.

transform voter data into exponentially more effective, extreme partisan gerrymanders. This information is used to microtarget and track voters.

Amici in *Rucho* warned that:

> As powerful as current methods are, predictive modeling and other large-scale analytical tools will become more potent in the near future. New technologies and data sources, such as augmented voter files and modern machine-learning algorithms, will make it easier for mapmakers to predict the decision-making habits of Americans in a more nuanced and accurate way than ever before. When applied to the process of redistricting, new data analysis techniques will enable partisan mapmakers to create gerrymanders that are even more biased, more durable, and more capable of withstanding the effects of "wave" election years.

Brief for Political Science Professors as Amici Curiae Supporting Appellees, *Rucho*, 139 S. Ct. 2484, 2019 WL 1167919, at *25.

Courts of last resort in other states have increasingly turned to court consultants for advice and assistance in their judicial review of legislative districting plans because of these advancements in an age of highly sophisticated mapping programs and voter microtargeting. This Court used such an expert in 2002, and it is disappointing that the Court in the instant cases did not use an independent expert to help understand the data underlying the plan presented to the Court especially because, as shown *infra*, the statistical reports given to the Special Magistrate contain contradictory demographic data from the reports that were distributed to the public through the Department of Planning and General Assembly "Redistricting" websites.

The Majority's decision today cements in our jurisprudence the notion that Maryland's "compact in form" is a toothless constitutional requirement that abandons the standard adopted by this Court in 1982 and supplants it with total deference to the General

12

Assembly regardless of the district's contours. Armed with granular data on Maryland's households and microtargeting of voters, the General Assembly can use mapping technology that surgically carves the most precise partisan districts. This Court stands idly by and, with the intentionally designed and sharply gerrymandered district lines, sentences the voters of this State to death by a thousand partisan paper cuts. Slowly, but surely—unchecked by this Court—extreme partisan gerrymanders will become increasingly more prevalent and durable.

**DISCUSSION**

I begin with the Court's constitutional mandate "upon petition of any registered voter": "the Court of Appeals shall have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland." Art. III, § 5. The Court is duty-bound by this broad grant of jurisdiction to review all aspects of the challenged districting. Any constitutional infirmity discovered during review—whether or not raised by a particular petition challenging the legislative districting—will invalidate the plan. To otherwise turn a blind eye repudiates our role as non-partisan, neutral arbiters of the law.

I agree with the Majority's summation of the burdens of proof that govern various stages of the districting process. *See* Maj. Slip Op. at 44–46. I part ways, however, with the Majority's conclusion that there exists no compelling evidence of a violation of Article III, § 4 on the issues of compactness, contiguity, or due regard. The Special Magistrate's

13

conclusion that the Petitioners failed to meet their burden is a conclusion of law, which this Court reviews *de novo*. *2012 Districting*, 436 Md. at 179.

I would sustain certain of the Petitioners' exceptions and hold that "compelling evidence demonstrates that the plan has subordinated mandatory constitutional requirements to substantial improper alternative considerations." *1992 Districting*, 331 Md. at 614. Where, as here, that occurs, the burden shifts to the State to produce "sufficient evidence" to demonstrate that the plan is compliant with the requirements of Article III, § 4. *2012 Districting*, 436 Md. at 137–38. Because the State's showing falls woefully beneath the bar of "sufficient evidence," I would hold that the State failed to meet its burden. Accordingly, I would reject the plan. I shall explain.

## A.    *Legislative Privilege and Transparency in Districting*

Inextricably woven throughout the 2022 Districting is the General Assembly's lack of transparency in creating the legislative districting plan and absolute assertion of legislative privilege. Both frustrate this Court's constitutional mandate to determine whether the plan complies with the provisions of Article III, § 4.

I cannot think of anything in the Majority Opinion that is more consequential than its decision to allow the General Assembly to formulate districting plans in secret under the guise of legislative privilege. For this districting cycle, and those to follow, the assertion of absolute, legislative privilege will keep the public in the dark as to how the General Assembly designs legislative districts. As I relate the issues concerning the General Assembly's approach to drawing new legislative districts with high-powered

14

computer programs in backroom secrecy, ask yourself: Is this how Maryland redistricting is supposed to work?[10]

*1.      Original Jurisdiction*

This Court alone is charged with determining whether the districting of the State is constitutionally sound.     Art. III, § 5.     In the realm of apportionment, under our constitutional arrangement, "the function of the courts is limited to assessing whether the principles underlying the compactness and other constitutional requirements have been fairly considered and applied in view of all relevant considerations." *1982 Districting*, 299 Md. at 688; *see also 2002 Districting*, 370 Md. at 361 (same); *2012 Districting*, 436 Md. at 154–55 (same).

Implicit in this constitutional mandate is the ability to evaluate the information and decision-making process by which legislative districts are drawn. If the Court is not provided information about how the General Assembly designed the districts, and the Court cannot require the State to produce such information, it cannot fulfill its constitutional duty. By invoking legislative privilege, the State deprives this Court of its ability to assess whether "constitutional requirements have been fairly considered and applied in view of all relevant considerations."

---

[10] Justice Kagan posed a similar rhetorical question as it concerned congressional districting: "As I relate what happened in those two States [North Carolina and Maryland], ask yourself: Is this how American democracy is supposed to work?" *Rucho*, 139 S. Ct. at 2509 (Kagan, J., dissenting).

15

"The ultimate purpose of the judicial process is to determine the truth."[11] *Norman v. Borison*, 418 Md. 630, 652 (2011) (quoting *Adams v. Peck*, 288 Md. 1, 5 (1980)). On the relatively infrequent occasions where this Court exercises original jurisdiction, the responsibility becomes ours to seek out the truth of a dispute. Our truth-seeking function is thwarted where, as here, the Majority turns a blind eye toward the withholding of critical information under the guise of legislative privilege. On this alone, because the broad invocation of legislative privilege precludes the Court from satisfying its constitutional duty to exercise its truth-seeking original jurisdiction, I would reject the plan.

2.     *Legislative Privilege*

These cases mark the first time that this Court has considered whether the General Assembly may invoke legislative privilege over the process of legislative districting. As best I can tell, the General Assembly has not previously invoked legislative privilege in this context. To put it bluntly, despite five decades of districting challenges, the Court has never had occasion to consider the propriety of this invocation. Until now. And at this fork in the road, the Majority has no quarrel with the General Assembly's regression from public transparency.

---

[11] This concept is borne from "litigation privilege," which, unlike the legislative privilege, immunizes individuals from statements made at trial to "foster the 'free and unfettered administration of justice.'" *Norman v. Borison*, 418 Md. 630, 651–52 (2011) (quoting *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 404 (1985); *see also O'Brien & Gere Engineers, Inc. v. City of Salisbury*, 222 Md. App. 492, 509 (2015) ("[T]he truth of a dispute is decided by a neutral fact-finder in a judicial proceeding where each party, ordinarily through counsel, advocates his position by presenting evidence, challenging his opponent's evidence through cross-examination and otherwise, and arguing in favor of what the party sees as the just result.").

While the Majority sustains the assertion of legislative privilege, I do not believe the privilege is applicable here.  The privilege stems from Article 10 of the Maryland Declaration of Rights, the "speech and debate clause," which provides "[t]hat freedom of speech and debate, or proceedings in the Legislature, ought not to be impeached in any Court of Judicature."  The privilege is construed *in pari materia* with the corollary federal provision contained in Article I, Section 6 of the federal constitution.  *See Blondes v. State*, 16 Md. App. 165, 175 (1972).

The speech and debate clause extends "to things generally done *in a session . . .* by one of its members *in relation to the business before it*."  *Hutchinson v. Proxmire*, 443 U.S. 111, 126 (1979) (internal quotation omitted and emphasis in original).  Thus, it is clear there must be a discernable connection between the business of the legislature and the assertion of privilege.  As the Supreme Court put it:

> Legislative acts are not all-encompassing.  The heart of the Clause is speech or debate in either House.  Insofar as the Clause is construed to reach other matters, *they must be an integral part of the deliberative and communicative processes* by which Members participate *in committee and House proceedings* with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. . . . [T]he courts have extended the privilege to matters beyond pure speech or debate in either House, but "only when necessary to prevent indirect impairment of such deliberations."

*Gravel v. United States*, 408 U.S. 606, 625 (1972) (internal citation omitted and emphasis added).

In addition to these interpretations of the legislative privilege, the Legislative Desk Reference Manual, maintained by the Department of Legislative Services, confirms that

17

the privilege is not as far-reaching as the Majority permits. *See* Maryland Dep't of Leg. Servs., *Legislative Desk Reference Manual*, 29–32 (2018), http://dlslibrary.state.md.us/publications/OPA/I/LDRM_2018.pdf, archived at https://perma.cc/6VGK-FWK3. The Legislative Desk Reference Manual refers to "Legislative Immunity" that "extends to words spoken or votes taken in committee hearings and proceedings, and to the contents of committee reports," but does not "extend to acts that are not an integral part of the legislative process, even if taken as part of the legislator's duties." *Id.* at 29.

The Majority relies on two decisions of the Court of Special Appeals to reach its overbroad conclusion that legislative privilege applies here: *Montgomery County v. Schooley*, 97 Md. App. 107 (1993), and *Floyd v. Baltimore City Council*, 241 Md. App. 199 (2019).[12]

With regard to the former, the Majority clings to the assertion that "a legislator, even if not a party to the action and thus not subject to any direct consequence of it, cannot be compelled to explain, other than before the legislative body of which he is a member, either his legislative conduct or 'the events that occurred' in a legislative session." *Schooley*, 97 Md. App. at 117. The Majority passingly refers to *Marylanders for Fair Representation v. Schaefer*, 144 F.R.D. 292 (D. Md. 1992), upon which *Schooley* relies. *Schaefer*, importantly for our purposes, seemingly placed a temporal limitation on when the

---

[12] I note that the Majority's decision to sustain the assertion of legislative privilege creates exceedingly important precedent without the benefit of traditional briefing as is customary in other cases proceeding before this Court. Instead, the Special Magistrate made a recommendation to the Court based on arguments conducted in a private hearing.

18

legislative privilege attaches to acts of legislators: the three-judge panel "would flatly prohibit their depositions from being taken as to any action which they took *after the redistricting legislation reached the floor of the General Assembly . . . .*" *Schaefer*, 144 F.R.D. at 305 (emphasis added). The discovery requests at issue here pertain to factual material created *before* the introduction of Senate Joint Resolution 2 in either chamber of the General Assembly.

As to the latter, the Majority relies on *Floyd* to suggest that a "judicial carve-out of an exception to the application" of legislative privilege "would be inappropriate" and best left to the General Assembly. 241 Md. App. at 214. This may be true when the legislative privilege conflicts with the requirements of the Open Meetings Act, as was the case in *Floyd*. However, with respect to legislative districting, a weightier topic—which sets the foundation for our representative democracy and is enshrined in our constitution, not statute—this Court should consider whether an exception is warranted. I would hold that it is.

A distinction lies between the General Assembly's prerogative to invoke legislative privilege for shielding its deliberative process and the public's right to know, in this context, how legislative districting plans are drawn and what, if any, outside data or influences impacted the process.

3. *Democratic Performance Index as a Basis for the 2022 Plan*

To fully understand Petitioners' argument and discovery request, I must first explain the events giving rise to *Benisek v. Lamone*, in which Maryland voters challenged partisan gerrymandering in the 2012 congressional districting. Evidence adduced over the course

of that litigation revealed the manner in which the General Assembly enacted the 2012 congressional districts. The National Committee for an Effective Congress ("NCEC")[13] "was specifically charged with drawing a map that maximized 'incumbent protection' for Democrats and changed the congressional delegation from 6 Democrats and 2 Republicans to 7 Democrats and 1 Republican, and it was given no other instruction as how to draw the map." *Benisek v. Lamone*, 266 F. Supp. 3d 799, 823 (D. Md. 2017) (Niemeyer, J., dissenting), *aff'd*, *Benisek*, 138 S. Ct. 1942 (2018).

To achieve this result, an NCEC analyst "used a proprietary metric created by NCEC called the Democratic Performance Index . . . , which indicates how a generic Democratic candidate would likely perform in a particular district." *Id.* (Niemeyer, J., dissenting). As explained by NCEC, the Democratic Performance Index "is an accurate cornerstone on which campaigns build their vote goals and paths to victory. [The Democratic Performance Index] is backed with the NCEC's extensive repository of actual candidate performance—the most comprehensive archive of its kind spanning back to the early 1980s." *About Us*, National Committee for an Effective Congress, https://ncec.org/about/, archived at https://perma.cc/ZU9H-BVYA. NCEC "select[s], integrat[es], format[s], and audit[s] election results as well as demographic data for almost every precinct in the country." *Id.*

---

[13] NCEC is a "a stalwart supporter of progressive candidates" that "support[s] candidates and campaigns with data and analysis to plan campaign strategies." *About Us*, National Committee for an Effective Congress, https://ncec.org/about/, archived at https://perma.cc/ZU9H-BVYA.

And, *Benisek* revealed that NCEC undertook similar calculations to apply in state legislative districting: "NCEC also calculated separate versions of the [Democratic Performance Index] specific to federal and state races—with the federal [Democratic Performance Index] 'only us[ing] federal races' and the state [Democratic Performance Index] 'only us[ing] state races'—to better account for 'ticket splitting.'" 266 F. Supp. 3d at 823 (Niemeyer, J., dissenting). The NCEC analyst, working in conjunction with "Maryland's Democratic House Delegation and their staff," prepared several draft maps before "[u]ltimately, Maryland's Democratic members of the U.S. House Delegation proposed and forwarded to the state Democratic leadership at least two [NCEC] maps." *Id.* at 824 (Niemeyer, J., dissenting).

The Petitioners are caught in a classic "Catch-22."[14] They presume, based upon the evidence developed in *Benisek*, that the presiding officers in 2022 continued the same practice used in 2012 to rely upon outside consultants who use a "Democratic Performance Index" to methodically and precisely design Senate and House districts to protect incumbents and expand opportunities to pick up additional seats. Their petitions assert, based upon "information and belief," that these practices caused extreme partisan gerrymandering in violation of the Maryland Constitution. The "Catch-22" is that, if the presiding officers assert legislative privilege to shield discovery of any outside consultants

---

[14] "Catch-22" is a term made popular by author Joseph Heller in his 1961 novel of the same name. A catch-22 is a dilemma that cannot be solved due to contradictory rules or limitations that result in circular logic. *See Baltimore Cty. v. Baltimore Cty. Fraternal Ord. of Police Lodge No. 4*, 439 Md. 547, 583 (2014) (McDonald, J., dissenting).

and Democratic performance algorithms, then Petitioners are precluded from proving their case.

The effect of the Democratic Performance Index in the current plan is revealed by reference to a district's competitiveness. During floor debate in the Senate, and relying on "Dave's Redistricting," Senator Michael J. Hough explained that this plan reduces the number of competitive Senate districts to only four: Districts 4, 34, 37, and 42. Senate Proceedings No. 6, Floor Debate on Senate Joint Resolution 2, January 19, 2022, at 23:50, https://mgaleg.maryland.gov/mgawebsite/FloorActions/Media/senate-6-, archived at https://perma.cc/RZ5V-RZ6H ("Senate Proceedings No. 6"). In these four districts, all four incumbents are members of the Republican Party. No competitive district has a Democratic incumbent facing a serious challenge by a Republican, which effectively locks in a supermajority of 32 Democratic Senators.[15] Senator Hough continued, "[i]t's very obvious that the goal of this map was very simple: take any districts that were competitive, or that the [Republican] Party would have a chance at winning, and shore them up and make them noncompetitive. That is partisan gerrymandering 101." *Id.* at 24:42.

If Senator Hough is correct, and this map is so microtargeted that only 4 of 47 Senate districts are competitive, 43 of the State's 47 Senate Districts are controlled in the party primary. The state election laws allow the political parties to determine who can vote in their primaries and the two principal parties hold "closed" party primaries. *See* Maryland

---

[15] *See Membership Profile*, Maryland General Assembly, https://mgaleg.maryland.gov/pubs-current/current-member-profile.pdf, archived at https://perma.cc/9EBM-F2SP.

Code (2003, Repl. Vol. 2022), Election Law Article ("EL") § 8-202. Unaffiliated voters cannot "crossover" to participate in a party primary, which is allowed in states with "open" primaries. *Id.*

The result is that those 43 districts subject to extreme partisan gerrymandering are noncompetitive except in the party primary. When a party primary decides the election due to the underlying microtargeting, then the general elections become irrelevant and, in effect, the unaffiliated and third-party voters, who together make up 22% of Maryland voters, are disenfranchised.[16]

4.      *Petitioners' Discovery Request and the Invocation of Legislative Privilege*

Here, the Petitioners seek factual information that is not protected by legislative privilege. Petitioners propounded the following discovery requests:

(1) who was responsible for the actual drawing or construction of the specific legislative districts Petitioners have challenged;

(2) if a computer program was used, what criteria was the program instructed to use to draw the legislative districts Petitioners have challenged;

(3) who provided instructions to the actual map drawer(s) regarding what factors or other criteria were to be used in drawing the legislative districts Petitioners have challenged; and

---

[16] Based upon voter registration statistics in April 2022, at the time of oral argument in these cases, third-party and unaffiliated registrations totaled 924,949 voters (Unaffiliated—831,254; Libertarian—16,954; Green Party—6,350; The Working Class Party—3,595; and Other—43,492). For reference, total active registration in Maryland is 4,114,208, made up of 54% Democratic Party (2,228,432); 24% Republican Party (984,131) and 22% third-party and unaffiliated voters (924,949). *See Summary of Voter Registration Activity Report*, Maryland State Board of Elections, April 2022, https://elections.maryland.gov/pdf/vrar/2022_04.pdf, archived at https://perma.cc/LF9G-3V85.

(4) what specific instructions were given to the map drawer(s) regarding the various legislative districts Petitioners have challenged.

*Amended Order of Special Magistrate Regarding Discovery*, at 4–5 (March 11, 2022) ("Special Magistrate's Discovery Order") (quoting from memorandum by counsel for Misc. No. 25 Petitioners, "Strider L. Dickson[,] *Memorandum Concerning Applicability of Legislative Privilege to Petitioners Discovery Requests, at 2, 3*").

The Petitioners' propounded discovery requests do not seek disclosure of "legislative conduct or the 'events that occurred' in a legislative session." *Schooley*, 97 Md. App. at 117. The information sought does not strike at the heart of the deliberative process. Instead, I find this Court's decision in *Hamilton v. Verdow* instructive. 287 Md. 544 (1980). There, grappling with executive privilege, we observed that not all assertions of the executive privilege are treated equally. *See id.* at 563. More often, depending on whether the privilege is asserted "for potential evidence at a criminal trial, or where there is an allegation of government misconduct, or where the government itself is a party in the underlying litigation," courts will "engage in a balancing process, weighing the need for confidentiality against the litigant's need for disclosure and the impact of nondisclosure upon the fair administration of justice." *Id.* at 563–64 (footnotes omitted).

I, too, would draw a distinction when it comes to the legislative privilege in the context of districting. In districting, the State is a party to the litigation and the impact of nondisclosure has an irreversible negative impact upon the fair administration of justice. Because it is of unique importance, a careful balancing test must be applied to weigh the applicability of the privilege. *See Hamilton*, 287 Md. at 565 ("[C]ourts weigh[] the

24

government's reasons for non-disclosure against the need for discovery, sometimes upholding the claim of privilege in its entirety, sometimes rejecting the claim in its entirety, and sometimes requiring the production of some but not all of the materials sought."). Here, I would carefully limit the applicability of the privilege to the deliberative process, legislative conduct, and the events occurring in a legislative session, not factual data underlying formulation of the plan.

To be sure, as *Hamilton* explains, a balancing process may be of great utility where the information sought contains factual material. 287 Md. at 564–65. Certain documents "consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery," while opinions and recommendations are more likely protected by privilege. *Id.*

What the Majority fails to appreciate is that, no matter the type of privilege at issue—legislative or executive—*in camera* review exists to evaluate the legitimacy of an assertion of privilege.[17] Here, exercising our original jurisdiction as a trial court, the Court should have reviewed the information sought and made a threshold determination. "The *in camera* inspection may be utilized to determine whether the material is privileged, to sever privileged from non-privileged material if severability is feasible, and to weigh the

---

[17] In fairness, the occurrence of *in camera* review is an "intrusion upon the privilege" in and of itself. *Hamilton*, 287 Md. at 566. Therefore, it is not automatic upon every assertion of privilege. "The burden is on the party seeking production to make a preliminary showing that the communications or documents may not be privileged or, in those cases where a weighing approach is appropriate, that there is some necessity for production." *Id.* I would say, at a minimum, the Petitioners satisfied this initial burden to warrant *in camera* review.

25

government's need for confidentiality against the litigant's need for production." *Hamilton*, 287 Md. at 567. Had this occurred, and the Court reviewed the information sought by Petitioners, perhaps the outcome of these cases would have turned on very different grounds. But, only the General Assembly will ever know.

Utilizing *Schooley*, the Majority suggests that a member of the legislature may only be compelled to explain himself or herself before the legislative body in which he or she is a member. 97 Md. App. at 117. The Majority effectively says that Petitioners metaphorically "missed the boat" by failing to obtain answers to their questions in the legislature. The Majority takes issue with Petitioners for not asking any questions at the abbreviated public hearings on the districting plan. However, when a legislative initiative is a "party call"—i.e., leadership directs all party members to vote affirmatively on a measure, thereby greasing the skids for the bill's rushed passage—opponents know that they will not change any votes in the minority party and will be steamrolled in the legislative process. Therefore, they will defer any questioning at committee hearings and wait until the floor debate hoping to, at the least, score some points in the arena of public opinion.

The Majority's determination that the districting process was fair and transparent relies upon an exchange that occurred in the Senate Reapportionment and Redistricting Committee's joint hearing with the House Rules and Executive Nominations Committee:

> Delegate Kathryn Szeliga, a member of the House Rules and Executive Nominations Committee, asked [Chairman] Aro and Ms. Davis who had drawn the maps and whether public money was spent on outside consultants. Ms. Davis testified that making the plan involved a number of aspects so that the staff varied with the particular task, that DLS and LRAC

26

members' staffs worked on it, that some DLS staff worked on the bill-drafting aspects and others on the map-drawing, and that outside consultants had not been hired. [Chairman] Aro stated that DLS's budget takes the map-making process into account and that consultants were not hired. The Senate committee gave the bill concerning the LRAC plan a favorable report.

Maj. Slip Op. at 36 (footnotes omitted).

In a technical sense, the response given by Chairman Aro and Ms. Davis, a DLS staffer, is correct: DLS created the materials presented to the General Assembly—preparing the legislative district maps drawn on Maptitude, drafting the bills introduced as Senate Joint Resolution 2 and House Joint Resolution 2, and crafting the corresponding fiscal and policy notes. No public money was used on outside consultants because "NCEC provides its data and analysis to progressive candidates *at no cost to them*." *About Us*, National Committee for an Effective Congress, https://ncec.org/about/, archived at https://perma.cc/ZU9H-BVYA (emphasis in original). Accordingly, this exchange does not answer the question as to whether data provided by outside consultants was used in preparing the maps. What remained unanswered after this exchange was what underlying data, if any, was implemented in providing a foundation for the line drawing and census tract descriptions later completed by DLS.

To demonstrate extreme partisan gerrymandering, Petitioners propounded discovery seeking to show that the NCEC's Democratic Performance Index guided the drawing of the districts during 2022 Districting. The State invoked legislative privilege. At this impasse, on March 5, 2022, the parties jointly notified the Special Magistrate of a discovery dispute. That notice is not publicly available. The Special Magistrate heard arguments from Petitioners and the State at a "remote meeting" on March 8, 2022. A video

27

record of that hearing is not publicly available. Seemingly, the parties briefed the issue before the Special Magistrate. *See* Special Magistrate's Discovery Order, at 5 (quoting from memorandum by counsel for Misc. No. 25 Petitioners, "Strider L. Dickson[,] *Memorandum Concerning Applicability of Legislative Privilege to Petitioners Discovery Requests, at 2, 3*"). Those memoranda are not publicly available on Maryland Electronic Courts ("MDEC"), which composes the record in these cases.[18]

Yet, relying on arguments made out of public view, the Special Magistrate made a critical recommendation with far-reaching ramifications. As applied in the instant case, the evidence needed to prove the level of gerrymandering is concealed from the public and unavailable for the Petitioners to prove before the Special Magistrate. More broadly, the Majority now cements the applicability of legislative privilege in our districting jurisprudence. Under the Majority's rationale, any future use of outside consultants in districting, with high-tech map-drawing programs, is protected by an assertion of legislative privilege—which, at its core, is intended to protect *legislators* in the exercise of their duties during a legislative session. Given the extreme importance of districting, and how it ought to be a fully transparent process,[19] this Court should not sanction the concealment of what I believe to be vital and nonprivileged information.

---

[18] The Court is making an effort to complete the record, but as of this writing, submissions and arguments to the Special Magistrate are unavailable to the public.

[19] Take, for example, North Carolina. That state employs a public terminal where any member of the public can design a districting plan using districting software and reference data. *See Public Redistricting Terminal*, North Carolina General Assembly, https://www.ncleg.gov/Redistricting/PublicTerminal, archived at https://perma.cc/DY7C-

The Majority attributes transparency for the adopted plan based upon the fact that there were 16 public meetings held across the state by the members of LRAC. Maj. Slip Op. at 32. But, if the General Assembly created the underlying map for the adopted plan in secrecy, by an outside consultant utilizing the Democratic Performance Index, how is the public served by that lack of transparency? Indeed, the public comment and testimony is of no value at all where actual decisions are made in back rooms with outside consultants and algorithms on Democratic performance that never receive the light of public scrutiny.

The Majority suggests that Ms. Davis conclusively settled this issue by her answers throughout the legislative process. *See* Maj. Slip Op. at 36 n. 25. But Ms. Davis' answers in the legislative process do not satisfactorily answer the questions Petitioners had in propounding the discovery at issue. Ms. Davis may have been correct—the General Assembly did not procure outside consultants to draw the plan. However, Petitioners sought information in discovery designed to ferret out whether, for example, outside consultants produced example districting plans from which the General Assembly could copy or outside consultants produced Democratic Performance Index data so the General Assembly could draw a plan in conformity therewith. Without that information, this Court and the voters cannot assess the foundation of the plan.

This is a Court that has always upheld the public's right to know with a strict interpretation of the "Sunshine Acts" concerning open meetings and access to public information. The Majority fails to absorb the secrecy that occurred under the LRAC

---

78QK. All plans created using the terminal are public information and archived for public access. *Id.*

29

process in drawing the adopted plan and then condones that secrecy by endorsing legislative privilege to conceal data from the public. The formal sounding name of LRAC—Legislative Redistricting Advisory Commission—gives the impression that this is a legislative joint committee with all of the responsibilities of open meetings and public access. But it is not. The LRAC held its meetings and made its decisions in secret. As explained on the Senate Floor by LRAC member Senator Melony Griffith, the LRAC work sessions were not advertised, not open to the public or streamed online, and not open to the media because "ultimately this bipartisan group was not a public body, so I don't believe they were required to have that meeting held in public." Senate Proceedings No. 6, at 58:28.

Meanwhile, the Majority values purported public input at public meetings and testimony in floor debates. It simultaneously fails to recognize that sustaining the General Assembly's assertion of legislative privilege conceals the fact that the master plan for legislative districts was developed in secret without any regard to the public's right to know the data used for the adopted plan. The sixteen public hearings held by LRAC and the quickly arranged legislative hearings in January, upon which the Majority relies for "transparency," are actually a façade of window dressing that prevents the public from legitimate input and hides from voters any knowledge of the real map-drawing process.

In all, this plan is bedeviled by an unrelenting lack of transparency. Petitioners' third exception concerns the Special Magistrate's discovery ruling, which had the effect of denying Petitioners' discovery requests. *Misc. No. 25 Exceptions*, at 34–40. I would

30

sustain Petitioners' exception, overrule the Special Magistrate's discovery ruling, and grant the discovery requests propounded by Petitioners.

**B.      *Constitutional Requirement that Districts be Compact in Form***

Article III, § 4 requires that legislative districts be "compact in form[.]"  To define this constitutional requirement, better known as "compactness," this Court—in the 1980s—considered how a handful of states interpreted similar compactness requirements and sought to define the concept as it applied in Maryland.  Compactness, we said, is "a requirement for a close union of territory (conducive to constituent-representative communication), rather than . . . a requirement which is dependent upon a district being of any particular shape or size." *1982 Districting*, 299 Md. at 688.  Since the 1982 Districting, this Court has not meaningfully discussed the compactness requirement or elaborated on this definition.  The Court misses an opportunity here to refine one of the few constitutional standards—one that serves to protect against partisan gerrymandering—in an era of high-powered computer analytics used in the mapping of Maryland's legislative districts.

I readily agree that to be "compact in form," a district must encompass a "close union of territory."  The crux of the State's argument, which the Majority implicitly accepts by its decision, is that where a challenged district's lines are drawn is of no consequence in determining whether a district is compact.  This approach is not only illogical, but untenable, in that it necessarily voids the constitutional requirement of compactness.

The Majority mischaracterizes our earlier observations concerning Maryland's geography to suggest that "an oddly shaped district does not in itself establish a violation" of the compactness requirement contained in Article III, § 4.  This Court's pronouncement

31

is not as absolute as the Majority would have it. Instead, in the most egregious of cases, a district's shape *can* establish a violation of Article III, § 4. At the bare minimum, this Court's 1982 Districting decision embraces the notion that a showing of noncompactness can constitute the "compelling evidence" required to shift, to the State, the burden of proving the constitutionality of a challenged district.

*1.* Rucho *and the Invitation to Consider Maryland's Constitutional Provisions Anew*

The 2022 districting cycle is unique. It is the first occasion for redistricting and reapportionment in Maryland since *Rucho*. There, the Supreme Court of the United States concluded that "claims of excessive partisanship" are nonjusticiable and beyond the jurisdiction of federal courts. *Rucho*, 139 S. Ct. at 2491, 2506–07. Yet, the Court did not "condemn complaints about districting to echo into a void." *Id.* at 2507. To the contrary, *Rucho* recognized that "[t]he States . . . are actively addressing the issue [of excessive partisan gerrymandering] on a number of fronts. . . . Provisions in state statutes and state constitutions can provide standards and guidance for state courts to apply." *Id.*

We have already recognized that the requirement of compactness enshrined in Article III, § 4 is "intended to prevent political gerrymandering." *1982 Districting*, 299 Md. at 687. The Majority, by declining to enforce the compactness requirement here, ignores the national trend that our sister states have embraced to tackle the scourge of partisan gerrymandering. *See, e.g.*, *Rucho*, 139 S. Ct. at 2507–08 (collecting examples). Against this backdrop, I will turn to the first and only time this Court has meaningfully considered the compactness requirement: the 1982 Districting.

2.     *Judicial Interpretation of the Compactness Requirement*

a.     1982 Definition

This Court has previously explored the contours of compactness, which requires that "[e]ach legislative district . . . be compact in form[.]"  Art. III, § 4.  During the 1982 Districting, we observed, as the Majority recognizes, that "compactness [is] a requirement for a close union of territory (conducive to constituent-representative communication), rather than . . . a requirement which is dependent upon a district being of any particular shape or size."  *1982 Districting*, 299 Md. at 688.

b.     "Close Union of Territory" Necessarily Requires Consideration of District Lines

Under this Court's existing definition of compactness—that a district be "a close union of territory"—the shape or geographic placement of district lines is critical to this Court's analysis.  Yet, at oral argument, counsel for the State repeatedly denied this basic premise, arguing:

- "If the Court wants to know what types of shapes are permissible, it need look no further than its very own map that it produced in 2002."  Oral Argument, Misc. No. 25, at 36:15–36:25.

- "[S]hape in and of itself, and particularly shape based on the Court's prior districts, cannot constitute compelling evidence."  Oral Argument, Misc. No. 25, at 38:59–39:11.

- "[W]hen the compactness argument is based purely on shapes that have already been sanctioned by this Court, then yes, I think they have to come up with something more."  Oral Argument, Misc. No. 25, at 42:17–42:30.

33

Counsel for the State further engaged the Court in the following colloquy

concerning the Court's inquiry into compactness:

> [THE COURT]: So what you're saying is that if the shapes are consistent
> with prior shapes, the inquiry is over, we're done?
>
> [COUNSEL FOR THE STATE]: Unless there's something else going on
> here.[20]

Oral Argument, Misc. No. 25, at 42:35–42:45.

The State argues that once this Court has "blessed"[21] a district with irregular

contours, by approving or constructing a particular shape, it must always accept that shape

in future districting cycles.[22]  One of the benefits of decennial districting, aside from

---

[20] There may be something else going on here—the use of the Democratic Performance Index.  But the State, under the assertion of legislative privilege, conceals whether "something else is going on here."

[21] Counsel for the State argued: "You can't get behind the legislative privilege simply because you don't like a shape on a map that is based on a shape that this Court has already blessed."  Oral Argument, Misc. No. 25, at 1:02:27–1:02:37.

[22] Without advocating for a "least change approach" or identifying by name the concept of "core retention"—the notion that voters should be kept in the same districts each cycle— the State's argument implies such principles are valid guideposts for this Court's approval of the plan.  "[T]he 'least change' approach necessarily enshrines the partisan advantage adopted by the political branches [in prior districting cycles].  Its application undermines, rather than fulfills, the promise of a truly representative government."  *Johnson v. Wisconsin Elections Comm'n*, 971 N.W.2d 402, 420 (Wis. 2022) (Bradley, J. concurring), *rev'd by Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245 (2022) (per curiam).  In Maryland, this Court has never considered these principles as secondary standards, much less as criteria rising to constitutional proportions.

Similarly, during debate on the House floor, Delegates dedicated considerable time to the notion that when voters are grouped in a legislative district, they become a "community of interest" worthy of preservation.  We discussed communities of interest at some length in our prior districting jurisprudence.  In *2002 Districting*, we reiterated those prior decisions where we said that "the protection of non-official communities of interest" could not overcome constitutional requirements of Article III, § 4.  370 Md. at 322.

updating districts with regard to census numbers, is that the Court can look at the past districts and improve them to the benefit of Maryland's voters. We can evaluate the districts of 2002 and 2012 and adjust so that minorities have better opportunities for electoral success and to make the districts more competitive so that voters have choices. But instead, the General Assembly has become beholden over the last twenty years to voter microtargeting because it makes for less competitive districts and favors incumbents in party leadership. Regrettably, the Majority fails to recognize this national phenomenon in voter microtargeting and relegates Maryland voters to the adverse consequences of districts drawn to protect incumbents and stifle competitiveness.

Returning to this Court's discussion of the compactness requirement, I now turn to the fault in the State's argument.

3.     *Noncompactness as Proof of Constitutional Violation or "Compelling Evidence"*

Relying on our recognition that Maryland's "geography inhibits the geometric fashioning of districts of symmetrical compactness," *1982 Districting*, 299 Md. at 687, and our observation that the compactness requirement does not serve "to promote aesthetically pleasing district configuration forms," *id.*, the Majority asserts that "an oddly shaped district does not in itself establish a violation of Article III, §[]4." Maj. Slip Op. at 14. I agree that in most cases, a district's shape—alone—does not establish a violation. However, the Majority's pronouncement is overbroad. Under our caselaw, evidence of noncompactness can: (1) in egregious cases, establish proof of a violation of Article III,

35

§ 4; or (2) constitute the "compelling evidence" required of Petitioners to shift the burden of proving compliance with Article III, § 4 to the State.

The Majority faults Maryland's geography—the fact that it "is oddly shaped and is not easily divided into regular geometric shapes"—as a blanket excuse for skirting our established definition of compactness. Maj. Slip Op. at 18. In doing so, the Majority details: the footprint of the Chesapeake Bay, "rivers and harbors" that make for an "irregular" shoreline, "a thin area of land" attaching Garrett County and Allegany County to the eastern parts of the State, and the fact that the District of Columbia "juts into two counties." *Id.* at 16–17.

However, as I shall explain, the majority of the challenged districts do not coincide with, or even come near, the complained-of state boundaries. Instead, they are districts in the heart of the State that the General Assembly has drawn to create their own zig-zag patterns and appendages. The Prince George's County districts that do border the District of Columbia arguably provide the best opportunity to create compact districts. Affording due regard to the county boundary provides a straight line with which the General Assembly could have, but did not, create "regular geometric shapes." *Id.* at 16.

a.    Proof of a Constitutional Violation

Egregiously drawn districts—those "of extremely irregular size or shape"—permit the Court to conclude that such a district is unconstitutionally noncompact with "a glance at the districting map." *1982 Districting*, 299 Md. at 680 (citation omitted). The Majority asserts that "an oddly shaped district does not in itself establish a violation of Article III, §4." Maj. Slip Op. at 14. But that is not faithful to what this Court previously said: "Oddly

36

shaped or irregularly sized districts of themselves do not, therefore, *ordinarily* constitute evidence of gerrymandering and noncompactness." *1982 Districting*, 299 Md. at 687 (emphasis added). We continued, "an affirmative showing is *ordinarily* required to demonstrate that such districts were intentionally so drawn to produce an unfair political result, that is, to dilute or enhance the voting strength of discrete groups for partisan political advantage or other impermissible purposes." *Id.* (emphasis added). Generally, "irregularity of shape or size of a district is not a litmus test proving violation of the compactness requirement." *Id.*

We did not say that a district's shape may *never* evince noncompactness. Though not in every case, or even most cases, we left open the door that a district could be drawn so egregiously that its odd or irregular shape could establish a violation of Article III, § 4. And rightfully so. A hypothetical district beginning in Maryland's western-most Garrett County and narrowly twisting and turning to encompass parts of St. Mary's County or Worcester County could be so egregiously noncompact as to establish a violation of Article III, § 4. *See generally Schrage v. State Board of Elections*, 430 N.E.2d 483 (Ill. 1981)).

And, this understanding is consistent with what this Court said in 1982 after surveying other states' approaches to the compactness requirement. *1982 Districting*, 299 Md. at 676–87. Looking to the interpretation of compactness as discussed in our sister states, including Rhode Island, New York, Pennsylvania, Missouri, New Jersey, and Colorado, caused us to recognize that compactness "must be applied in light of, and in harmony with," the other requirements of Article III, § 4. *Id.* at 680; *see also id*. at 688 (emphasis omitted) ("[I]n determining whether there has been compliance with the

37

mandatory compactness requirement, due consideration must be afforded, as the cases almost uniformly recognize, to the 'mix' of constitutional and other factors which make some degree of noncompactness unavoidable, i.e., concentration of people, geographic features, convenience of access, means of communication, and the several competing constitutional restraints, including contiguity and due regard for natural and political boundaries, as well as the predominant constitutional requirement that districts be comprised of substantially equal population.").

Therefore, while "it cannot ordinarily be determined by a mere visual examination of an electoral map whether the compactness requirement has been violated," we made clear that "in some instances involving districts of extremely irregular size or shape[,] a glance at the districting map may permit the conclusion that a district is not constitutionally compact." *1982 Districting*, 299 Md. at 680 (citing *Schrage*, 430 N.E.2d 483 (Ill. 1981)).[23]

To be sure, only the extreme district will meet this high bar and provide proof of a constitutional violation. But our precedent has not foreclosed Petitioners from establishing

---

[23] In *1982 Districting*, this Court discussed *Schrage* in relation to a challenged Maryland district, District 17. 299 Md. at 680. We observed that the Illinois court found the Illinois "district to be noncompact . . . *because of its unwieldy size*." *Id.* (citing *Schrage*, 430 N.E.2d at 489). The Illinois district "involved a challenge to a state legislative district of extremely irregular size, running in excess of 125 miles through 20 townships, 6 counties, parts of 4 congressional districts, 2 Appellate Court districts, and 5 formerly apportioned state delegate districts." *Id.* In comparing District 17 to the Illinois district deemed noncompact, we said, "District 17 is but a fraction of the size of the district involved in *Schrage* and we see no parallel between the two districts. Moreover, we note that District 17 is widest at its center, while the district condemned in *Schrage* was most narrow at its center (typical of the so-called dumbbell shape)." *Id.* at 689. This discussion confirms our Court's willingness to find, at minimum, evidence of noncompactness by reference to a district's physical boundaries, as I shall explain more, *infra*.

a constitutional violation—i.e., noncompactness—by reference to egregiously odd-shaped districts.

b.     "Compelling Evidence"

More commonly, evidence of noncompactness in a legislative districting plan constitutes the "compelling evidence" necessary to shift the burden of justifying constitutionality to the State. There can be no doubt that the constitutional requirements of Article III, § 4—including compactness—are mandatory. *2002 Districting*, 370 Md. at 356 ("These requirements are mandatory and not 'suggestive[.]'"); *1982 Districting*, 299 Md. at 681 ("Like compactness and contiguity, the 'due regard' requirement is of mandatory application . . . ."). In satisfying the mandatory compactness requirement, "due consideration" shall still be afforded to the constitutional and other factors. *1982 Districting*, 299 Md. at 688.

Even though the compactness requirement, in some instances, may yield to other considerations, such noncompactness must be justified. In those cases, where a level of noncompactness is incorporated into the plan, the burden falls to the State to show the necessity in drawing a noncompact district. Noncompactness will not necessarily invalidate a districting plan. But, any constitutional "deviations must be undergirded by 'valid considerations[.]'" *2012 Districting*, 436 Md. at 178.

With respect to compactness, the judiciary's role is not "to determine whether a more compact district could have been drawn"; our function is to "to determine whether the principles underlying the requirement of compactness of territory have been considered and properly applied considering all relevant circumstances." *1982 Districting*, 299 Md.

39

at 680–81 (citations omitted).  But, if the Court cannot inspect the State's rationale behind deviations from compactness for other constitutional requirements, we cannot be said to have considered all relevant circumstances.  Turning a blind eye to what this Court is constitutionally mandated to review grants the General Assembly a license for "[i]ndiscriminate districting": "little more than an open invitation to partisan gerrymandering."  *2012 Districting*, 436 Md. at 178 (quoting *Reynolds v. Sims*, 377 U.S. 533, 578–79 (1964)).

This is not to say that every district must achieve perfect compactness—the ideal of which, "in geometric terms, is a circle."  *1982 Districting*, 299 Md. at 676.  Still, if a petitioner produces compelling evidence of noncompactness, as here, the State must, by "sufficient evidence," justify which other constitutional or federal requirements dictate that outcome.

As this Court did in 1982 on the principle of compactness, now is the time to look to how our sister states have defined the contours of "extreme partisan gerrymandering"[24] and forge a judicial standard by which to address it in Maryland.  For example, as the Supreme Court of Ohio put it:

> Gerrymandering is the antithetical perversion of representative democracy.  It is an abuse of power—by whichever political party has control to draw geographic boundaries for elected state and congressional offices and engages in that practice—that strategically exaggerates the power of voters who tend to support the favored party while diminishing the power of voters who tend to support the disfavored party.  Its singular allure is that it locks

---

[24] As defined in Black's Law Dictionary, it is "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength."  *Gerrymandering*, Black's Law Dictionary 830 (11th ed. 2019).

in the controlling party's political power while locking out any other party or executive office from serving as a check and balance to power.

*Adams v. Dewine*, __ N.E.3d__, __ (Ohio 2022), 2022 WL 129092 at *1. Or, the Supreme Court of North Carolina, when it said that a partisan gerrymander

> deprives a voter of his or her fundamental right to substantially equal voting power. This fundamental right encompasses the opportunity to aggregate one's vote with likeminded citizens to elect a governing majority of elected officials who reflect those citizens' views. When on the basis of partisanship the General Assembly enacts a districting plan that diminishes or dilutes a voter's opportunity to aggregate with likeminded voters to elect a governing majority—that is, when a districting plan systematically makes it harder for one group of voters to elect a governing majority than another group of voters of equal size—the General Assembly infringes upon that voter's fundamental right to vote.

*Harper v. Hall*, 868 S.E.2d 499, 552 (N.C. 2022).

Inherent in any definition this Court could craft is the notion that a severe lack of compactness demonstrates that a districting plan is an extreme partisan gerrymander.

The Majority gives no weight to the various methods of measuring a district's compactness. *See* Maj. Slip Op. at 65. The Reock, Schwartzberg, and Polsby-Popper tests,[25] the Majority says, have not "previously figured prominently in this Court's review of a redistricting plan." *Id.* This notwithstanding, in the Report of the Special Magistrate ("2022 Report"), the Special Magistrate discussed each method and, in summarizing the Petitioners' challenges to certain districts, mentioned each respective score. *See* 2022 Report at 4–5, 19–23. In enforcing this Court's interpretation of "compact in form"—that

---

[25] Computer mapping programs used in districting contain algorithms to calculate these scores. *See* "Maptitude includes like five different, six different—maybe even eight different [compactness] measurements." *Benisek v. Lamone*, 585 U.S. __ (2018), No. 17-333, Joint Appendix, Vol. I, at 135 (deposition of Eric Hawkins).

districts constitute a "close union of territory"—I would consider various measures of compactness as but one factor in the compactness analysis. To be clear, I do not believe one test or a particular score establishes a dividing line between compact or noncompact districts, but these test scores are helpful in evaluating the plan on a district-by-district basis. For this reason, I reiterate each challenged district's scores, *infra*.

## C.    *District-by-District Analysis*

The Petitioners deserve a district-by-district analysis that analyzes population change, district demographics, and geographic considerations. Because the Special Magistrate did not include any such analysis, I shall do so here.

### 1.    *The Special Magistrate's Report*

The following is the extent of the Special Magistrate's consideration of Misc. No. 25, which focused largely on compactness:

> The evidentiary hearing focused almost entirely on one aspect of redistricting – that the districts be "compact." It is clearly an important element and, in some instances, may be dispositive because of its nexus to gerrymandering. But it is not the only element, and historically has been regarded as being subject to other considerations – predominantly equality of population, the Federal Voting Rights Act and other supervening Federal requirements, contiguity, and, although on its own not a Constitutional consideration, trying to keep people in their home districts where they are closer to the local needs and politics. Thus, in [*2002 Districting*, 370 Md. at 361] – the case in which the Court of Appeals drew the redistricting plan – the Court acknowledged:
>
> > "that the redistricting process is a political exercise for determination by the legislature and, therefore, that the presumption of validity accorded districting plans applied with equal force to the resolution of a compactness challenge [citing *1982 Districting*, 299 Md. at 688]. Thus, we instructed, 'the function of the courts is limited to assessing whether the principles underlying the compactness and other constitutional

42

> requirements have been fairly considered and applied in view of all relevant considerations, and not to insist that the most geometrically compact district be drawn."
>
> There has been no unanswered assertion here that the LRAC Plan is in violation of the equality of population requirement or the Voting Rights Act. A comparison of the current plan with the one it replaces shows that an attempt was made to keep voters in their current districts, with which they are familiar, and to avoid crossing political or natural boundary lines except when required to achieve or maintain population equality. Suggestions in the petitions that political considerations played a role were all on "information and belief" and were not supported by any compelling evidence. Accordingly, the Special Magistrate recommends that Petition No. 25 be **DENIED**.

(Emphasis in original and footnote omitted).

I recognize that the Special Magistrate operated under difficult time constraints that required abbreviated proceedings, due to the impending deadlines with the election calendar for the 2022 Primary Election—an election already delayed by this Court's orders. *See* Maj. Slip Op. at 23–25. Additionally, the Special Magistrate was required to hold hearings in and around the congressional redistricting case,[26] which involved the same attorneys from the State and counsel for Petitioners in the instant case.

Here, the Special Magistrate did not consider or articulate any meaningful analysis of the challenged districts. An independent expert, similar to the experts employed by the Special Master in 2002, would have helped the Court understand the data underlying the plan before it. Instead, in the most general of terms, the Special Magistrate concluded that the plan passed constitutional muster. The 2022 Report does not aid this Court acting with

---

[26] *See Kathryn Szeliga, et al. v. Linda Lamone, et al.*, C-02-CV-21-001816.

43

original jurisdiction.  Thus, I will engage in a district-by-district review, beginning with a description of each district.  I will then turn to the data specific to each district.

2.      *Compactness Analysis of the Challenged Districts*

a.      Howard and Anne Arundel Counties

In the 2020 census, Howard County experienced the second largest population increase in the State with a 15.8% population increase from the 2010 census.  Howard County's total population is 332,317, setting the "ideal" number of Senate districts in the County at 2.53.  The population of Howard County has increased by almost 100,000 persons in the last two decades.  In the 2000 census, Howard County's population was 247,842, which then grew by 40,000 persons in the 2010 census, coming in at a total population of 287,085.

In neighboring Anne Arundel County, the population is 588,261, increasing by 9.4% from the 2010 census and setting the "ideal" number of Senate districts in the County at 4.46.  In 2002, the population of Anne Arundel County was 489,656.  At the time, Special Master Robert L. Karwacki observed that Anne Arundel County had to share districts with residents of other counties "because Anne Arundel [C]ounty ha[d] too much population for four districts and not enough for five districts."  *2002 Districting*, 370 Md. at 421.  The County's population again rose in 2010 to 537,656.

The location of both Howard and Anne Arundel Counties in the center of the state is optimal for attracting travelers and tourists, but presents a difficult scenario for districting because of the pressures from the surrounding high-growth counties that need to share

population with another county. Therefore, both counties typically have the highest number of boundary crossings of any county in the State; that is true with the adopted plan.

i. *District 12*

District 12 encompasses parts of Howard County and Anne Arundel County. District 12 has a total adjusted population of 131,907, with 86,473 residents of Howard County and 45,434 residents of Anne Arundel County. It is a long, noncompact district that stretches from southcentral Howard County in the west and ending in Glen Burnie and Marley Heights in Anne Arundel County in the east. District 12 divides the towns or localities of Columbia, Elkridge, Linthicum, and Ferndale. This is an entirely new configuration for District 12 because the 2012 Districting had a shared district between Howard and Baltimore Counties and thus did not include any of Anne Arundel County.



**District 12**

The shape of District 12 resembles that of a hump-backed dragon. The legs and feet of the dragon stretch ten miles down Governor Ritchie Highway ("Ritchie Highway") in Anne Arundel County from Brooklyn Park to Marley Heights and Freetown. Along this stretch, the district narrows to only one-half mile wide (between Ritchie Highway, Md. Route 2, and Arundel Expressway, Md. Route 10, at the head of the tributary of Furnace Creek) before billowing out to the south to capture the Marley Heights and Freetown neighborhoods down to the intersection of Mountain and Solley Roads. To the north of the one-half-mile wide section, the district expands to encompass the west side of Furnace Branch and Curtis Creek, including Thomas Point, and then intersects with and follows the Baltimore City boundary adjoining Senate District 48 up to the Patapsco River, which forms the northern boundary of Anne Arundel County.

46

The district then follows an irregularly-contoured swath to the west for approximately twenty miles, crossing over I-295, I-95 and Md. Route 29 through many suburban neighborhoods. The dragon's humpback is a wider stretch of territory along the I-95 corridor. The district broadens out to an almost seven-mile-wide area between the Patapsco River at Ilchester to the commercial-industrial area along Coca-Cola Drive in Hanover.

The district narrows again just east of the cloverleaf intersection of Columbia Pike, Md. Route 29 and Clarksville Pike, where the district is only one-half-mile wide along Bendix Road, to include the new building of the Circuit Court for Howard County. This narrow intersection forms the neck of the dragon. Then, the dragon's head flourishes out in a broad fan shape to encompass several Columbia neighborhoods including Wilde Lake and Harper's Choice. I note that these meandering boundaries are the overall result of the mapmaker's pen and not attributable to Maryland's odd-shaped geographical features, *see* Maj. Slip Op. at 14, 18–19, except for the occasional alignment with Furnace Branch, Curtis Creek, and the Patapsco River.

Based upon the narrowing and widening boundaries of this district and the long linear stretch of suburban Maryland that it encompasses, there is no conceivable standard under this Court's districting jurisprudence by which District 12 is compact.

The Majority cites to the 2002 and 2012 configurations of District 12 as if legislative districts from decade to decade are bound by *stare decisis* or the constitutional requirement of compactness is subservient to the non-constitutional standard of "core retention"—

47

keeping voters in their same districts.[27]  In 2002, we made clear that the goal of core retention, "may not, as we have seen, excuse a constitutional violation." *2002 Districting*, 370 Md. at 373.  Moreover, we observed that core retention often conflicts "with the due regard provision and, perhaps, the compactness requirement, in that it tends to perpetuate the status quo.  By incorporating this goal in a districting plan, subdivision crossings already in existence will likely continue, or in the case of compactness, noncompactness may be inevitable." *Id.* at 374.

No registered voter challenged District 12 in 2002 or 2012 (in *2002 Districting*, it is only discussed in relation to county boundary crossings for Howard and Baltimore counties).  The Majority's position that a noncompact district when challenged by Petitioners in 2022 should survive due to the non-constitutional standard of core retention is untenable.

The State's best response at oral argument was that in the 2002 Districting, District 12 had "a very, very strange configuration" but was not altered by this Court when the plan was adopted by Court order on June 21, 2002.  Both the Majority and the State fail to recognize the concepts articulated by Justice Kagan that I rely on throughout this opinion.  The nature of districting has changed through the application of highly sophisticated computer mapping programs and voter microtargeting.  To protect the rights of Maryland

---

[27] The Special Magistrate also afforded the concept of core retention undue weight.  *See* 2022 Report at 26.  The Special Magistrate, in his analysis, asserts that the constitutional requirement of compactness is "subject to other [non-constitutional] considerations": "trying to keep people in their home districts where they are closer to the local needs and politics." *Id.*

voters, and here specifically the voters in District 12, this Court's application of the compactness standard must evolve closer to what we articulated in 1982 Districting. "[C]ompact in form" must actually mean that a district encompasses a close union of territory; we must adhere to that standard throughout the State.

Petitioners except to the Special Magistrate's conclusion that District 12 is compact. *See Exceptions to the Report of the Special Magistrate*, Misc. No. 25 (September Term, 2021) ("*Misc. No. 25 Exceptions*"), at 13–15. Petitioners introduced into evidence the result of analyzing District 12 under widely used compactness metrics: "Reock (.138), Polsby-Popper (.110), Inverse Schwartzberg (.332), and Convex Hull (.433)." *Id.* at 14. These scores are but one consideration in the compactness analysis, but such low scores support a finding that District 12 is not "compact in form," as defined by this Court.

I would sustain Petitioners' exception and overrule the Special Magistrate's conclusion that District 12 is compact. District 12 falls into the narrow category of egregiously odd-shaped districts for which visual inspection alone constitutes proof that the district violates Article III, § 4.

ii.     *District 33*

District 33 is contained entirely within Anne Arundel County and has a total adjusted population of 131,878. For the first time, three single-member subdistricts have been created in District 33.

49



**District 33**

The entire district lacks compactness and the Delegate subdistricts 33A and 33C are particularly irregular. While subdistrict 33B is compact, the other two subdistricts spin off like a whirligig from the northern tip of District 33. For context, subdistrict 33B follows the contours of the district from the 2012 Districting starting on the west side of Severna Park and proceeding south through Crownsville and Crofton; it continues south of U.S. Route 50 to capture a broad land area around Davidsonville.

The western whirligig from subdistrict 33B is the highly irregular subdistrict 33A that straddles over Crain Highway twice to capture two residential areas near Waugh Chapel Road; then heads north to encompass Gambrills, Piney Orchard, and Odenton; and then skirts to the east of Fort George G. Meade. The outline of subdistrict 33A's boundaries resembles a miniature elephant, although the demographics favor a Democratic candidate (48% Democratic registration) instead of a Republican (30% Republican registration).

50

The eastern whirligig from subdistrict 33B is the jagged pie-shaped subdistrict 33C, which contains portions of the peninsula between the Severn and Magothy Rivers where the Chesapeake Bay Bridge is located, although part of this area is shared with the neighboring Delegate subdistrict 30A in an alignment that splits the communities of Arnold and Severna Park.  Subdistrict 33C starts at Sandy Point State Park and, to the south, includes Whitehall and Saint Margarets.  It also follows the north shore of the Magothy River to include Cape St. Claire and the east side of Ritchie Highway in Arnold starting north of Anne Arundel Community College (the community college campus is in the adjoining District 30A).  Proceeding north, it encounters District 31 at Cypress Creek wherein subdistrict 33C then wedges itself through a one-mile stretch of Ritchie Highway and zigzags to the opposite side of the highway.  On the west side of Ritchie Highway, subdistrict 33C travels as far north as Earleigh Heights, where it makes a small intersection with subdistrict 33B along Benfield Boulevard.  Of note, by following Cypress Creek along the east side of Ritchie Highway, the district excludes a small "V"-shaped parcel of land that contains the residence of an incumbent Republican Delegate, which will be discussed *infra*.

The odd-shaped configurations of subdistricts 33A and 33C are not compact.  The boundaries of subdistrict 33A are entirely interior to the state so there is no justification for the elephant-shaped outline due to Maryland's odd geography.  *See* Maj. Slip Op. at 14; 18–19.  Even accounting for the necessary jagged outline of subdistrict 33C due to the Severn and Magothy Rivers, the unusual intersections of Districts 30, 31 and 33 in this area of Anne Arundel County belie the notion that the mapmakers were pursuing other

51

legitimate objectives than the constitutional requirement for compactness. As described *infra*, the only rational explanation for the lack of compactness is the overt partisan ramifications from the design of this district.

The adopted plan presents, for the first time in District 33, a division of three single-member districts even though this Senate District totally encompasses county territory and does not share a boundary crossing with an adjoining county. This creation of single-member districts runs counter to the General Assembly's historical approach to districting in Maryland.

As described *supra*, prior to *Baker v. Carr*, and throughout most of Maryland's history, the district boundaries for Senate and House of Delegates districts were the county boundaries. The number of Delegates per county ranged from two to six, and these Delegates ran at-large within the county boundaries—i.e., in essence, every county was a multi-member Delegate district.

After *Baker v. Carr*, the members of the General Assembly were intensely loyal to the multi-member districts within the county boundaries. In fact, in the first Constitutional Amendment ratified in 1969 to enact one person, one vote districting in Maryland, an aversion to single-member districts was explicitly stated in this earlier version of Article III, § 4 as ratified by the citizens in 1969:

> Each legislative district shall consist of adjoining territory and shall be compact in form. The ratio of number of Senators to population shall be substantially the same in each legislative district; the ratio of the number of Delegates to population shall be substantially the same in each legislative district. *Nothing herein shall be construed to require the election of only one Delegate from each legislative district*.

52

1969 Md. Laws, ch. 785, *ratified* November 3, 1970 (emphasis added).

Following this preference for multi-member Delegate districts, the policy used by the General Assembly was almost uniformly as follows:

1. If a Senate district was entirely within a county's boundaries, the three Delegates ran at-large within the entire Senate district;

2. If a Senate district crossed over from one county into another, subdistricts were considered to protect the voting rights of those voters in the county with the smaller population; and/or

3. Subdistricts for the Delegates were also considered if necessary to support the goals of the federal Voting Rights Act.[28]

This policy on the establishment of subdistricts for Delegates is cited by the Majority as expressed during the January 18, 2022, testimony of Chairman Karl Aro in response to a question about the LRAC approach to the creation of subdistricts:

[Chairman Aro] stated that the LRAC plan kept districts "pretty much where they were" but, so as to give due regard to county boundaries, "if we had to cross a line, and if at all possible," a subdistrict was created to ensure that the people in that area would not be "overwhelmed" in an at-large district.

Maj. Slip Op. at 35.

This policy was uniformly followed in Anne Arundel County prior to the 2002 Districting. For example, in the 1992 Districting, the plan respected Anne Arundel County's political boundary by placing four Senate districts entirely within the county and containing only one crossover district where population was shared with Prince George's

---

[28] On the Eastern Shore, a majority minority district was created in the 1992 Districting for District 37A that has been preserved in each subsequent districting since then.

County. In the four districts entirely within Anne Arundel County—Districts 30, 31, 32 and 33—the Delegates ran at-large in three-member Delegate districts.

The change in this uniform policy occurred in the 2002 Districting with District 30. In response to a growing Republican presence by voter registration numbers in Anne Arundel County, the Speaker of the House, Michael E. Busch, created for himself a two-member Delegate subdistrict to surgically remove the Republicans and create a Democratic preference within his subdistrict.[29] The political design of that district was successful and today retains its two Democrats as Delegates. District 33 was also made a multi-member Delegate district for the first time with two Delegates representing subdistrict 33A and a single-member district in 33B. In the 2012 districting, the subdistricts were eliminated for District 33 and it returned to a three-member Delegate district contained within one Senate district.

Now, in the adopted plan, this same approach of Delegate subdistricts when a Senate District is totally within the county's boundaries is being employed in District 33. The Majority would accede to these manipulations of the line-drawing as an effort to balance out competing political parties. Maj. Slip Op. at 71. "In any event, 'an intentional effort to district so as to create a balance between two primary partisan political parties does not violate' the federal constitution.'" *Id.* at 71–72 (quoting *1982 Districting*, 299 Md. at 673–74).

---

[29] *See* Senate Proceedings No. 6, Floor Debate on Senate Joint Resolution 2, Remarks by Senator Edward R. Reilly, at 11:20.

The flexible standard pronounced by the Majority is outdated by the modern districting process with highly sophisticated computer mapping programs and voter microtargeting to ensure incumbent protection of candidates and to improve a partisan political party's performance. It is time for this Court to adopt a standard to apply for extreme partisan gerrymandering and establish Maryland as an example that other states can look to as they consider the legal consequences of districting.

Under the historical standard of only creating subdistricts where there are boundary crossings, the burden shifts to the State to explain why single-member districts are necessary when the Senate district is entirely within a county's boundaries. Unfortunately, the Court is deprived of the data that would show the rationale for this division of single-member districts by the Majority's overbroad interpretation of legislative privilege. *See supra*, at 14–31.

*Targeting of a Republican Delegate*

Currently, District 33 is represented by two Republican Delegates and one Democratic Delegate. Delegate Rachel Muñoz is one of the two Republican Delegates who currently represents District 33. However, because of the adopted plan, Delegate Muñoz's neighborhood has been surgically drawn out of District 33 and is now a part of neighboring District 31.

Delegate Muñoz resides in the Cypresspointe neighborhood in Severna Park, which is a small residential neighborhood adjacent to Cypress Creek Road. The District 33 boundary line that trails the southern branch of Cypress Creek, perpendicular to Ritchie Highway, falls just narrowly to the south of Delegate Muñoz's neighborhood. The

boundary line, pictured below, harshly veers off Ritchie Highway into Cypress Creek, ticks up to the north, and barely exorcises the Cypresspointe neighborhood from District 33.

In November 2022, just prior to the release of the LRAC draft maps, Governor Lawrence J. Hogan, Jr. appointed Delegate Muñoz to fill a vacancy in District 33 created by Delegate Michael Malone's appointment to the Circuit Court for Anne Arundel County. At oral argument, the Court questioned the timeline of Delegate Muñoz's appointment in comparison to the actual drawing of District 33's boundary lines.

Counsel for the State could not answer the Court's question but supplied a supplemental response following oral argument, which identified that Governor Hogan appointed Delegate Muñoz on November 4, 2021, and she was sworn in on November 8, 2021. The next month, the LRAC released the State's plan to the public on December 20, 2021, after the appointment of Delegate Muñoz.



In this close-up image, Delegate Muñoz lives in the "V"-shaped portion formed by Ritchie Highway and Cypress Creek. She is now separated by mere tenths of a mile from the district she used to represent. Moreover, Cypresspointe is not a sprawling neighborhood, making its impact on the total adjusted population of District 33—were it to be included in District 33—exceedingly small.

In the floor debate, Senator Edward Reilly provided an overview of the attempts to use the gerrymandering techniques of "packing" and "cracking" in District 33 in the districting maps of 2002 and 2012. Senator Reilly described how District 33 is being "cracked" in the adopted plan, particularly by the division of Severna Park which is being strategically carved into 3 separate Senate districts for partisan advantage. *See* Senate Proceedings No. 6, Floor Debate on Senate Joint Resolution 2, Remarks by Senator Edward R. Reilly, at 12:35.

The State's plan markedly alters the political make-up of District 33 in favor of Democratic candidates. Petitioners' exceptions state that the redrawing of District 33 has resulted in an increase of registered Democratic voters from approximately 38% to 41% and a decrease in registered Republican voters from approximately 38% to approximately 35%. Additionally, in thirteen of the twenty-three precincts or partial precincts taken out of District 33, registered Republican voters outnumbered registered Democratic voters. Further, in eleven of the thirteen precincts or partial precincts that moved into District 33, registered Democratic voters outnumbered registered Republican voters.

The Majority responds to Petitioners' challenge by again asserting the default deference to the General Assembly in any partisan objective:

57

In any event, the issue is once again resolved by the fact that Maryland's Constitution assigns the drawing of maps to the political branches and not to this Court. Accordingly, the fact that a plan "may have been formulated in an attempt to . . . help or injure incumbents or political parties, or to achieve other social or political objectives, will not affect its validity." *2002 Districting*, 370 Md. at 322; *see also 2012 Districting*, 436 Md. at 134 (stating that, within the constraints of State and federal law, "[t]he political branches may pursue a wide variety of objectives, including . . . aiding political allies or injuring political rivals").

Maj. Slip Op. at 72–73 (alterations in original).

Again, I would ascribe the actions of the General Assembly to extreme partisan gerrymandering. As explained above, the broad flexibility standard is no longer protecting the citizens of Maryland and their ability to elect representatives of their own choosing, particularly when districts are drawn with highly sophisticated computer mapping programs and microtargeting based upon a Democratic Party voter performance index. *See supra*, at 5, 19–20.

The Petitioners except to the Special Magistrate's conclusion that District 33 is compact. *Misc. No. 25 Exceptions*, at 16–20. Petitioners introduced into evidence the result of analyzing District 33 under widely used compactness metrics: "Reock (.140), Polsby-Popper (.140), Inverse Schwartzberg (.374), and Convex Hull (.568)." *Id.* at 17. These scores are but one consideration in the compactness analysis, but such low scores support a finding that District 33 is not "compact in form," as defined by this Court.

I would sustain Petitioners' exception and overrule the Special Magistrate's conclusion that District 33 is compact. Concluding that Petitioners have established compelling evidence of this district's noncompactness, I would require the State to provide

58

"sufficient evidence" that other Article III, § 4 criteria required the shape of the district as drawn.

b.     Prince George's County

Under the demographic trends of recent decades, Prince George's County became a majority-minority county. However, recent history reflects that a lack of compactness in the makeup of the County's legislative districts has led to an underrepresentation of minorities in the General Assembly. During the 2002 Districting, Special Master Robert L. Karwacki noted that Prince George's County had the second highest population growth of any Maryland county in the 2000 census—from 729,268 persons in 1990 to 801,515 in 2000. At the time, Prince George's County had the second highest percentage of Black residents in the State and a total minority population percentage of 71.5%.

In 2010, Prince George's County again saw an increase in population size to 863,420 persons. The County's total minority population percentage increased to 78.7%. In 2020, Prince George's County's population expanded from 2010 by 12%, now totaling 967,201 persons, with the County's total minority population percentage increasing to 85.5%. Over the past twenty years, Prince George's County has experienced an almost 15% increase in its minority population; however, this increase is not reflected in the design of the County's state legislative districts.

In 2002, the County Executive of Prince George's County, Wayne F. Curry,[30] filed a petition in this Court challenging the validity of Governor Parris N. Glendening's

---

[30] Wayne K. Curry served as the Prince George's County Executive from 1994 to 2002. *Wayne        K.        Curry*,        Md.        State        Archives,

districting plan. Mr. Curry's petition contended that the plan "will dilute the voting strength of [Blacks], Latinos, and other minority citizens in the State of Maryland generally and in Prince George's [County specifically]" in violation of state and federal law. Mr. Curry's petition explained that Prince George's County is one of the two largest jurisdictions in the State of Maryland and, collectively with Montgomery County, had a minority population of more than 57%. Mr. Curry argued that Governor Glendening's plan intentionally sought to deny minority voters "an equal opportunity to participate in the political process and to elect candidates of their choice." Specifically, Mr. Curry's petition argued that the plan in Prince George's County "pack[ed]" the Black population into only four of the County's eight Senate districts to "protect the reelection prospects of white incumbents preferred by white voters."

At Mr. Curry's request, Dr. Richard H. Engstrom analyzed Prince George's County and prepared an expert report of his findings. Dr. Engstrom determined that "there is a strong association between the racial majority within legislative districts in [Prince George's County] and the race of the representative or representatives serving those districts." Dr. Engstrom continued in observing that "[t]he opportunity for [Black voters] to elect representatives of their choice in [Prince George's County] legislative districts is no doubt strongly dependent on being a majority of the potential electorate in those districts."

---

https://msa.maryland.gov/msa/mdmanual/36loc/pg/former/html/msa11645.html, archived at https://perma.cc/3DFK-H9PQ. Term limits precluded Mr. Curry from running for reelection in 2002. Mr. Curry died of lung cancer on July 2, 2014.

In comparing Mr. Curry's proposed drawing of the legislative districts that he submitted as part of his petition challenging Governor Glendening's adopted plan, Dr. Engstrom emphasized that Mr. Curry's proposal "demonstrates that, consistent with Maryland's standards for compactness and respect for political subdivisions, more reasonably compact majority-Black districts can be created in [Prince George's County]." Dr. Engstrom concluded that under Governor Glendening's plan, "the fraction of senate and house seats that will be tied to majority-Black (or majority-Hispanic) electorates is less than the fraction of the population that is Black (or Hispanic)." While the Court ultimately accepted only the due regard portion of Mr. Curry's petition with regard to boundary crossings, in hindsight, Mr. Curry's argument and Dr. Engstrom's findings that the voting strength of minority citizens has been diluted in the State—specifically in Prince George's County—proved to be accurate.

The prognosis of minority underrepresentation offered in Mr. Curry's petition and the electoral analysis of his expert was prescient. In the 2002 election, with a 71.5% minority population, the lack of noncompact districts led to only four of the eight Senate districts in Prince George's County electing minority Senators. The minority Senators were Nathaniel Exum (District 24), Ulysses Currie (District 25), Gloria Lawlah (District 26), and Gwendolyn Britt (District 47). The non-minority Senators were John Giannetti, Jr., (District 21), Paul G. Pinsky (District 22), Leo E. Green (District 23), and Thomas V. "Mike" Miller (District 27).

In the challenges to the 2012 Districting, the underrepresentation of minorities was again raised before this Court in the petition of Cynthia Houser. *See* Misc. No. 5,

61

(September Term, 2012).  Ms. Houser alleged, in pertinent part, that: (1) "[d]istricts with [Black] majorities are underpopulated" (as compared to the rural, Republican majority districts that were overpopulated); (2) "Maryland discriminated against [the Black population] by using multi-member districts to dilute [Black voters'] ability to elect candidates of their choice"; and (3) "[Blacks] can constitute a compact minority group in a significantly larger number of districts than under the current map[.]"  Report of the Special Master, 2012 Legislative Districting of the State (September Term, 2012) ("2012 Report"), at 64.  The majority of Houser's claims were brought under the Voting Rights Act; this Court rejected those claims under the *Gingles* test.  *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986); *see League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425–26 (2006) (denominating these factors as the "*Gingles*" factors, after the case in which they were articulated).

However, the Houser petition also raised claims under the compactness and due regard provisions, which the Special Master defined as "extremely skimpy regarding alleged violations of Article III, § 4" and unsupported by the evidence presented.  2012 Report at 70.  We upheld the Special Master's determination that Houser failed to meet the burden of proving these constitutional violations.

As a result, the lack of compactness in the Prince George's County legislative districts remained relatively unchanged, and the incumbents generally prevailed at the next two gubernatorial elections of 2014 and 2018.  Although the minority population had increased to 78.7%, minority representation in the Senate delegation remained at only 50%.  In 2014, the minority Senators were Joanne C. Benson (District 24), Ulysses Currie

(District 25), C. Anthony Muse (District 26), and Victor Ramirez (District 47). The non-minority Senators were James C. Rosapepe, (District 21), Paul G. Pinsky (District 22), Douglass J.J. Peters (District 23), and Thomas V. "Mike" Miller (District 27).

In the gubernatorial election of 2018, the ratio of minority Senators remained the same at 50%. The non-minority incumbents were all re-elected, and the minority Senators elected in 2018 were Joanne C. Benson (District 24), Melony G. Griffith (District 25), Obie Patterson (District 26), and Malcolm L. Augustine (District 47). Since 2018, two new minority Senators have been added to the delegation. Ron L. Watson (District 23) was appointed to replace Douglas J.J. Peters when he resigned on July 31, 2021, to become a member of the Board of Regents, University of Maryland System. Michael A. Jackson (District 27) was appointed on January 13, 2021, to fill the vacancy caused by the death of Senate President Miller. While this has increased the percentage of minority Senators, with the minority population from the 2022 census reaching 85.5%, the noncompactness of the Prince George's County districts still contribute to an underrepresentation of minorities representing the voters of this county.

The Majority suggests that due regard for political subdivisions, namely municipality boundaries, excuses some of the contours of the Prince George's County districts. *See* Maj. Slip Op. at 19. However, as I shall explore, municipal boundaries—odd as they may be—do not coincide with the shape of district boundaries.

I will address the noncompactness of each of Prince George's County's legislative districts individually.

i.    *District 21*

District 21 encompasses a county boundary crossing that combines parts of Prince George's County with western Anne Arundel County. District 21 is focused around the College Park area in the southwest, Laurel and Maryland City in the north, and a divided Crofton in the southeast.



**District 21**

The composition of the district resembles that of a jagged-edged boomerang. The southwestern arm of the boomerang encompasses the University of Maryland campus and most of College Park. The boomerang's arm then continues north, widening to cover Hillandale, Calverton, and Beltsville. The boomerang's center elbow falls right over West Laurel and the southern part of Laurel. The boundary follows the Howard County line in the north and then cuts east, crossing into Anne Arundel County, engulfing the Patuxent Environmental Science Center, U.S. Army Fort George G. Meade, and the Tipton Airport.

64

The arm in the southeast has two harsh points due to the carve out of the Crofton Country Club and using Route 301 as its boundary line.

The odd-shaped configuration of District 21 is not compact. The boundaries of District 21 are completely interior to the State, so there is no justification for the jagged-edged boomerang outline due to Maryland's unique geography. *See* Maj. Slip Op. at 14, 18–19. Instead, it is designed to methodically and precisely carve out the communities in Prince George's County that have low Black voter populations and merge them with low Black voter populations in Anne Arundel County. In College Park and West Laurel, the Black population is less than 20%. In the same vein, the Black population is less than 45% in Hillandale, Calverton and Beltsville. As the district approaches Anne Arundel County, the Black population of Laurel is approximately 50%, but the other Anne Arundel communities in District 21 have low Black populations. This section of the district contains parts of Crofton, Gambrills, Maryland City, and Odenton. While these are unincorporated places, the Department of Planning provides total population by race for certain unincorporated places [footnote]. Crofton and Gambrills have less than 20% Black population; Odenton has less than 30%; and Maryland City has less than 50%.

Here, the lack of compactness in the contours of District 21's boundaries and the methodical and precise separation of this district from the rest of Prince George's County, coupled with the boundary crossing into Anne Arundel County, creates a district that is only 30% Black, and contributes to the historical pattern of the underrepresentation of minorities in the state legislature. Petitioners except to the Special Magistrate's conclusion that District 21 is compact. *Misc. No. 25 Exceptions*, at 15–16. Petitioners introduced into

65

evidence the result of analyzing District 21 under widely used compactness metrics: "Reock (.288), Polsby-Popper (.125), Inverse Schwartzberg (.354), and Convex Hull (.504)." *Id.* at 15. These scores are but one consideration in the compactness analysis, but such low scores support a finding that District 21 is not "compact in form," as defined by this Court.

I would sustain Petitioners' exception and overrule the Special Magistrate's conclusion that District 21 is compact. Concluding that Petitioners have established compelling evidence of this district's noncompactness, I would require the State to provide "sufficient evidence" that other Article III, § 4 criteria required the shape of the district as drawn.

ii. *District 22*

District 22 is contained entirely within Prince George's County. One Maryland resident submitted written opposition to Senate Joint Resolution 2, which, in pertinent part, compared District 22's shape to the "Notre Dame Fighting Irish logo."[31] Letter from Brian Griffiths to the Honorable Nancy King (January 14, 2022). I assume that Mr. Griffiths meant a replication of the Notre Dame logo, but one drawn on an Etch-A-Sketch. Based upon this representation, we agree that the design of District 22 resembles an inverse Fighting Irish leprechaun.

---

[31] Representative of the Fighting Irish's "tenacious spirit . . . and [] determination[, t]he leprechaun is recognized around the world today as the mascot of Notre Dame athletics dating back to its design in the early 1960s." *Leprechaun*, University of Notre Dame, https://onmessage.nd.edu/athletics-branding/logos/leprechaun/, archived at https://perma.cc/FG2K-SCZE.

66



**District 22**

The southern legs of the leprechaun branch out on either side of I-495 in a highly asymmetrical pattern to carefully select certain residential subdivisions in the Glenarden and Dodge Park municipalities. The district narrows to less than a mile wide at the intersection of I-495, Annapolis Road, and Lanham-Severn Road (Md. Route 564), which forms the waist of the leprechaun, but then widens to an almost 10-mile stretch forming the body of the leprechaun. This section of the district then follows I-495 north and divides the communities of Lanham and New Carrollton. The body of the leprechaun then extends to the west to include Woodlawn, Greenbelt Park, and East Riverdale. The leprechaun's coattails flail out into District 24, encompassing Rolling View and Vista Raceway. Just beyond East Riverdale the leprechaun's fists take shape to cover Riverdale Park and Hyattsville. The leprechaun's more northern fist swirls and twirls in an odd, asymmetrical configuration around the Mall at Prince George's.

67

The defining characteristic of District 22 is that it methodically and precisely divides each of the communities with a large Black population (Glenn Dale, Lanham and New Carrollton have approximately 60% or greater Black populations) and offsets the minority population with communities that have less than 40% Black populations, i.e., Riverdale Park, East Riverdale, Hyattsville, and Berwyn Heights. It is without question that this bizarre configuration of District 22 is not compact and was drawn specifically to exclude minorities. Further, the boundaries of District 22 are wholly interior to the State, and, therefore, there is no justification for the leprechaun-shaped outline due to Maryland's unique geography. *See* Maj. Slip Op. at 14, 18–19. The lack of compactness of these carefully drawn boundaries reflects the mapmakers' intent to separate the communities of this district with low populations of Black residents from the rest of Prince George's County. This disregard for compactness results in a district that is only 44% Black and contributes to the historical pattern of the underrepresentation of minorities in the state legislature.

Petitioners except to the Special Magistrate's conclusion that District 22 is compact. *Misc. No. 25 Exceptions*, at 20–24. Petitioners introduced into evidence the result of analyzing District 22 under widely used compactness metrics: "Reock (.448), Polsby-Popper (.115), Inverse Schwartzberg (.340), and Convex Hull (.639)." *Id.* at 22. These scores are but one consideration in the compactness analysis, but such low scores support a finding that District 22 is not "compact in form," as defined by this Court.

I would sustain Petitioners' exception and overrule the Special Magistrate's conclusion that District 22 is compact. Concluding that Petitioners have established

68

compelling evidence of this district's noncompactness, I would require the State to provide "sufficient evidence" that other Article III, § 4 criteria required the shape of the district as drawn.

iii.    *District 23*

District 23 is contained entirely within Prince George's County. District 23 is an elongated, narrow strip that follows a large portion of the eastern boundary of Prince George's County. District 23 curves around and intersects with Districts 21, 22, 24, and 25 with intricately drawn cutouts along the district's western boundary line.



**District 23**

The heart of this district is its southern section, which follows U.S. 301 from its entry into Prince George's County at the Anne Arundel County line for approximately 19 miles, through Bowie and Upper Marlboro, down to Rosaryville near the district's boundary with District 27. The southernmost section of District 23 encompasses

69

Rosaryville, Duley, Croom, and Marlton. The district also tilts to the northwest for approximately 10 miles from the U.S. 301 entry into Prince George's County at the Anne Arundel County line to include a large area of parkland (the Patuxent Research Refuge, Longwood Park and National Capital Parks) and the unincorporated areas of Jericho Park and Montpelier. Both Duckettsville and South Laurel are divided by the northern boundary lines of District 23.

The boundaries of District 23 create an elongated strip approximately five to ten miles wide for approximately 30 miles of Prince George's County's eastern boundary. These boundaries are fully interior to the State, so there is no justification for this expansive outline due to Maryland's own geography. *See* Maj. Slip Op. at 14, 18–19. The demographics of this district have changed significantly over the past decade. At one time, the northern portion of the district had a majority white population, but many communities that had less than 50% Black populations, such as Bowie, now contain predominantly minority populations. Bowie went from 30% Black in 2002 to 48% in 2012 to 54% in 2020. In the southern part of this district, Rosaryville, Marlton, and Mitchellville are all over 80% Black. The district is now 65% Black, so the rationale of preserving the racial demographic through this extremely oblong district in prior districting cycles to protect white incumbents, if it was ever justified, no longer exists to support the noncompact configuration.

Petitioners except to the Special Magistrate's conclusion that District 23 is compact. *Misc. No. 25 Exceptions*, at 20–24. Petitioners introduced into evidence the result of analyzing District 23 under widely used compactness metrics: "Reock (.236), Polsby-

70

Popper (.132), Inverse Schwartzberg (.363), and Convex Hull (.549)." *Id.* at 22. These scores are but one consideration in the compactness analysis, but such low scores support a finding that District 23 is not "compact in form," as defined by this Court.

I would sustain Petitioners' exception and overrule the Special Magistrate's conclusion that District 23 is compact. Concluding that Petitioners have established compelling evidence of this district's noncompactness, I would require the State to provide "sufficient evidence" that other Article III, § 4 criteria required the shape of the district as drawn.

iv.    *District 24*

District 24 is contained entirely within Prince George's County. The district is nestled between Districts 22, 23, 25, and 47, with its southwestern boundary line bordering the boundary of the District of Columbia.



**District 24**

The composition of District 24 bears a striking resemblance to that of a seahorse. The seahorse's head, making up the northern part of the district, lays over Hynesboro, Seabrook, Glendale Heights, Homehurst, Hillmeade, High Bridge Estates, and Hillmeade Manor. The towns or localities of New Carrollton, Westgate, Seabrook Acres, Glenn Dale, Ducketsville, Springfield, and Collington are all divided by the boundary lines of the seahorse's head. Moving to the south of the seahorse's head, District 24 swoops to the west, encompassing Springdale and Lake Arbor.

The seahorse's dorsal fin divides Woodmore and curves just to the west of the Six Flags America amusement park. Both Dodge Park and Glenarden are divided in the western portion of the seahorse's keel. Its tail continues even further south, covering Seat Pleasant and Coral Hills. The tail's boundary line divides Capitol Heights, Marlow Heights, and Suitland.

72

The common characteristic in District 24 is that all of the communities have over 50% Black populations. Moreover, the following significant number of communities have over 90% Black populations: Capitol Heights, Coral Hills, Glenarden, Lake Arbor, Seat Pleasant, Springdale, and Suitland.

Unlike Districts 22 and 23, District 24 is not located in the interior of the State. Notably, the only portion of District 24's boundary line that follows a clean line or edge is the portion that shares its border with the District of Columbia. Accordingly, Maryland's own geography is no justification for District 24's lack of compactness. This is a majority-minority district that has 76% Black population for which there is no rationale for its noncompact shape except for packing the population of the black communities and opening up opportunities for white candidates in other parts of Prince George's County.

Petitioners except to the Special Magistrate's conclusion that District 24 is compact. *Misc. No. 25 Exceptions*, at 20–24. Petitioners introduced into evidence the result of analyzing District 24 under widely used compactness metrics: "Reock (.222), Polsby-Popper (.083), Inverse Schwartzberg (.289), and Convex Hull (.571)." *Id.* at 22. These scores are but one consideration in the compactness analysis, but such low scores support a finding that District 24 is not "compact in form," as defined by this Court.

I would sustain Petitioners' exception and overrule the Special Magistrate's conclusion that District 24 is compact. Concluding that Petitioners have established compelling evidence of this district's noncompactness, I would require the State to provide "sufficient evidence" that other Article III, § 4 criteria required the shape of the district as drawn.

73

v.    *District 47*

District 47 is contained entirely within Prince George's County.  In the 2002 Districting, Baltimore City lost population and Prince George's County gained sufficient population to add an additional Senate District, thus the designation of District 47, previously assigned to Baltimore City, was transferred to the new Prince George's County Senate District.  District 47, as drawn, resembles the shape of the letter "G," with its western boundaries bordering Montgomery County and the District of Columbia, and its interior eastern boundaries trailing a jagged, "G"-shape pattern through Prince George's County.



**District 47: Delegate Subdistricts of 47A and 47B**

The northern tip of the District 47 is north of the Washington Beltway (I-495) and includes the Hillandale Forest neighborhood south of Hillandale.  The district outline follows the boundary with Montgomery County at times narrowing to a one-half mile wide

74

portion at Adelphi Road. It continues as a narrow strip along New Hampshire Avenue until University Boulevard where it starts to expand to the east in an asymmetrical pattern. At East-West Highway, an unusually-shaped appendage resembles someone raising their arm to flex a muscle that circles around Northwestern High School campus and the Mall at Prince George's. This section following the Montgomery County boundary encompasses portions of Adelphi, Langley Park, and Chillum.

The district forms an elbow at its westernmost tip at the intersection of Prince George's and Montgomery Counties with the boundary with the District of Columbia. It then proceeds south adjoining the District of Columbia boundary, narrowing to less than one mile at Queen's Chapel Road, but then broadens out in two appendages that sweep out to the east—one capturing Bladensburg and the second encompassing part of Landover.

In 2012, the Delegate subdistrict was created to form a majority-Hispanic district, which as designed today is 68% Hispanic. The total district, depending upon which set of data is correct, approaches 50% Hispanic. The unusual shape of the district raises the question of whether a more compact configuration would actually increase the Hispanic majority in this district.

Petitioners except to the Special Magistrate's conclusion that District 47 is compact. *Misc. No. 25 Exceptions*, at 20–24. Petitioners introduced into evidence the result of analyzing District 47 under widely used compactness metrics: "Reock (.268), Polsby-Popper (.127), Inverse Schwartzberg (.356), and Convex Hull (.473)." *Id.* at 22. These scores are but one consideration in the compactness analysis, but such low scores support a finding that District 47 is not "compact in form," as defined by this Court.

75

I would sustain Petitioners' exception and overrule the Special Magistrate's conclusion that District 47 is compact. Concluding that Petitioners have established compelling evidence of this district's noncompactness, I would require the State to provide "sufficient evidence" that other Article III, § 4 criteria required the shape of the district as drawn, and especially to provide data supporting that this district best defines an opportunity for a Hispanic candidate's electoral chances in Senate District 47.

c.      Prince George's County Districts are Noncompact, Causing the Underrepresentation of Minorities in a County with 85% Minority Population

By synthesizing the data in Prince George's County, as in the two charts below, we get an overall picture of what is occurring in the Prince George's County Senate districts. But we do so with caution, because we do not know which demographic numbers are correct—i.e., whether the correct numbers were given to the Special Magistrate in Exhibit F or whether the correct numbers were given to the public, for review and scrutiny, on the "Redistricting" page of the Department of Planning website. Nevertheless, we use the data contained in Exhibit F, as that information is what the parties presented to the Court.

*Four Traditionally Black Prince George's County Senate Districts*

| District | 2002 - Percentage Black Population | 2012 - Percentage Black Population | 2022 - Percentage Black Population |
|---|---|---|---|
| **District 24** | 91.17%[32] | 85.25% | 78.76% |
| **District 25** | 81.48%[33] | 85.80% | 83.74% |
| **District 26** | 81.24%[34] | 78.72% | 72.63% |
| **District 47\*** | 59.94%[35] | 89.16% | **Subdistrict 47A** 50.01% |
| | | | **Subdistrict 47B** 23.44% |
| | **Hispanic** 22.83% | - | **Subdistrict 47A, Hispanic** 39.86% |
| | **Subdistrict 47B Hispanic**[36] 62.00% + | | **Subdistrict 47B, Hispanic** 67.70% |

---

[32] 2000 Census Summary File One (SF1) – Maryland Population Characteristics District 24 Total, Md. Dep't of Planning, https://planning.maryland.gov/MSDC/Documents/redist/senate02/Senate02_d24.pdf, archived at https://perma.cc/9J89-P7FG.

[33] 2000 Census Summary File One (SF1) – Maryland Population Characteristics District 25 Total, Md. Dep't of Planning, https://planning.maryland.gov/MSDC/Documents/redist/senate02/senate02_d25.pdf, archived at https://perma.cc/LV4G-A45B.

[34] 2000 Census Summary File One (SF1) – Maryland Population Characteristics District 26 Total, Md. Dep't of Planning, https://planning.maryland.gov/MSDC/Documents/redist/senate02/senate02_d26.pdf, archived at https://perma.cc/EYP7-G96G.

[35] 2000 Census Summary File One (SF1) – Maryland Population Characteristics District 47 Total, Md. Dep't of Planning, https://planning.maryland.gov/MSDC/Documents/redist/senate02/Senate02_d47.pdf, archived at https://perma.cc/GLH9-UTNV.

District 47 has historically contained a considerable percentage of Hispanic population, unlike Districts 24, 25, and 26. Subdistrict 47B was created in the 2012 Districting as the first majority-Hispanic Delegate district in the State. *See 2012 Districting*, 436 Md. at 177. To accurately reflect the minority population in District 47, I include those percentages as well.

---

[36] The Department of Planning data for 2012 Districting provides no statistics concerning the Hispanic population of District 47. This number is derived from a press release issued by the Governor's Office. *See* Governor O'Malley Introduces Proposed Legislative Redistricting Map, January 11, 2012 ("Governor O'Malley Press Release"). ("For the first time in Maryland's history, [the Governor's map] creates a single-member Hispanic district in Prince George's County, District 47B, which is over 62% Hispanic."). In the 2012 Districting, the State offered the Governor O'Malley Press Release as State's Exhibit 3.

*Four Traditionally Non-Black Prince George's County Senate Districts*

| District | 2002 - Percentage Black | 2012 - Percentage Black | 2022 - Percentage Black |
|---|---|---|---|
| **District 21** | 31.87%[37] | 29.65% | 31.75% |
| **District 22** | 46.21%[38] | 51.48% | 46.21% |
| **District 23** | 45.28%[39] | **Subdistrict 23A** 54.71% | 68.00% |
| | | **Subdistrict 23B** 64.92% | |
| **District 27** | 39.33%[40] | **Subdistrict 27A** 57.42% | **Subdistrict 27A** 65.23% |
| | | **Subdistrict 27B** 36.96% | **Subdistrict 27B** 37.73% |
| | | **Subdistrict 27C** 13.74% | **Subdistrict 27C** 15.61% |

From these charts, it is evident that, over the last two decades, the districts have been designed around the protection of incumbents, particularly four white incumbents,



[37] 2000 Census Summary File One (SF1) – Maryland Population Characteristics District 21 Total, Md. Dep't of Planning, https://planning.maryland.gov/MSDC/Documents/redist/senate02/senate02_d21.pdf, archived at https://perma.cc/567W-TDPM.

[38] 2000 Census Summary File One (SF1) – Maryland Population Characteristics District 22 Total, Md. Dep't of Planning, https://planning.maryland.gov/MSDC/Documents/redist/senate02/Senate02_d22.pdf, archived at https://perma.cc/W7U9-EHEN.

[39] 2000 Census Summary File One (SF1) – Maryland Population Characteristics District 23 Total, Md. Dep't of Planning, https://planning.maryland.gov/MSDC/Documents/redist/senate02/senate02_d23.pdf, archived at https://perma.cc/WBZ8-EYPN.

[40] 2000 Census Summary File One (SF1) – Maryland Population Characteristics District 27 Total, Md. Dep't of Planning, https://planning.maryland.gov/MSDC/Documents/redist/senate02/senate02_d27.pdf, archived at https://perma.cc/SP2C-PTF8.

even though the Prince George's County minority population has increased from 71.5% to 85.5%.

We will stop using the general term "noncompact" and instead use redistricting terms to clarify what is going on here. Over the last two districting cycles, and currently in this cycle, the Prince George's County Black population has been and is "packed" into four Senate districts. The other four districts are surgically designed to "crack" the Black population in four of the incumbent white candidate districts. In addition, the two boundary crossings in Prince George's County are strategically designed to protect white incumbents.

Not only are the Prince George's County districts aligned in a manner that produces an underrepresentation of minorities in the General Assembly, but the entire adopted plan fails to provide proportionality for Maryland's Black voting age population. In written testimony submitted at the joint hearing held on January 18, 2022, before the Senate Reapportionment and Redistricting Committee and the House Rules and Executive Nominations Committee, Professor Nathaniel Persily testified that the State's Black voting age population is 31% but the adopted plan provides only 19% of Senate districts (9 of 47) and 25% of House of Delegate districts (36 of 141) with a majority of black voting age population. This pervasive underrepresentation of minorities in the adopted plan is, in part, attributable to the lack of compactness in districts across the suburban Maryland population. *See* 2022 Report, Appendix II, Final Report of the Maryland Citizen Redistricting Commission, Addendum 2, Written testimony submitted by Professor

Nathaniel Persily regarding Senate Joint Resolution 3/House Joint Resolution 1 of the Maryland General Assembly, January 18, 2022, at 5–6.

In sum, the lack of compactness in the Prince George's County districts results in the underrepresentation of minorities. Objectively, this constitutes the sort of "compelling evidence" a petitioner must show to shift the burden to the State. Absent an adequate response or justification for this noncompactness from the State, I would reject the plan.

### D.     *Due Regard*

"Due regard shall be given to natural boundaries and the boundaries of political subdivisions." Article III, § 4.

The political dynamic of modern districting in Maryland, up until this Court's decision in 2002, focused on the retention of legislative power in the hands of the state legislators of Baltimore City. Just prior to the one person, one vote decision in *Baker v. Carr*, Baltimore City represented fully 20 percent of the Senate with 6 of 29 Senators. In the House of Delegates, Baltimore City was apportioned 6 Delegates for each of the 6 legislative districts for a total of 36 of 123 Delegates—almost 30% of the House membership. With the county boundaries serving as the legislative districts of each county, only Baltimore City was subdivided into legislative districts with all six lying entirely within the city's boundaries.

Under the 1972 constitutional amendment that established the modern apportionment plan, Baltimore City had 11 Senate Districts again drawn entirely with the city's boundaries. A steep population decline has occurred in Baltimore City over the past five decades, as shown in the chart below. Maryland's political leaders sought to deflect

81

the impact on legislative representation of this decline by establishing boundary crossings into Baltimore County, especially in the 1992 Districting created by Governor William Donald Schaefer, a former Mayor of Baltimore City.

| Districting | Population | Senate Districts | Within City Boundaries | Boundary Crossings |
|---|---|---|---|---|
| 1972 | 905,759 | 11 | 11 | 0 |
| 1982 | 786,775 | 9 | 9 | 0 |
| 1992 | 736,014 | 10 | 5 | 5 |
| 2002 | 651,154 | 6 | 6 | 0 |
| 2012 | 620,961 | 6 | 5 | 1 |
| 2022 | 585,708 | 5 | 4 | 1 |

**Baltimore City Districting, 1972 - 2022**

In 1992, the Court issued a clear warning: the number of Baltimore City/Baltimore County shared districts in that plan, which crossed the Baltimore City boundary, "came 'perilously close to running afoul of' the due regard provision." *2002 Districting*, 370 Md. at 363 (quoting *1992 Districting*, 331 Md. at 614). In 2002, Governor Glendenning ignored the warning sent by this Court and instead proposed, and the General Assembly adopted, a plan that again contained five districts with Baltimore City boundary crossings. This provided Baltimore City with ten Senate districts either entirely or partially within the City when the population count only justified six Senate districts. Upon reviewing challenges to the plan, we observed that the plan's shared districts constituted "an excessive number of political subdivision crossings" and we redrew the correct apportionment of six Senate districts entirely within the City's boundaries. *Id.* at 368.

Thus, in 2002, the Court looked at the rationale behind county boundary crossings and established a new standard on due regard. Due regard is no longer the most fluid

consideration as once enunciated by this Court. In crafting a remedial districting plan of our own, this Court eliminated all five of the Baltimore City/Baltimore County shared districts. *Id.* at 374. The Court's plan created two districts wholly within Baltimore County and three districts contained within Baltimore City. *Id.* Reconstituting these districts allocated "six fully self-contained districts" within Baltimore City, affording due regard to Baltimore City's political boundary. *Id.* at 375.

It is important to note that similar due regard factors were observed in 2002 for the Senate districts in Montgomery County. The population count supported eight Senate districts and all eight were drawn within the county boundary. *See id.* at 427. Yet the same cannot be said as to the Court's handling of boundary crossings in Prince George's County. Historically, the Court has approached Prince George's County differently than other populous political subdivisions. Here, the Majority upholds a districting plan that permits three boundary crossings in Prince George's County without justification for why these three boundary crossings are necessary. In my description of District 21, which shares a boundary crossing with Anne Arundel County, I question the overall effect of this boundary crossing on the underrepresentation of minorities for Prince George's County voters.

Our 2002 and 2012 decisions should apply with equal force to Prince George's County districts. Prince George's County, which is entitled to eight Senate districts, should have seven districts entirely within the county boundary and only one district with a boundary crossing. Yet, for reasons made clear above—namely incumbent protection to the disadvantage of minority populations—Prince George's County districts cross into

83

three other counties: Calvert, Charles, and Anne Arundel. In Baltimore City and Montgomery County, this Court enforced Article III, § 4's due regard requirement. Finding no violation of the due regard provision here, the Majority doubles down on this commitment to only respect those jurisdictions' political boundaries.

*1. Background of District 27*

In 2002, Mr. Curry also challenged the constitutionality of District 27 and subdistrict 27A. At the time, District 27 stretched across the Patuxent River and the Mattawoman Creek, encompassing parts of four counties—Prince George's County, Anne Arundel County, Charles County and Calvert County. Due to its composition, Mr. Curry contended that District 27 and subdistrict 27A failed to give due regard to natural boundaries and boundaries of political subdivisions in violation of Article III, § 4 of the Maryland Constitution.

In the Curry Petitioners' Exceptions to the May 21, 2002 Report of the Special Master, Mr. Curry maintained that Governor Glendening and the Governor's Redistricting Advisory Committee "had a single overarching goal – the protection of incumbents, especially white Democratic incumbents – which they pursued zealously, even when it conflicted with the law." *The Curry Petitioners' Exceptions to the May 21, 2002 Report of the Special Master*, In the Matter of the 2002 Legislative Redistricting of the State of Maryland, Maryland State Law Library, ("2002 Curry Exceptions") at 5. "Perhaps the most obvious legal violation within the area of the State affected by the Curry Plan is the design of District 27, which is represented by Senate President [Miller,] a member of the GRAC." *Id.*

Mr. Curry continued:

> Senator Miller's new district combines enough heavily black communities in southern Prince George's County to make the district safely Democratic in the general election, with enough white voters from _three_ other counties – Anne Arundel, Calvert, and Charles – to ensure that he cannot be effectively challenged in the Democratic primary by a[ Black] candidate . . . . To achieve this dual protection – against black Democratic challengers in the September primary and against white Republican challengers in the November general election – the district flouts the Maryland Constitution, in two ways. _First_, it traverses two natural boundaries – the Patuxent River (which defines Prince George's County's eastern border) and Mattawoman Creek (which defines much of its southern border). _Second_, the district grabs pieces of _four_ counties – Prince George's, Anne Arundel, Calvert (where the incumbent Senator resides), and Charles.

2002 Curry Exceptions at 5–6 (Emphasis in original).

In identifying that District 27 encompassed parts of four counties, Mr. Curry emphasized that Senate President Miller had recently moved his place of residence from Clinton in Prince George's County to Chesapeake Beach in Calvert County. Because the new residence was outside the boundaries of the district that he represented, Senate President Miller's change in residence also grabbed the attention of local media outlets, as he was hailed as a "longtime Democratic power in Prince George's County[.]" _See_ Daniel LeDuc & Matthew Mosk, _Miller Says Move Was Personal, Not Political_, Wash. Post, Oct. 15, 2000, at M5 ("Miller Move").

Notably, Senate President Miller's new residence in Calvert County was actually in District 29, not in District 27, i.e., the district that he represented, but Senate President Miller commented at the time that

> he's maintaining his voting registration and driver's license address at his old home in Clinton, where his family has operated a store for years. 'Not one but two of my children live there. I own the house. All my mail is delivered

85

there,' he said. 'My family business is in Clinton. My law office is in Clinton. I'm in Clinton every single day of my life.'

*Id*.

Recognizing this Court's decision in *Blount v. Boston*, 351 Md. 360 (1998), where we held that incumbent Senator Clarence W. Blount had not abandoned his original domicile[41] even though he had changed his primary place of abode, President Miller described Clinton as where he "continues his political activities and legal career in Prince George's and now has a home in Calvert." Miller Move, at M5.

In addition to identifying the peculiar location of Senate President Miller's home within District 27, Mr. Curry also drew attention to Senate President Miller's actions in relation to the 2002 Districting. "Although the State named Senator Miller on its initial witness list, he never showed up to testify and defend the configuration of his district, opting instead to make his views known by placing *ex parte* phone calls to two Members of this Court."[42] 2002 Curry Exceptions, at 6. In closing, Mr. Curry emphasized that "[b]y

---

[41] The constitutional requirement of residency for the state legislature has been controversial in recent decades. The residency provision of Article III, § 9 provides that "[a] person is eligible to serve as a Senator or Delegate, who on the date of his election, (1) is a citizen of the State of Maryland, (2) *has resided therein* for at least one year next preceding that date, and (3) if the district in which he has been chosen to represent has been established for at least six months prior to the date of the election, *has resided in* that district for six months next preceding that date. . . ." (Emphasis added). The controversy has focused on defining "resided" and, in *Blount v. Boston*, the analysis examined the different meanings between "domicile" or "primary place of abode." Maryland voters will have a chance to clarify this requirement through a Constitutional Amendment on the ballot as "Question 2" in November 2022 that establishes "primary place of abode" as the residency standard. *See* 2021 Md. Laws, ch. 808.

[42] While challenges to the 2002 Districting were pending in this Court, multiple judges of this Court "received calls and letters about redistricting from six Democratic lawmakers:

jumping the Patuxent to gobble up parts of four counties, with no legitimate justification, District[] 27 and [subdistrict] 27A of the State's Plan plainly violate the Maryland Constitution." *Id*. at 8.

Accepting this part of the Curry Petition in 2002 that it "consisted of four counties, in the case of District 27, and crossed two natural boundaries, the Patuxent River and Mattawoman Creek," this Court held that the district violated the due regard standard. Under the Court's plan, the portion of Anne Arundel was removed from District 27 and the remaining district crossed over three county boundaries: Prince George's, Charles and Calvert.

2.    *District 27 in this Plan*

Today, while District 27 is similar to the district drawn by this Court in 2002, it retains the contours from Clinton to Chesapeake Beach that are obviously a relic from President Miller's incumbency. The methodical and precise line-drawing to include downtown Clinton impacts the character of this district as defined by its single-member Delegate districts. Subdistrict 27A is 62% Black; Subdistrict 27B is 35% Black and Subdistrict 27C is 13% Black.

[Sen. Mike] Miller [(Prince George's)], [Sen. Ulysses] Currie [(Prince George's)], Sen. Ida G. Ruben (Montgomery), Sen. Robert R. Neall (Anne Arundel), Sen. Clarence W. Blount (Baltimore) and Del. Ruth M. Kirk (Baltimore)." *See* Matthew Mosk, *Md. Ethics Panel Condemns Miller for Judicial Calls*, Wash. Post, Aug. 17, 2002, at A1; A6.



**District 27 Showing 3 Single-Member Delegate Districts**

The Petitioners challenged the contours of District 27 in the adopted plan as violating the requirements of Article III, § 4 that legislative districts consist of adjoining territory and give due regard for natural boundaries and the boundaries of political subdivisions. Petitioner presented evidence that District 27 still encompasses parts of three counties—Prince George's County, Charles County, and Calvert County—and in doing so divides the towns or localities of Accokeek, Clinton, Rosaryville, Croom, Waldorf, and Hughesville. Further, District 27 is bisected by a stretch of the Patuxent River that has no bridge crossings. Pointing to the division of the southernmost portion of the peninsula that forms Calvert County that is sliced off to join Senate District 29 in St. Mary's County, Petitioners raise the issue of vote dilution for Calvert County, which has nearly enough residents for an entire Senate District (the county's population increased 4.5% in the 2020 census; at 92,925 it sits at 0.71 Senate Districts).

88

At the evidentiary hearing before the Special Magistrate, Delegate Mark N. Fisher, one of the Petitioners, testified about the adverse impact on the voters of Calvert County by the design of this district. By stretching the Senate District into Prince George's County, where the voting history is overwhelmingly Democratic, the district is designed to relegate only one resident legislator from Calvert County. To be clear, a majority of the voters in this district reside in Calvert County (71,277), but as Delegate Fisher stated, the voter performance in districts outside of Calvert County dilutes the effect of Calvert County voters and subordinates them to voters in Prince George's County. This is the clearest example of the voter performance index impacting voters as explained by Delegate Fisher. The configuration ensures that the Delegate from 27C will be from Calvert, but also ensures that the Senator and the two member Delegates are noncompetitive seats that remain firmly Democratic due to voter performance.

The Special Magistrate does not address any of the Petitioner's challenge of District 27 on contiguity and due regard principles, nor does the 2022 Report review the testimony of Delegate Fisher. Obviously, any impact of the Democratic Performance Index on the design of District 27 is not included in the 2022 Report because this data was protected by legislative privilege.

Petitioners have made a facial challenge that was not addressed in the 2022 Report. Based upon the record before the Court, I would sustain Petitioners' second exception concerning contiguity and due regard challenges to District 27. *Misc. No. 25 Exceptions*, at 29–34. Concluding that Petitioners have established compelling evidence of this district's lack of contiguity and due regard for natural and political boundaries, I would

89

require the State to provide "sufficient evidence" that other Article III, § 4 criteria required the shape of the district as drawn.

### E. *Inconsistency of Demographic Data Prevents Public Understanding of the Adopted Plan*

In addition to the foregoing, there is a fundamental inconsistency between publicly-available data maintained by the Maryland Department of Planning and data presented to the Special Magistrate that prevents the public from understanding the adopted plan, much less allow for adequate judicial review.

#### 1. *Noncompliance with Federal Requirements*

The Majority accurately details various federal constitutional and statutory provisions with which a districting plan must conform. *See* Maj. Slip. Op. at 8–10. In the 2012 Districting, we said in no uncertain terms that "intentional and invidious ethnic discrimination in legislative apportionment is repugnant to the United States Constitution under both the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment." *2012 Districting*, 436 Md. at 131 (citing *Shaw v. Reno*, 509 U.S. 630 (1993)). Federal statute—Section 2 of the Voting Rights Act, 52 U.S.C. § 10301— prohibits "[l]egislative apportionment plans that effectively disenfranchise or abridge the right to vote of any citizen on account of 'race or color.'" *Id.* at 132.

For reasons I shall explain, I have grave doubts that the plan proposed to the Court and ratified by the Majority comports with these federal requirements.

*2.      Sources of Discrepancy*

The Maryland Department of Planning "is the repository of the 2021 congressional and 2022 legislative districts as well as historical reapportionment and redistricting maps and data."[43]  As part of its role, the Department of Planning maintains interactive maps, House and Senate Reports, and "Demographic Data Tables" prepared by the Maryland State Data Center.[44]  The public can use these tools to view how a districting plan is drawn and composed.  *See supra*, n. 43.

Attached to the 2022 Report is "Exhibit F."  I note that, despite references to other Exhibits attached to the 2022 Report, the Special Magistrate did not discuss—or even mention—Exhibit F anywhere in the 2022 Report.  Exhibit F is an untitled Excel spreadsheet.  For each House subdistrict, Exhibit F sets out, in pertinent part: (1) total adjusted population; (2) numerical population deviation; (3) percentage population deviation; (4) the percentage of each district's Hispanic Origin population, based on adjusted population numbers; (5) the percentage of each district's White population, based

---

[43]  *2022 Maryland Legislative Districts*, Md. Dep't of Planning, https://planning.maryland.gov/Redistricting/Pages/2020/legiDist.aspx, archived at https://perma.cc/VP2C-U86Q.  In fact, the Department of Planning "is Maryland's designated state agency coordinator for the Census Redistricting Data Program with the U.S. Census Bureau." *Id.*

[44]  The Maryland State Data Center "monitors development trends, analyzes social, economic and other characteristics and prepares population, housing, employment, labor force, and income projections, which provide the baseline for planning for growth and development in the State." *The Maryland State Data Center (SDC)*, Md. Dep't of Planning, Md. State Data Center, https://planning.maryland.gov/MSDC/Pages/default.aspx, archived at https://perma.cc/797G-N9L4.

on adjusted population numbers; (6) the percentage of each district's Black population, based on adjusted population numbers; (7) the percentage of each district's Asian population, based on adjusted population numbers; and (8) the percentage of each district's Other population, based on adjusted population numbers.[45]

As it pertains to this section, the Majority gives short shrift to any inconsistencies in the data and argues that issues raised herein are of no consequence. It is grievously wrong. First, the Majority suggests that, because the parties jointly stipulated to Exhibit F, the Special Master was under no obligation to scrutinize its validity. *See* Maj. Slip Op. at 91. To the contrary—the volumes of raw data submitted in these cases warranted the Special Magistrate to hire an independent, expert consultant to make sense of the information presented. *That* would have assisted the Special Magistrate, whose role it was to aid this Court. Regardless of the Special Magistrate's conclusions, the Court assumes the responsibility of independently analyzing evidence and reviewing the recommendations of the Special Magistrate *de novo*. *2012 Districting*, 436 Md. at 179.

Second, the Majority seeks to have their cake and eat it too. The Majority excuses the Special Magistrate's faults due to the "limited time available to him," but affords the members of the Court no leeway for the same reason. Maj. Slip Op. at 91–92. The oral argument in these cases were a mere nine days after the Special Magistrate issued his 2022 Report, leaving little time for any member of the Court to scrutinize the data. If the Court

---

[45] The columns in Exhibit F provide, from left to right: "District," "Adj_Population," "Deviation," "% Deviation," "% Adj_Hispanic Origin," "% Adj_NH_AP_Wht," "% Adj_NH_AP_Blk," "% Adj_NH_AP_Asn," and "% Adj_NH_AP_Oth." I exclude columns pertaining to voter registration and turnout.

discovers discrepancies during the work in preparing opinions, it is in the public's best interest for those questions to be posed in the opinion. Ultimately, the public that has the right to know what data was used to prepare the districts, that the data made available to the public is accurate, and that the resulting districts were drawn in a fair and equitable manner for the upcoming elections of 2022, 2026, and 2030. In this opinion, I cannot offer that assurance to Maryland's citizens.

To be sure, following the Majority's logic, this Court is unable to remedy constitutional violations discovered in the plan because they are: (1) not raised by the parties; and (2) discovered after written submissions and oral argument. The urgency of these cases, principally imposed by an impending election, forces prompt attention. But to cast aside issues of constitutional proportions on technical grounds does nothing to serve the citizens of Maryland who entrust this Court with original jurisdiction to review legislative districting plans.

Third, the Majority implies fault with the identifying columns used in the following section. *See* Maj. Slip Op. at 92. What it fails to appreciate is that the information used here is taken directly from that presented to the Special Magistrate. Any purported "omissions" in the charts below occur because that information is not part of the record of these cases. The data presented to the Special Magistrate does not include information concerning individuals identifying as more than one race, *see* Maj. Slip Op. at 95, or individuals identifying as "American Indian and Alaska Native Alone," and "Native Hawaiian and Other Pacific Islanders Alone." *See* Maj. Slip Op. at 95 n. 85. The Majority attempts to align the data in Exhibit F to data *not presented to the Special Magistrate*. In

93

doing so, the Majority makes the very point I do: the data offered to this Court is not the complete set of data that exists, nor is it easy for the public to determine the true demographics of the challenged districts. Put another way, the information presented to the Court is incomplete and frustrates our ability to complete adequate judicial review. On this alone, I would reject the plan.

Above all, at varying times throughout the duration of these cases, the publicly available data has fluctuated an alarming amount. Different maps appear over time, statistics produced in prior districting cycles are not existent using 2020 census information, and there is no fixed date to expect the same to be accessible. It is an abysmal failure. The lack of available information leaves the public uninformed as to the districting plan in effect for the three gubernatorial elections over the next decade.

*3.    Inconsistent Data by District*

A review of the challenged districts reveals that racial and ethnic data presented to the Special Magistrate does not match that kept by the Maryland Department of Planning. These inconsistencies undermine the validity of the plan; how can the public—or the Special Magistrate tasked with reviewing the plan for constitutionality—be confident that the districts are composed of the specified racial and ethnic groups if the existing data varies up to several thousand persons per category? Even more perplexing is the fact that, while the data is inconsistent with regard to White, Black, Asian, and Other populations, there is little to no deviation *at all* with regard to the Hispanic Origin population. Could reliable data be so precise as to one category, yet so far afield as to four others? The

Majority tacitly approves of these discrepancies and permits this fundamentally inconsistent data to provide the basis of approving the plan.

I will start with what does compute. The total adjusted population numbers contained in Exhibit F, the Department of Planning interactive map, and "Legislative Districts: Adjusted Population by Race and Hispanic Origin" Demographic Data Table[46] match perfectly in a district-by-district comparison. However, the district-by-district racial and ethnic breakdown in Exhibit F does not match that maintained by the Department of Planning. Because of these inconsistencies there can be no confidence in how the districts in the adopted plan are actually composed. The question is: which set of books is correct? Due to these inconsistencies alone, and the inability of the public to adequately evaluate reliable data showing the impact of these changes to their communities, I would reject the adopted plan as fundamentally flawed and lacking adequate public transparency.

a.    District 12

Subdistrict 12A has a total adjusted population of 86,473; Subdistrict 12B has a total adjusted population of 45,434. Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 12A.

---

[46]  *Maryland 2022 Legislative Districts (SJR 2)*, Md. Dep't of Planning, https://planning.maryland.gov/Redistricting/Documents/2020data/Leg/Legislative_total_ population.pdf, archived at https://perma.cc/9NQP-68WA.

*Subdistrict 12A Comparison*

| | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 51.51% | 26.52% | 8.85% | 16.21% | 1.61% |
| **Department of Planning** | 46.75% | 23.84% | 8.85% | 14.05% | 0.68% |
| **Difference** | 4.76% | 2.68% | 0.00% | 2.16% | 0.93% |

In Subdistrict 12A, the Department of Planning calculates the adjusted populations to be: 40,425 (White); 20,615 (Black); 7,656 (Hispanic Origin); 12,147 (Asian); and 592 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 44,452 (White); 22,932 (Black); 7,652 (Hispanic Origin); 14,017 (Asian); and 1,392 (Other).

Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 12B.

*Subdistrict 12B Comparison*

| | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 54.72% | 28.19% | 13.78% | 5.55% | 1.38% |
| **Department of Planning** | 49.69% | 25.38% | 13.78% | 4.51% | 0.50% |
| **Difference** | 5.03% | 2.81% | 0.00% | 1.04% | 0.88% |

In Subdistrict 12B, the Department of Planning calculates the adjusted populations to be: 22,577 (White); 11,533 (Black); 6,260 (Hispanic Origin); 2,050 (Asian); and 227

(Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 24,861 (White); 12,807 (Black); 6,260 (Hispanic Origin); 2,521 (Asian); and 626 (Other).

b.     District 21

District 21 has a total adjusted population of 133,497, which includes 15,633 residents of Anne Arundel County and 117,864 residents of Prince George's County.

Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in District 21.

*District 21 Comparison*

|  | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 34.22% | 31.75% | 23.00% | 12.74% | 1.54% |
| **Department of Planning** | 31.06% | 29.71% | 23.00% | 11.28% | 0.71% |
| **Difference** | 3.16% | 2.04% | 0.00% | 1.46% | 0.83% |

In District 21, the Department of Planning calculates the adjusted populations to be: 41,466 (White); 39,657 (Black); 30,701 (Hispanic Origin); 15,065 (Asian); and 944 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 45,682 (White); 42,385 (Black); 30,704 (Hispanic Origin); 17,007 (Asian); and 2,055 (Other).

c.      District 22

District 22 has a total adjusted population of 136,541. Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in District 22.

*District 22 Comparison*

|  | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 15.54% | 46.21% | 32.67% | 6.57% | 1.51% |
| **Department of Planning** | 13.47% | 44.20% | 32.67% | 5.68% | 0.67% |
| **Difference** | 2.07% | 2.01% | 0.00% | 0.89% | 0.84% |

In District 22, the Department of Planning calculates the adjusted populations to be: 18,376 (White); 60,308 (Black); 44,584 (Hispanic Origin); 7,748 (Asian); and 912 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 21,204 (White); 63,054 (Black); 44,578 (Hispanic Origin); 8,964 (Asian); and 2,060 (Other).

d.      District 23

District 23 has a total adjusted population of 135,983. Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in District 23.

*District 23 Comparison*

|  | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 20.66% | 68.00% | 8.72% | 4.53% | 1.43% |
| **Department of Planning** | 17.83% | 64.73% | 8.72% | 3.55% | 0.63% |
| **Difference** | 2.83% | 3.27% | 0.00% | 0.98% | 0.80% |

In District 23, the Department of Planning calculates the adjusted populations to be: 24,244 (White); 88,018 (Black); 11,856 (Hispanic Origin); 4,825 (Asian); and 851 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 28,094 (White); 92,468 (Black); 11,857 (Hispanic Origin); 6,160 (Asian); and 1,944 (Other).

e.    District 24

District 24 has a total adjusted population of 135,504. Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in District 24.

*District 24 Comparison*

|  | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 6.77% | 78.76% | 12.54% | 3.00% | 1.23% |
| **Department of Planning** | 5.16% | 76.16% | 12.54% | 2.42% | 0.51% |
| **Difference** | 1.61% | 2.60% | 0.00% | 0.58% | 0.72% |

In District 24, the Department of Planning calculates the adjusted populations to be: 6,997 (White); 103,195 (Black); 16,986 (Hispanic Origin); 3,273 (Asian); and 691 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 9,173 (White); 106,772 (Black); 16,992 (Hispanic Origin); 4,065 (Asian); and 1,666 (Other).

f.   District 27

District 27 has a total adjusted population of 136,291, with 30,333 residents of Charles County, 34,681 residents of Prince George's County and 71,277 residents of Calvert County. Subdistrict 27A has a total adjusted population of 45,471; subdistrict 27B has a total adjusted population of 45,304; subdistrict 27C has a total adjusted population of 45,516.

Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 27A.

*Subdistrict 27A Comparison*

|  | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 24.80% | 65.23% | 8.10% | 3.62% | 1.30% |
| **Department of Planning** | 21.47% | 61.58% | 8.10% | 2.69% | 0.65% |
| **Difference** | 3.33% | 3.65% | 0.00% | 0.93% | 0.65% |

In subdistrict 27A, the Department of Planning calculates the adjusted populations to be: 9,761 (White); 27,999 (Black); 3,684 (Hispanic Origin); 1,224 (Asian); and 295 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 11,276 (White); 29,660 (Black); 3,683 (Hispanic Origin); 1,646 (Asian); and 591 (Other).

Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 27B.

*Subdistrict 27B Comparison*

|  | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 55.12% | 37.73% | 6.09% | 3.17% | 1.46% |
| **Department of Planning** | 50.68% | 35.07% | 6.09% | 1.92% | 0.51% |
| **Difference** | 4.44% | 2.66% | 0.00% | 1.25% | 0.95% |

In subdistrict 27B, the Department of Planning calculates the adjusted populations to be: 22,961 (White); 15,886 (Black); 2,759 (Hispanic Origin); 869 (Asian); and 230

(Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 24,971 (White); 17,093 (Black); 2,759 (Hispanic Origin); 1,436 (Asian); and 661 (Other).

Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 27C.

*Subdistrict 27C Comparison*

| | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 79.43% | 15.61% | 4.31% | 2.98% | 1.53% |
| **Department of Planning** | 73.91% | 13.46% | 4.31% | 1.60% | 0.44% |
| **Difference** | 5.52% | 2.15% | 0.00% | 1.38% | 1.09% |

In subdistrict 27C, the Department of Planning calculates the adjusted populations to be: 33,642 (White); 6,126 (Black); 1,963 (Hispanic Origin); 728 (Asian); and 198 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 36,153 (White); 7,105 (Black); 1,961 (Hispanic Origin); 1,356 (Asian); and 696 (Other).

g.    District 33

Subdistrict 33A has a total adjusted population of 42,189; subdistrict 33B has a total adjusted population of 45,469; subdistrict 33C has a total adjusted population of 44,220.

Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 33A.

*Subdistrict 33A Comparison*

| | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 57.43% | 29.17% | 8.30% | 8.59% | 1.68% |
| **Department of Planning** | 51.64% | 26.17% | 8.30% | 6.29% | 0.67% |
| **Difference** | 5.79% | 3.00% | 0.00% | 2.30% | 1.01% |

In subdistrict 33A, the Department of Planning calculates the adjusted populations to be: 21,786 (White); 11,041 (Black); 3,502 (Hispanic Origin); 2,654 (Asian); and 282 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 24,229 (White); 12,306 (Black); 3,501 (Hispanic Origin); 3,624 (Asian); and 708 (Other).

Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 33B.

*Subdistrict 33B Comparison*

| | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 82.85% | 8.29% | 5.87% | 5.36% | 1.77% |
| **Department of Planning** | 77.68% | 6.83% | 5.87% | 3.45% | 0.50% |
| **Difference** | 5.17% | 1.46% | 0.00% | 1.91% | 1.27% |

In subdistrict 33B, the Department of Planning calculates the adjusted populations to be: 35,320 (White); 3,105 (Black); 2,668 (Hispanic Origin); 1,567 (Asian); and 229

(Other).  Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 37,671 (White); 3,769 (Black); 2,669 (Hispanic Origin); 2,437 (Asian); and 804 (Other).

Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 33C.

*Subdistrict 33C Comparison*

|  | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 85.32% | 6.10% | 6.03% | 4.94% | 1.62% |
| **Department of Planning** | 80.21% | 4.76% | 6.03% | 3.12% | 0.42% |
| **Difference** | 5.11% | 1.34% | 0.00% | 1.82% | 1.20% |

In subdistrict 33C, the Department of Planning calculates the adjusted populations to be: 35,469 (White); 2,105 (Black); 2,667 (Hispanic Origin); 1,380 (Asian); and 184 (Other).  Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 37,728 (White); 2,697 (Black); 2,666 (Hispanic Origin); 2,184 (Asian); and 716 (Other).

h.      District 47

Subdistrict 47A has a total adjusted population of 91,043; subdistrict 47B has a total adjusted population of 45,473.  Comparing the data in Exhibit F and materials maintained

by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 47A.

*Subdistrict 47A Comparison*

| | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 8.51% | 50.01% | 39.86% | 2.28% | 1.29% |
| **Department of Planning** | 7.03% | 47.99% | 39.86% | 1.76% | 0.57% |
| **Difference** | 1.48% | 2.02% | 0.00% | 0.52% | 0.72% |

In subdistrict 47A, the Department of Planning calculates the adjusted populations to be: 6,403 (White); 43,687 (Black); 36,292 (Hispanic Origin); 1,606 (Asian); and 515 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 7,747 (White); 45,530 (Black); 36,289 (Hispanic Origin); 2,075 (Asian); and 1,174 (Other).

Comparing the data in Exhibit F and materials maintained by the Department of Planning, the following chart illustrates discrepancies in Subdistrict 47B.

| | Percentage of Total Adjusted Population: White | Percentage of Total Adjusted Population: Black | Percentage of Total Adjusted Population: Hispanic Origin | Percentage of Total Adjusted Population: Asian | Percentage of Total Adjusted Population: Other |
|---|---|---|---|---|---|
| **Exhibit F** | 5.42% | 23.44% | 67.70% | 3.61% | 1.03% |
| **Department of Planning** | 4.55% | 22.30% | 67.70% | 3.27% | 0.55% |
| **Difference** | 0.87% | 1.14% | 0.00% | 0.34% | 0.48% |

In subdistrict 47B, the Department of Planning calculates the adjusted populations to be: 2,069 (White); 10,141 (Black); 30,786 (Hispanic Origin); 1,485 (Asian); and 250 (Other). Multiplying the total adjusted population times the percentages attributable to each racial and ethnic group in Exhibit F produces different results: 2,464 (White); 10,658 (Black); 30,785 (Hispanic Origin); 1,641 (Asian); and 468 (Other).

*4.        Unexplained Population Inconsistencies Cannot Support the Plan*

Because of these inconsistencies, there can be no confidence in how these districts are actually composed. Neither the Court nor the public can be assured that the districts in the adopted plan pass muster when it comes to the federal districting requirements. I would, therefore, reject the plan.

***F.        Other Challenges to the Plan[47]***

In Misc. No. 27, Petitioner Seth E. Wilson challenges the plan on the basis that District 2A, a two-member Delegate district, should be divided into two single-member

---

[47] I agree with the disposition of Petitioner David Whitney's challenge to the plan in Misc. No. 24. *See* Maj. Slip Op. at 39. I also agree that the Misc. No. 26 Petitioners' argument

Delegate districts for a total of three single-member Delegate districts in District 2. In discussing District 33, I provided a full explanation of the General Assembly's policy regarding single-member Delegate districts. *Supra*, at 52–55.

The ideal population size for a single-member Delegate district is 43,797, whereas the ideal population size for a multi-member Delegate district with two Delegates is 87,594. District 2A has a total adjusted population of 84,500, with 15,757 Frederick County residents and 68,743 Washington County residents. Where a county boundary crossing occurs with a substantial population compared to what is considered to be the "ideal" population size for a single-member Delegate district, historically the policy has been to create two single-member districts rather than a multi-member district with two delegates.

The Majority expresses an apparent preference stating "Mr. Wilson's preference for three single-member districts instead of one single-member district and one two-member district might well be our preference as well if the task of drawing the districts were assigned to this Court[,]" but that Mr. Wilson did not present compelling evidence that District 2A, as drawn in the adopted plan, violates any federal or state constitutional criteria. Maj. Slip Op. at 110.

I would grant Mr. Wilson's petition. I question whether the Democratic Performance Index is at play in District 2 because of the configuration. Based upon our concerns over the Democratic Performance Index, I would require the State to provide

is correctly denied. The mixed use of single-member and multi-member districts is not clearly unconstitutional under Article III, § 3 as it exists today.

107

"sufficient evidence" that other Article III, § 4 criteria required the construction of District 2 as drawn.

**CONCLUSION**

As Senate President James once said, expecting the General Assembly to design a "fair legislative apportionment [is] a task beyond the capacity of legislators." *Supra*, at 9. That is why is this Court is given original jurisdiction and a heightened responsibility to protect Maryland's voters. Even in an age before the sophistication of computer mapping programs and voter microtargeting, Senate President James was correct.

The permanency of harms attendant to extreme partisan gerrymandering have caused one former architect of a Maryland gerrymander to rethink how districting should proceed. Former Governor Martin O'Malley, in a Boston College School of Law lecture, advocated for the end of gerrymandering and partisan redistricting commissions. *See* O'Malley Sees the Light on Redistricting, Balt. Sun., Feb. 13, 2017, https://www.baltimoresun.com/opinion/editorial/bs-ed-omalley-redistricting-20170213-story.html, archived at, https://perma.cc/9UCM-LSC2. Once the lone individual in the State who "held that redistricting pen in [his] own Democratic hand," Governor O'Malley recognized the very point I make here: the districting process of this cycle and future cycles—"combined with big data, geographic information systems, and microtargeting of precinct by precinct voting trends"—progressively weakens the democratic institutions of this State and country. Voters deserve fair districts and the opportunity to elect representatives of their choice.

108

The Attorney General, hiding behind the legislature's assertion of legislative privilege, offers little to rebut the apparent constitutional infirmities in the plan. And, for the first time in our districting jurisprudence, a narrow Majority of this Court sustains the General Assembly's assertion of legislative privilege over the process used in determining the boundaries for the state legislative districts. This undoubtedly obscures the once transparent nature of this decennial exercise and grievously constrains this Court's ability to independently assess the constitutionality of this and future districting plans.

In the simplest of terms, Petitioners established "compelling evidence" that several districts in the enacted plan are not "compact in form," as required by Article III, § 4. I would sustain certain of Petitioners' exceptions, as outlined *supra*, and require the State to elaborate on the constitutional and other criteria that caused each noncompact district's creation. Moreover, Petitioners established "compelling evidence" that District 27 lacks due regard for the boundaries of political subdivisions. I would likewise require the State to explain the constitutional and other criteria that offset the violations of compactness and due regard in the specified districts, *supra*.

\*　　\*　　\*

If, upon review of a challenged plan, this Court finds "constitutionally impermissible" deviations, there is "but one choice: declare the plan unconstitutional and void." *2002 Districting*, 370 Md. at 322. The Majority fails to do so.

I would rescind this Court's April 13, 2022 Order and issue a new order with the following effect: "Given the imminence of the election and the inadequate time to resolve the factual disputes," *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam), I would

order that the 2022 General Election proceed under the adopted plan and that those districts remain in effect for the term of four years. However, given the above, I would declare the plan void and require the General Assembly to prepare a new legislative districting plan for use in the elections of 2026 and 2030, subject to review under the original jurisdiction of this Court.

Since 1783, this Court has displayed as its seal a design created by Annapolis silversmith Thomas Sparrow. The primary symbols on this seal are the scales of justice and a five-pointed star with a circle of light emanating from the star. The iconography of our Court's seal is straightforward and represents our judicial goals as Maryland's court of last resort. The scales of justice represent fairness and carefully balancing the judicial review, weighing all sides of the matter before us. The star carries connotations of seeking knowledge and truth while shining a light on the facts under consideration. Reviewing these Petitions, on a matter of utmost importance to the preservation of democracy in Maryland and protecting the public's right to know, we failed in achieving those goals. In this failure, we allow the light embodied by the shining star to be eclipsed by legislative privilege and the scales of justice to be tipped unfairly in the 2022 districting of the State.

For the aforementioned reasons, I respectfully dissent.

Judge Biran and Judge Gould have authorized me to state that they join in this Opinion.

110